UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| PEOPLEFLO MANUFACTURING, INC., <br><br> Plaintiff, <br><br> v. <br><br> SUNDYNE, LLC, et al., <br><br> Defendants. | No. 20 CV 3642 <br><br> Judge Manish S. Shah |

MEMORANDUM OPINION AND ORDER

When PeopleFlo Manufacturing, Inc., developed a novel sealless pump design, it sought a large industry partner to help bring the technology to market. It pitched the technology to manufacturer Sundyne, LLC, and its affiliate Accudyne, LLC (under cover of non-disclosure agreements), but they ultimately passed on a deal. PeopleFlo then picked up negotiations with distributor DXP Enterprises Inc., and its manufacturer subsidiary, PumpWorks, LLC. DXP and Sundyne had a pre-existing supply and distribution relationship, but DXP assured PeopleFlo that Sundyne had no objection to DXP or PumpWorks pursuing their own deal with PeopleFlo. PumpWorks and PeopleFlo later contracted to bring the sealless pumps to market.

PeopleFlo says PumpWorks did not uphold its end of the bargain, DXP and Sundyne sabotaged the deal, and Accudyne and Sundyne misappropriated trade secrets to develop and market a competing product. PeopleFlo sues all four companies, bringing several claims under Illinois law. Relevant here are its fraud claims against DXP and PumpWorks, and its breach of contract and trade-secret

misappropriation claims against Sundyne and Accudyne. Defendants move to dismiss under Rule 12(b)(6). For the reasons below, the DXP/PumpWorks motion is granted, but Sundyne's and Accudyne's motions are denied.

### I. Legal Standards

A complaint must contain a short and plain statement that plausibly suggests a right to relief. Fed. R. Civ. P. 8(a)(2); *Ashcroft v. Iqbal*, 556 U.S. 662, 677–78 (2009). To survive a Rule 12(b)(6) motion, plaintiff must allege facts that "raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). I accept all factual allegations as true and draw all reasonable inferences in plaintiff's favor, but I disregard legal conclusions or "threadbare recitals" supported by only "conclusory statements." *Iqbal*, 556 U.S. at 678. Allegations of fraud require more. A party must "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). In other words, plaintiff must describe the "who, what, when, where, and how" of the fraud. *See Muskegan Hotels, LLC v. Patel*, 986 F.3d 692, 698 (7th Cir. 2021).

### II. Facts

#### A. Negotiations for PeopleFlo's Sealless Pump Technology

PeopleFlo designed and engineered pump technology for pump-equipment manufacturers and other end users. [77] ¶ 7.[1] This case is about its efforts to bring its patented, magnetically coupled sealless pump technology to market. *Id.* ¶ 1.

---

[1] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are taken from the CM/ECF header placed at the top of filings. Facts are taken from the first amended complaint, [77].

In 2012, pump-manufacturer Sundyne (and shortly thereafter, its affiliate Accudyne) began negotiations regarding PeopleFlo's sealless pump technology. *Id*. ¶¶ 8–10, 18. PeopleFlo disclosed to Sundyne and Accudyne—after executing separate non-disclosure agreements—details regarding its commercial plans and market concept, intellectual property, confidential information, and trade-secret information. *Id*. ¶¶ 21–22. Sundyne executed an NDA with PeopleFlo in February 2012, and Accudyne executed an NDA with PeopleFlo in April 2014. *Id*. ¶¶ 20–24; [77-2] at 2.[2]

Under the NDAs, Sundyne and Accudyne agreed not to disclose any confidential information provided by PeopleFlo without prior written consent; they also agreed not to use any of PeopleFlo's confidential information other than to evaluate their potential business relationship with PeopleFlo. [77] ¶¶ 25–26. The agreements defined "confidential information" to include:

> any and all financial, technical, commercial or other information concerning the business and affairs of [PeopleFlo], including business plans, financial information, lists of customers, vendors or employees, marketing techniques, strategies and developments, computer software, methods of operation, and all notes, analyses, compilations, studies or other materials derivative of any of the foregoing (including, without limitation, all retrievable information in any computer storage format), or any information which a reasonable person would consider confidential, which has been or may hereafter be provided or shown to Receiving Party or any of its Representatives, irrespective of the form of the communication, by [PeopleFlo] or by its Representatives, and also includes all notes, analyses, compilations, studies or other material prepared by Receiving Party or its Representatives containing or based on, in whole or in part, any information provided or shown by [PeopleFlo] or by its Representatives.

---

[2] PeopleFlo alleges in the complaint that Sundyne executed the NDA "on or about February 11, 2013." [77] ¶ 23. PeopleFlo attached the actual agreement to its complaint, however, which indicates that the agreement was "entered into as of 10 Feb 12." [77-2] at 2.

3

*Id.* ¶ 27. Sundyne and Accudyne further agreed that PeopleFlo would remain the owner of all intellectual property rights in the confidential information, including any inventions, modifications, or improvements Sundyne or Accudyne made based on such information. *Id.* ¶ 28. The NDAs covered all communications between the parties, but each party could opt out of future confidential discussions by providing notice to the other party. *Id.* ¶ 29. Confidential information disclosed under the agreements would remain protected for five years after the last disclosure of confidential information (except trade secrets, which would remain confidential until no longer legally a trade secret). *Id.* After executing the NDAs, PeopleFlo shared highly confidential and commercially sensitive information with Sundyne and Accudyne between 2014 and 2018. *Id.* ¶¶ 30, 132.

By March 2017, as PeopleFlo and Sundyne neared a deal, Sundyne confirmed that PeopleFlo's technology represented a new product design for a new market segment that would not be competitive with any of Sundyne's existing sealless pump product lines. *Id.* ¶¶ 31–32. A few months later, Accudyne Vice President Peter Johansson met with PeopleFlo CEO Bill Blankemeier to discuss and review a deal for PeopleFlo's pump technology. *Id.* ¶¶ 33–34. Johansson and Sundyne representatives agreed with the deal's valuation, and Johansson provided Blankemeier guidance on how to structure the transaction to obtain approval from Sundyne. *Id.* ¶¶ 35–36.

During roughly the same period, PeopleFlo also engaged in separate negotiations with distributor DXP and manufacturer PumpWorks. *Id.* ¶¶ 37–40. In late 2014, top executives from DXP and PumpWorks (DXP's subsidiary) visited

4

PeopleFlo's facilities to learn more about its sealless pump technology. *Id.* ¶¶ 11–13, 38. DXP and PumpWorks remained interested in the technology for years, especially after PeopleFlo designed its sealless pumps to be integrated into an existing PumpWorks product. *Id.* ¶ 40. Although DXP had a pre-existing relationship with Sundyne (which supplied several product lines that DXP distributed), both companies acknowledged that Sundyne's pump products were not competitive with PeopleFlo's new product line. *Id.* ¶¶ 41–42. Still, PumpWorks and DXP sought to ensure that Sundyne would not object if they negotiated or made a deal with PeopleFlo. *Id.* ¶ 43.

In September 2017, DXP and PumpWorks representatives met with Sundyne to discuss PumpWorks's potential use of PeopleFlo's technology. *Id.* ¶¶ 45–48. During the meeting, Sundyne revealed to DXP and PumpWorks that it too was involved in ongoing negotiations with PeopleFlo regarding the same pump technology. *Id.* ¶ 49. DXP, PumpWorks, and Sundyne decided that Sundyne would have the right of first refusal with respect to any deal for PeopleFlo's sealless pump technology. *Id.* ¶ 50.

The next month, Accudyne and Sundyne representatives met with PeopleFlo at its Franklin Park, Illinois facility. *Id.* ¶ 51. PeopleFlo shared and demonstrated its advanced manufacturing intellectual property, tailored to pump manufacture. *Id.* ¶ 53. By the end of the meeting, the representatives told PeopleFlo that they would be presenting the pump-technology deal to their boards in mid-November for final approval. *Id.* ¶¶ 51, 54. Sundyne's board passed on the deal in November 2017. *Id.* ¶¶ 57–58. PeopleFlo nevertheless continued its discussions with Sundyne and

Accudyne representatives into 2018 and continued disclosing trade secrets and confidential information regarding its pump technology. *Id.* ¶ 132.

> **B.** **The Deal Between PeopleFlo and PumpWorks**

DXP and PumpWorks learned of Sundyne's decision to pass on the deal the same day and immediately resumed negotiations with PeopleFlo. *Id.* ¶¶ 60, 66–67. In a late-November 2017 phone call, PumpWorks Vice President Trey Maxwell told Blankemeier that Sundyne had provided its "blessing" and "had no objection to" DXP and PumpWorks entering their own deal to bring PeopleFlo's technology to market. *Id.* ¶¶ 61, 212. DXP and PumpWorks representatives Skip Giessing and Mark Smith "further communicated about and confirmed this blessing after November 2017." *Id.* ¶¶ 62, 213. Sundyne has said (in this litigation) that it did not provide its blessing, and PeopleFlo alleges that Maxwell's statement was knowingly false. *Id.* ¶¶ 210, 212. PeopleFlo relied on these representations in moving forward with the PumpWorks and DXP negotiations and, ultimately, entering an agreement and investing significant time and money in development and engineering costs. *Id.* ¶¶ 64, 215.

In late March 2018, after months of negotiations, PeopleFlo and PumpWorks entered a multi-year agreement to bring PeopleFlo's pump technology to market. *Id.* ¶ 68. PeopleFlo agreed to design, manufacture, and supply custom magnetic coupling units for integration into PumpWorks's existing pump products using the sealless pump technology. *Id.* ¶¶ 70–71. This enabled PumpWorks to launch a new product line. *Id.* ¶ 80. PumpWorks agreed to use its best efforts to promote the sale and use of the coupling units in connection with the new product line. *Id.* ¶¶ 76–77.

## C. PeopleFlo's Allegations of Wrongdoing

PeopleFlo met its obligations under the agreement, but PumpWorks delayed the launch of the new product line without reasonable explanation. *Id.* ¶ 81. Just over a year after signing the deal, a DXP representative told PeopleFlo that Sundyne was to blame for the ongoing delay; according to the representative, Sundyne had used PeopleFlo's pump design and target-market concept to design a competing product. *Id.* ¶¶ 82–84. The complaint alleges that Sundyne and Accudyne violated their NDAs and misappropriated PeopleFlo's trade secrets to redesign, enhance, and market Sundyne's new pump products. *Id.* ¶¶ 132, 137–38, 186. The alleged misappropriated trade secrets included: (1) technical and financial information, design specifications, marketing strategy and other features relating to the bushings incorporated into PeopleFlo's pump technology; (2) those same categories, along with pricing information and cost-reduction strategies and methods, relating to PeopleFlo's PEEK carbon fiber shell technology and secondary containment technology; (3) pricing and cost structures and models, processes, and marketing strategies associated with achieving cost reductions in the design and production of magnetically coupled sealless pumps; (4) the identities of non-publicly available suppliers and vendors that PeopleFlo engaged to achieve cost reductions in the components and design features associated with its sealless pump technology; and (5) marketing plans and strategies that enable sealless pumps to compete with single-sealed pumps in mainstream markets. *Id.* ¶¶ 142, 184.

PeopleFlo later learned that DXP Vice President Jim Hook knew about Sundyne's plan to develop a product that would potentially compete with PeopleFlo's sealless pumps. *Id.* ¶ 87. In June 2019, Hook assured PeopleFlo's Blankemeier that "Sundyne was not working on a competing product or any products using PeopleFlo's concept or [pump technology]." *Id.* ¶¶ 88, 216. PeopleFlo relied on Hook's assurances in continuing to work with PumpWorks and DXP regarding the development of the pump technology. *Id.* ¶¶ 89, 219. Hook knew that the statements were false—he had recently visited Sundyne's United Kingdom facility and observed its new product line that used PeopleFlo's concept, confidential information, and trade secrets. *Id.* ¶¶ 91, 218. DXP also required PumpWorks to delay the launch of its new product line to help boost the launch of Sundyne's competing sealless product line. *Id.* ¶ 90.

PumpWorks launched its new product line in late August 2019, but within a week, it abandoned most marketing, sales, and distribution efforts. *Id.* ¶¶ 95–97. PeopleFlo alleges that PumpWorks conspired with DXP and Sundyne to breach its agreement with PeopleFlo by substantially abandoning all marketing, distribution, and sales of the new product line in areas where DXP distributed Sundyne's sealless pumps. *See id.* ¶¶ 98–131.

PeopleFlo brings: breach of contract claims against PumpWorks (Count I) and Sundyne and Accudyne (Count IV); tortious interference claims against Sundyne (Counts II & III) and DXP (Counts VI & VII); trade-secret misappropriation claims against Sundyne and Accudyne (Count V); civil conspiracy claims against PumpWorks, DXP, and Sundyne (Count VIII); and fraud claims against PumpWorks

8

and DXP (Count IX).[3] DXP and PumpWorks move to dismiss the fraud claims (Count IX), *see* [79], and Sundyne and Accudyne move to dismiss the breach of contract and trade-secret claims (Counts IV & V), *see* [82], [94].

### III. Analysis

#### A. Fraud (DXP and PumpWorks)

A plaintiff alleging fraudulent inducement must show: (1) a false statement of material fact; (2) knowledge or belief by defendant that the statement was false; (3) an intention to induce plaintiff to act; (4) reasonable reliance upon the truth of the statement by plaintiff; and (5) damages. *See Smart Oil, LLC v. DW Mazel, LLC*, 970 F.3d 856, 866 (7th Cir. 2020).[4] Reliance upon a false statement must be justified. *See Cozzi Iron & Metal, Inc. v. U.S. Off. Equip., Inc.*, 250 F.3d 570, 574 (7th Cir. 2001) (citing *Charles Hester Enters., Inc. v. Illinois Founders Ins. Co.*, 114 Ill.2d 278 (1986)). In assessing the reasonableness (*i.e.*, justifiability) of reliance, "all facts known to the plaintiff and those facts plaintiff could have learned through the exercise of ordinary prudence must be taken into account." *Ringgold Cap. IV, LLC v. Finley*, 2013 IL App (1st) 121702, ¶ 37. Justifiable reliance is ordinarily a question of fact but can be determined as a matter of law when only one conclusion can be drawn from the facts. *See Siegel Dev., LLC v. Peak Const. LLC*, 2013 IL App (1st) 111973, ¶ 114; *see also Cozzi Iron & Metal*, 250 F.3d at 574.

---

[3] The court has subject-matter jurisdiction under 28 U.S.C. § 1332. The amount in controversy exceeds $75,000, PeopleFlo is a citizen of Illinois, Sundyne is a citizen of the United Kingdom, DXP is a citizen of Texas, PumpWorks is a citizen of Delaware and Texas, and Accudyne is a citizen of Delaware and North Carolina. [1] ¶¶ 7–10, 13–20; [112].

[4] PeopleFlo has clarified that it does not attempt to allege promissory fraud. [97] at 11–12.

A party "is justified in relying upon the representations of another, without independent investigation, where the person to whom the representations are made does not have the same ability to discover the truth as the person making the representations." *Gerill Corp. v. Jack L. Hargrove Builders, Inc.*, 128 Ill.2d 179, 195 (1989). Reliance is not justified, on the other hand, when a plaintiff "has ample opportunity to ascertain the truth of the representations before he acts." *Davis v. G.N. Mortg. Corp.*, 396 F.3d 869, 882 (7th Cir. 2005) (quoting *Elipas Enterprises, Inc. v. Silverstein*, 243 Ill.App.3d 230, 237 (1st Dist. 1993)).

PeopleFlo premises its fraud claims on two statements.[5] First, Maxwell's 2017 statement to Blankemeier that Sundyne provided its "blessing" and "would not object to" or "had no objection to" PumpWorks and DXP pursuing a deal to bring PeopleFlo's pump technology to market.[6] PeopleFlo asserts that Maxwell knew that Sundyne had not provided such assurances, that he misrepresented this material fact to induce PeopleFlo to enter the PumpWorks agreement, and that PeopleFlo detrimentally relied when it continued to negotiate and later entered the agreement. *See* [97] at 5.

---

[5] Giessing's and Smith's alleged communications cannot sustain a fraud claim under Rule 9(b). The complaint alleges that Smith and Giessing "further communicated about and confirmed this blessing after November 2017." [77] ¶¶ 62, 213. Even assuming this sufficiently pleads what Smith and Giessing said, the complaint fails to allege with the requisite particularity who they communicated with, and how, when, or where the communications occurred.

[6] The complaint characterizes Maxwell's November 2017 statement in different ways. *Compare* [77] ¶ 61 (Sundyne "would not object to DXP and/or PumpWorks entering into their own deal"), *with id.* ¶ 212 ("Sundyne had no objection to DXP and PumpWorks engaging in a deal with PeopleFlo."). PeopleFlo's fraud claim, however, is against DXP and PumpWorks and based on Maxwell's knowingly false confirmation of Sundyne's blessing. The tense in which Sundyne phrased the blessing is not material because PeopleFlo's fraud allegations are a step further down the chain. The question here is whether Maxwell knew that Sundyne had provided no blessing at all when he spoke to Blankemeier.

Second, PeopleFlo points to Jim Hook's 2019 statement assuring Blankemeier that "Sundyne was not working on a competing product or any products using PeopleFlo's concept or sealless pump technology." *Id*. PeopleFlo argues that it reasonably and detrimentally relied on Hook's false statement by continuing to work with PumpWorks and DXP on the development of the sealless pump technology. *Id*. at 6.

Neither statement is actionable for fraud here. As a preliminary matter, the complaint's allegation that Maxwell's statement was knowingly false is directly contradicted by other facts in the complaint. Maxwell told Blankemeier of Sundyne's blessing in a late-November 2017 call, not more than two weeks after Sundyne and Accudyne informed PeopleFlo that they would not be moving forward with a deal of their own. [77] ¶¶ 57, 61. PeopleFlo's allegation that Maxwell's representation was knowingly false conflicts with the complaint's allegation that defendants agreed in September 2017 that Sundyne would have "the right of first refusal with respect to engaging a deal" for the pump technology. *Id*. ¶ 50. The alleged agreement between defendants suggests that once Sundyne stepped back from negotiations with PeopleFlo, other defendants had the green light to proceed.

Setting these contradictions to the side and assuming the falsity of Maxwell's statements, the fraud claim still fails because PeopleFlo has not alleged justifiable reliance on Maxwell's statement. According to the complaint's allegations, PeopleFlo had both time and opportunity to investigate the veracity of Maxwell's claims. After Maxwell made his statement, PeopleFlo and PumpWorks engaged in "months of negotiations" before entering a multi-year contract in March 2018. *Id*. ¶ 68. If

11

Sundyne's blessing was so critical to PeopleFlo's decision to move forward and sign the PumpWorks deal, it easily could have sought verification from Sundyne. Recall that PeopleFlo continued to engage in discussions with Sundyne representatives into 2018. *See id.* ¶¶ 30, 132. PeopleFlo thus had both ample time (four months) and opportunity (continued access to Sundyne) to ascertain the truth of Maxwell's representations before entering the contract. Because it failed to do so, PeopleFlo's reliance on Maxwell's statements was unjustified. *See Metro. Cap. Bank & Tr. v. Feiner*, 2020 IL App (1st) 190895, ¶ 47 ("Where parties 'have equal knowledge or means of obtaining knowledge of the misrepresented facts,' a plaintiff's reliance on a defendant's material misrepresentation is only justifiable where the defendant 'has created a false sense of security or blocked further inquiry,' and where 'the facts were not such as to put a reasonable person on inquiry.'" (quoting *Hassan v. Yusuf*, 408 Ill.App.3d 327, 350 (1st Dist. 2011))).

PeopleFlo has also failed to plead any detrimental reliance or damage stemming from Hook's false statement. Hook told PeopleFlo that Sundyne was not working on a competing product or any products using PeopleFlo's concept or technology. PeopleFlo says it relied on these assurances in continuing to work with PumpWorks and DXP regarding the development of the sealless pump technology. [77] ¶ 219. Yet Hook made this statement over a year after PumpWorks and PeopleFlo entered their agreement, which bound PeopleFlo to work with PumpWorks to develop and bring to market the sealless pump technology. No matter what Hook told PeopleFlo about Sundyne's activities, PeopleFlo would have remained bound by

12

its contract with PumpWorks. Put another way, if Hook had told PeopleFlo that Sundyne had been using its concept or technology or working on a competitive product, PeopleFlo would have still been obligated, under its contract, to continue working with PumpWorks. PeopleFlo has not alleged detrimental reliance or harm caused by Hook's statements.

Count IX is dismissed.

### B.    Trade Secret Misappropriation (Sundyne and Accudyne)

Sundyne and Accudyne move to dismiss the trade-secret misappropriation claims (Count V). To prove misappropriation under the Illinois Trade Secrets Act, 765 ILCS 1065/1 *et seq.*, PeopleFlo must show: "(1) a trade secret existed; (2) the secret was misappropriated through improper acquisition, disclosure, or use; and (3) the owner of the trade secret was damaged by the misappropriation." *Nat'l Tractor Parts Inc. v. Caterpillar Logistics Inc.*, 2020 IL App (2d) 181056, ¶ 40 (quoting *Liebert Corp. v. Mazur*, 357 Ill.App.3d 265, 281 (1st. Dist. 2005)). The Act defines a "trade secret" as information that: "(1) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality." 765 ILCS 1065/2(d). Whether a trade secret exists "ordinarily is a question of fact" that is "best 'resolved by a fact finder after full presentation of evidence from each side.'" *Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*, 342 F.3d 714, 723 (7th Cir. 2003) (quoting *Lear Siegler, Inc. v. Ark–Ell Springs, Inc.*, 569 F.2d 286, 289 (5th Cir. 1978)).

13

Defendants argue that PeopleFlo has failed to identify its trade secrets with enough specificity, that its alleged secrets are not trade secrets due to disclosure in a patent, and that it has failed to allege misappropriation.

PeopleFlo has alleged sufficiently specific trade secrets. At the pleading stage, the complaint "can describe trade secret information in general terms." *Gen. Elec. Co. v. Uptake Techs., Inc.*, 394 F.Supp.3d 815, 831 (N.D. Ill. 2019); *see also Covenant Aviation Sec. v. Berry*, 15 F.Supp.3d 813, 818 (N.D. Ill. 2014) (collecting cases). Defendants focus on the generic categories of information PeopleFlo identifies (technical and financial information, design specifications, marketing strategy, pricing and cost strategies, and lists of vendors) and argue that PeopleFlo is simply reciting the types of information listed in the statute. *See* 765 ILCS 1065(d).

But PeopleFlo does more than just list these broad categories. It instead ties them to specific aspects of its technology or marketing strategy, including the bushings, PEEK carbon fiber shell technology, and secondary containment technology that it incorporated into its sealless pumps. PeopleFlo alleges secrets regarding cost-reduction strategies, marketing, and non-public vendors and suppliers, but only as they relate to the sealless pumps. PeopleFlo also alleges steps that it took to protect its trade secrets, including disclosing such information for business purposes only after executing NDAs, storing the information in a locked facility, and keeping electronic forms of secret information on a secure server with password protection. [77] ¶ 133. To ultimately prevail in its trade-secret claims, PeopleFlo will need evidence showing how Sundyne and Accudyne misappropriated

14

concrete secrets that derive economic value from not being public. *See* 765 ILCS 1065(d); *Composite Marine Propellers, Inc. v. Van Der Woude*, 962 F.2d 1263, 1266 (7th Cir. 1992). PeopleFlo's description of its trade secrets at this stage, however, is sufficiently specific to put defendants on notice and to survive dismissal.[7]

Defendants next argue that because PeopleFlo patented its sealless pump design in 2019, PeopleFlo's alleged trade secrets were public information. *Cf. BondPro Corp. v. Siemens Power Generation, Inc.*, 463 F.3d 702, 706 (7th Cir. 2006) ("A trade secret that becomes public knowledge is no longer a trade secret … [and] [p]ublication in a patent destroys the trade secret."); *see also Rototron Corp. v. Lake Shore Burial Vault Co.*, 712 F.2d 1214, 1215 (7th Cir. 1983) (patented process cannot be regarded as a trade secret, "because the grant of a patent automatically constitutes full disclosure of the patented process"). The patent, Sundyne further argues, also claimed the specific subparts of the design central to PeopleFlo's trade-secret allegations—the bushings, PEEK carbon fibers, and secondary containment shell.

But PeopleFlo does not allege secrecy in the patented design or its subparts. The patent says nothing about the financial information, marketing, pricing, cost strategies, and lists of vendors related to some parts of the design. That information, according to the complaint, remained secret and could not be gleaned from a search of public records. *See 3M v. Pribyl*, 259 F.3d 587, 595–96 (7th Cir. 2001) ("A trade

---

[7] Sundyne argues that I should "require more of PeopleFlo" because the parties have been litigating for nearly a year, engaged in some discovery, and PeopleFlo has not refined its trade-secret allegations. [104] at 2–4. But under Rule 12(b)(6), the allegations in the amended complaint control, and I do not consider external litigation facts.

secret can exist in a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process, design and operation of which, in unique combination, affords a competitive advantage and is a protectable secret."); *Syntex Ophthalmics, Inc. v. Tsuetaki*, 701 F.2d 677, 684 (7th Cir. 1983) ("[A] trade secret can be comprised of both public and novel information."). The patent does not preclude PeopleFlo from holding the trade secrets it alleges.

Finally, PeopleFlo adequately alleges misappropriation. Misappropriation means "the unauthorized acquisition, disclosure, or use of a trade secret by a person who knows or has reason to know that the secret was improperly acquired." *J.S.T. Corp. v. Foxconn Interconnect Tech. Ltd.*, 965 F.3d 571, 576–77 (7th Cir. 2020) (citing 765 ILCS 1065/2(b)). PeopleFlo adequately alleges unauthorized use. The complaint asserts that both Sundyne and Accudyne obtained access to its trade secrets under the cover of NDAs, agreed that they would not use PeopleFlo's confidential information and trade secrets other than to evaluate the business relationship, and then used PeopleFlo's trade secrets to develop and market Sundyne's competing pump products. *See* [77] ¶¶ 21, 26, 90, 137–38, 142–43, 186. In discovery, PeopleFlo may need to be more specific about how Sundyne and Accudyne misappropriated its secrets through incorporation into Sundyne's products and marketing before subjecting defendants to overbroad search parameters. But its allegations, taken as true, raise a plausible inference of misappropriation. Accudyne and Sundyne have sufficient notice of what PeopleFlo intends to prove—that both knew or had reason to know that their use of PeopleFlo's trade secrets was not authorized.

### C. Breach of Contract (Sundyne and Accudyne)

Sundyne and Accudyne also move to dismiss PeopleFlo's breach of contract claims, arguing that the NDAs are unenforceable. In Illinois, confidentiality agreements are restrictive covenants, and their enforceability is a question of law. *See Coady v. Harpo, Inc.*, 308 Ill.App.3d 153, 159 (1st Dist. 1999) (quoting *Woodfield Group, Inc. v. DeLisle*, 295 Ill.App.3d 935, 938 (1st Dist. 1998)). The test is reasonableness, though business-to-business contracts are analyzed less stringently than employment contracts because businesses negotiating at arm's length hold more bargaining power than typical employees. *See Arcor, Inc. v. Haas*, 363 Ill.App.3d 396, 404 (1st Dist. 2005); *see also ExactLogix, Inc. v. JobProgress*, LLC, 508 F.Supp.3d 254, 276 (N.D. Ill. 2020). In general, a restrictive covenant is reasonable if it does not injure the public, cause undue hardship to the promisor, and the restraint imposed is no greater than necessary to protect the promisee's legitimate business interests. *See Reliable Fire Equip. Co. v. Arredondo*, 2011 IL 111871, ¶ 17; *Coady*, 308 Ill.App.3d at 161. While Illinois law disfavors restrictive covenants that inhibit trade, courts must remain mindful that "[a]n equally important public policy in Illinois is the freedom to contract." *See Prairie Eye Ctr., Ltd. v. Butler*, 305 Ill.App.3d 442, 448 (4th Dist. 1999). Defendants argue that the NDAs they signed are unreasonable because the agreements lack time or geographic limitation, and because they are overbroad.

Confidentiality agreements are not unenforceable in Illinois "for lack of durational or geographic limitations where trade secrets and confidential information are involved." *Coady*, 308 Ill.App.3d at 161 (citing *PepsiCo, Inc. v. Redmond*, 54 F.3d

17

1262, 1272 n.10 (7th Cir. 1995)). While the NDAs at issue do not identify a specific end date, they do include some time limits. Defendants may disclose confidential information five years after PeopleFlo's final disclosure of such information. More importantly, the contracts provide an escape hatch: either party can end confidential negotiations by providing notice to the other.

And although the agreements contain no geographic limits, that is perfectly sensible in this context. While imposing geographic limits make sense in the context of employment agreements (to prevent tying up human capital), applying such limits to contracts restricting "the use of particular information between businesses that have vertical (supplier-to-customer) rather than horizontal (competitor-to-competitor) relations" makes little sense. *See IDX Sys. Corp. v. Epic Sys. Corp.*, 285 F.3d 581, 585–86 (7th Cir. 2002).[8] As such, defendants' reliance on Illinois decisions involving employment-based restrictive covenants is inapt. They have not cited, and I am not aware of, any Illinois decision requiring durational or geographic limits as a condition to enforce a non-disclosure agreement between businesses regarding intellectual property.

That leaves defendants' argument that the NDAs are unenforceable because their scope is unlimited. The agreements are certainly broad, applying "without limitation" to disclosure of "any and all financial, technical, commercial or other

---

[8] Sundyne points out that *IDX* is a case applying Wisconsin law. While *IDX* does not control on questions of Illinois law, its reasoning on the geographic-limits issue is equally persuasive when applied to the NDAs here. It is also consistent with Illinois law. *See Coady*, 308 Ill.App.3d at 162 (rejecting a plaintiff's argument that "confidentiality agreement is too broad because it remains effective for all time and with no geographical boundaries").

information concerning" PeopleFlo's "business and affairs." [77] ¶ 27. But the agreements cover only "certain information" that "is non-public and/or proprietary in nature." [77-2] ¶ 1; [77-3] ¶ 1. And the NDAs expressly exclude information that Accudyne or Sundyne learned before PeopleFlo's disclosures, or information that "was or becomes generally available to the public" (unless Sundyne's or Accudyne's disclosure caused the publicity). *See id.* As such, Accudyne is incorrect when it implies that PeopleFlo's business address, website, and phone number might be confidential information under the terms of the agreement. [95] at 13. The breadth of the non-disclosure agreement is reasonable given the context of the parties' discussions and PeopleFlo's need to protect its intellectual property. The three-page NDAs signed by Sundyne and Accudyne—sophisticated business entities—are not unenforceable for overbreadth. *Cf. McClure Eng'g Assocs., Inc. v. Reuben H. Donnelley Corp.*, 95 Ill.2d 68, 72 (1983) (Illinois embraces "a widespread policy of permitting competent parties to contractually allocate business risks as they see fit").

## IV. Conclusion

DXP and PumpWorks's motion to dismiss Count IX, [79], is granted. The dismissal is without prejudice. Sundyne's and Accudyne's motions to dismiss Counts IV and V, [82] and [94], are denied.

ENTER:

_____

Manish S. Shah
United States District Judge

Date: July 23, 2021