UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

PEOPLEFLO MANUFACTURING, INC.,

      Plaintiff,

    v.

SUNDYNE, LLC, DXP ENTERPRISES,
INC., PUMPWORKS, LLC, and
ACCUDYNE INDUSTRIES, INC.,

      Defendants.

No. 20 CV 3642

Judge Manish S. Shah

## MEMORANDUM OPINION AND ORDER

Plaintiff PeopleFlo designed a pump that it believed would revolutionize the "sealless" pump market. It negotiated for the sale of its design with defendant Sundyne (and its parent company Accudyne), but they did not reach a deal. PeopleFlo then contracted with defendant PumpWorks to incorporate the design into one of PumpWorks's existing pumps; defendant DXP was to be the major distributor of the pump. PeopleFlo and PumpWorks's venture went south, and PeopleFlo brings this suit alleging that PumpWorks breached its obligations under the contract. PeopleFlo also brings claims for trade secret misappropriation and breach of contract against Sundyne and Accudyne, claims for tortious interference with contract and with prospective business advantage against Sundyne and DXP, and a claim for civil

---

* This opinion is entered under seal because it references an alleged trade secret. The court will enter a public version on the docket after soliciting input from the parties about appropriate redactions.

conspiracy against PumpWorks, Sundyne, and DXP. PumpWorks, in turn, accuses PeopleFlo of breach of contract for failing to provide the pump pieces for which it had been paid. Defendants Sundyne, Accudyne, and DXP bring motions for summary judgment; PeopleFlo and PumpWorks bring cross-motions for summary judgment on their breach of contract claims.

## I.    Legal Standards

A court must grant summary judgment when the movant shows that there is no genuine dispute of material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists if the evidence is such that a reasonable jury could return a verdict in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court views "the facts and draws reasonable inference in the light most favorable to the non-moving party." *Sullivan v. Flora, Inc.*, 63 F.4th 1130, 1141 (7th Cir. 2023). On cross-motions for summary judgment, a court must draw inferences "in favor of the party against whom the motion under consideration is made." *Markel Ins. Co. v. Rau*, 954 F.3d 1012, 1016 (7th Cir. 2020) (citation omitted). "Cross-motions must be evaluated together, and the court may not grant summary judgment for either side unless the admissible evidence as a whole—from both motions—establishes that no material facts are in dispute." *Bloodworth v. Vill. of Greendale*, 475 Fed. App'x 92, 95 (7th Cir. 2012).

## II.    Facts

The parties treated the Local Rule 56.1 statements like another opportunity to argue their cases. They included extraneous nonresponsive additional facts in their response statements. *See, for example,* [364] ¶¶ 8, 23, 110, 125, 128, 144; [382] ¶¶ 16, 55, 67, 69, 72; [352] ¶¶ 3, 11, 23, 27, 32, 33, 41, 47; [392] ¶¶ 4, 7, 9–11, 26, 30, 32, 35. I ignore all additional facts asserted in the response that are not responsive. *See* N.D. Ill. L.R. 56.1(e)(2). The parties also offered legal conclusions in their statements and arguments in their responses that had nothing to do with the admissibility of the asserted facts. *See, for example,* [364] ¶¶ 54, 60, 85; [382] ¶¶ 51, 69, 72; [352] ¶¶ 27, 45, 47; [392] ¶¶ 6, 15, 40. The statements of fact are not the place to argue, they are the vehicle for presenting the facts as supported by the evidence in the record.

Furthermore, the parties ignore the technical requirements of Local Rule 56.1(d)(2) by not including the relevant page number, *see* [352] ¶ 46 *and* [392] ¶ 38 and citing to 15 or 20 pages of a deposition testimony, *see* [352] ¶ 14 *and* [382] ¶ 55. Finally, all the parties submit statements of fact and responses that are too long. The Local Rule asks for "concise" numbered facts. N.D. Ill. L.R. 56.1(d)(1). The following statements were too long. [352] ¶¶ 11, 16, 25, 28, 33; [382] ¶¶ 9, 19, 21, 33, 45, 48–49, 58, 61–65, 68–69, 72–73; [392] ¶¶ 1, 2, 4–9, 11–13, 19, 21–23, 27–30, 32–33, 37, 39. The following responses to statements of fact were also too long. [364] ¶¶ 8, 110; [382] ¶ 52–56, 58–73; [352] ¶¶ 11, 14, 16, 25, 27–28, 32–33, 47; [392] ¶¶ 1, 2, 4, 6–12,

14, 17–18, 21–24, 26, 28–30, 33.[1] These discrepancies may seem minor, but when put together, these violations did the clients no favors because they wasted the time and energy that would be better spent analyzing legal arguments (indeed, the lawyers ran the risk that I would summarily deny all the motions for failure to comply with the local rules, with the costs of briefing simply poured down the drain).

## A.    PeopleFlo's Project Colorado

Plaintiff PeopleFlo is a pump designer, manufacturer, and innovation lab in Franklin Park, Illinois. [352] ¶ 1. William Blankmeier was president of PeopleFlo, serving in that position since 2004 with 24 years of prior experience in the pump industry. [352] ¶ 4. Tom Haan was an outside consultant for PeopleFlo; Haan was formerly president of a mechanic seal company. [352] ¶ 10. Clark Shafer was a vice president at PeopleFlo. [364] ¶ 80.

---

[1] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are taken from the CM/ECF header placed at the top of filings, except in the case of citations to depositions, which use the deposition transcript's original page numbers. Facts are taken from the parties' responses to Local Rule 56.1 statements of facts, [352], [382], [364], and [392], where both the asserted fact and response are sent forth in one document. I overrule the objections and accept the facts asserted in the following statements of fact: [364] ¶¶ 1, 2, 6–8, 14–15, 22, 38–40, 45, 49–51, 58–59, 61–63, 66, 72–73, 77–78, 90–91, 93–94, 108–109, 111–12, 119, 122–29, 134, 138–39, 141, 144; [382] ¶¶ 1–5, 26; [352] ¶¶ 1–2, 4–5, 23; [392] ¶¶ 3, 35. I accept the facts asserted with some modification in the following statements: [364] ¶¶ 3, 9, 16–17, 23–24, 26–28, 30–31, 34–36, 41–44, 46–48, 52, 60, 65, 67–69, 71, 74–76, 79–80, 84, 89, 92, 96–98, 100–107, 110, 113, 118, 120–21, 130–33, 135–36, 140, 142–43, 145–46; [382] ¶¶ 2, 6–7, 11–12, 14–15, 17, 19, 21–23, 25, 27–28, 30–40, 43–50, 53–55, 57, 60–63, 65–66, 68–69, 71–74; [352] ¶¶ 8, 10–13, 15–17, 19, 21–22, 24–27, 29–30, 32–33, 38–42, 44, 48–49; [392] ¶¶ 1, 4–11, 13–14, 18–21, 24, 26–31, 33–34, 37–39, 41. I strike the following statements because they are unsupported by evidence or are legal argument: [364] ¶¶ 29, 42 (admission used), 54, 64, 81, 85; [382] ¶¶ 8, 20, 23–24, 29, 42, 51, 59; [352] ¶¶ 14, 18, 28, 43, 45–46; [392] ¶¶ 15, 51. Finally I have not relied on the following statements because they were duplicative or irrelevant: [364] ¶¶ 10, 15, 18–21, 25, 32–33, 37, 55–57, 70, 82–83, 85–88, 95, 114–16, 137; [382] ¶¶ 9, 10, 13, 16, 18, 41, 56, 58, 60, 64, 67, 70; [352] ¶¶ 3, 7, 9, 20, 31, 34–37; [392] ¶¶ 2, 12 (using some responsive facts), 16–17, 21–22, 25, 31–32, 36, 40.

In the early 1990s, the North American pump industry established nationwide pump standards through the American National Standards Institute (ANSI) and American Society of Mechanical Engineers (AMSE); these standards govern sizing, footprint, hydraulic outputs, and related characteristics across brands. [364] ¶ 11. Because pumps must meet these standards, many pumps offered for sale in North America share design similarities. [364] ¶ 13.

Some pumps use centrifugal force generated by a spinning "impeller" to move the liquid (or pumped matter) through the pump system. [364] ¶ 12. The type of centrifugal pumps at issue in this case are "sealless pumps," also called "magnetic drive pumps"; the rotational movement created by the pump's engine is translated to the impeller by two sets of magnets rather than by a drive shaft that is physically connected from the engine to the impeller. [364] ¶ 12. The use of the magnets means that there does not have to be a seal around the drive shaft when it enters the "wet" side of the pump, a technological improvement because mechanical seals often fail. *Id.*

A traditional magnetic sealless pump design puts a containment shell around an inner ring of magnets attached to the impeller and then a ring of magnets external to the containment shell that is attached to the engine. [364] ¶ 27. PeopleFlo's design switched the magnets so that the inner magnets drove the outer magnets, which were attached to the impeller. [364] ¶ 26. PeopleFlo's sealless pump design was named "Project Colorado." [382] ¶ 6. PeopleFlo claims that trade secrets in the Project Colorado technology provided it with several operational advantages, including: (i)

5

enhanced run-dry capabilities, meaning the pump can operate without fluid for a longer time without experiencing catastrophic failure; (ii) greater field serviceability; and (iii) the ability to solve for energy efficiency penalties experienced in typical mag-drive pumps. [364] ¶ 79.

**B.** **Alleged Trade Secrets**

The elements of PeopleFlo's magnetic sealless pump design at issue in this case are: ███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████

*1.   Containment Shell*

PeopleFlo claims that two elements of its containment shell constitute trade secrets: ███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████ [382] ¶ 19. PeopleFlo's

---

[2] PEEK is polyether ether ketone, a pliable material.

containment shell is fabricated as a two-piece shell consisting of a PEEK and carbon fiber "tube" with a metal cap. [364] ¶ 53. PeopleFlo developed its PEEK carbon fiber shell between 2014 and 2017. [364] ¶ 36. PeopleFlo sampled different PEEK carbon fiber materials and sourced its raw material from ██████████████████████ [364] ¶ 52.

PeopleFlo does not claim a trade secret in the formula of the PEEK and carbon fiber materials used, which it sourced from outside companies; but rather in the shell technology, which ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ [364] ¶¶ 41–44. PeopleFlo asserts that it "pioneered these technological enhancements," but provides no external evidence to support the assertion. *See* [382] ¶ 20.

PeopleFlo applied for a patent of its canister design in 2016; the patent, number '869, was published in 2018 and issued in 2019. [364] ¶ 31. The patent describes a shell "constructed of a structural composite comprising PEEK (Polyetheretherketone) thermoplastic and elongated carbon fibers in the form of several layers of a thin tape wound over a mandrel and having the layers melted together." [364] ¶ 40. The patent also discloses that a pump canister made of strong, nonconductive or low conductive materials in a generally tubular shape is easier to manufacture and protects against "eddy currents" that create unwanted heat. [364] ¶ 71.

2.  *Bushing Design*

PeopleFlo claims a trade secret in its bushing design that incorporated four

key elements: ██████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████ [382] ¶ 21; [364] ¶¶ 58–59.[3] No pump manufacturer had used this

combination of the four design features in a pump before 2017. [382] ¶ 22.

PeopleFlo applied for a patent of its pump design, including the bushing

system in 2016; the patent, number '764, was published in 2017 and issued in 2018.

[364] ¶ 31. The patent describes how O-rings are used to keep the bushing centered

on the impeller: "the O-rings [30] are not intended to provide sealing between the two

surfaces" instead, if temperature changes cause thermal expansion of the two

bushings or impeller, "the compression of the O-rings [30] … will maintain a

concentric relationship between the bushing [800] and the impeller [702]." [364] ¶ 62.

The '764 patent also discloses the use of flats on the bushing to prevent rotation. [364]

¶ 63.

---

[3] Although "bushings" and "bearings" are different objects, PeopleFlo notes that it uses the terms interchangeably for purposes of the motions for summary judgment, *see* [382] at 9 n.3, and no other party has indicated that the difference is material to the resolution of these motions. I also use both terms.

8

Using O-rings to center and retain bushings and making the bushings site-serviceable was known in the pump industry before 2014. [364] ¶ 60.

### 3. Go-to-Market Strategy

PeopleFlo also asserts a trade secret in its "go-to-market strategy"—its plans and marketing strategies for a magnetically-coupled sealless pump, including cost-reduction techniques to reduce the price of a mag-drive pump and target the mainstream markets that traditionally use sealed pumps. [364] ¶ 69. It's been difficult to pin PeopleFlo down on a specific definition of its "go-to-market strategy." Sundyne characterizes it as a claim for a combination trade secret including (a) the physical components of its pump design, (b) PeopleFlo's manufacturing technique, (c) cost-reduction, achieved through the first two elements, and (d) PeopleFlo's marketing strategy, which relies on the first three elements. [364] ¶ 76. PeopleFlo

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████ [364] ¶ 77.

████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████████████ [364] ¶ 78. The '764 patent discloses the

9

marketing strategy of using mag-drive pumps to replace an existing sealed pump. [364] ¶ 73.

Mag-drive pump manufacturers such as Ansimag, Goulds, and Flowserve have targeted the sealed pump market for decades. [364] ¶ 74. Before Sundyne acquired Ansimag, Ansimag directed its efforts to replace sealed pumps with its non-metallic ANSI dimensional pump and was successful in some applications. [364] ¶ 75. Pump distributors/sellers such as defendant DXP have set goals for their salespeople that they sell four sealless pumps sold for new applications or replacement of a non-mag-drive pump. [364] ¶ 75.

### C. Sundyne and PeopleFlo Discussions

Defendant Sundyne, LLC owns various brands that design and manufacture pumps and compressors, including HMD Kontro Sealless Pumps, Ansimag, SunFlo, and other brands. [364] ¶ 1. Before ever meeting with PeopleFlo, Sundyne manufactured and sold multiple lines of sealless pumps. [364] ¶ 2. For about 10 years from 2012, Sundyne was owned by Accudyne, a holding company, which did not itself design or manufacture the pumps. [364] ¶ 3.

PeopleFlo contacted Sundyne in 2013 to discuss an idea it had for a new pump design. [364] ¶ 22. As part of those discussions, Sundyne and People Flo signed a "Mutual Non-Disclosure Agreement," which prevented either party from disclosing or using confidential information for any purpose other than to evaluate a potential

business relationship between the two. *Id*.[4] Accudyne and PeopleFlo signed a nearly identical mutual NDA in 2014. [364] ¶ 23.

Both NDAs required "specific prior written consent" to disclose confidential information to someone other than a party representative, and Sundyne never sought or obtained written consent from PeopleFlo to disclose any information that had been shared under the NDA. [382] ¶ 2. Furthermore, a party representative who received the confidential information had to be informed of the confidentiality of the information and receive a copy of the NDA. [382] ¶ 4. Sundyne and Accudyne also agreed not to use confidential information "in any way detrimental" to PeopleFlo. [382] ¶ 3. The NDAs governed all communications between the parties until one party gave notice that subsequent communication would not be covered; the obligation to keep information confidential survived for five years after the last disclosure. [382] ¶ 5.

> Under the NDAs, "confidential information" was defined as:
>
> any and all financial, technical, commercial or other information concerning the business and affairs of Disclosing Party, including business plans, financial information, lists of customers, vendors or employees, marketing techniques, strategies and developments, computer software, methods of operation, and all notes, analyses, compilations, studies or other materials derivative of any of the foregoing … which has been or may hereafter be provided or show to Receiving Party or any of its representatives, irrespective of the form of the communication, by Disclosing Party or by its Representatives.

---

[4] The email from Blankmeier to Sundyne returning the NDA was sent in 2013, suggesting that the February 2012 date on the Sundyne NDA may be a scrivener's error. *See* [359-152]. In any case, the date of the NDA is immaterial to the resolution of this motion.

11

[382] ¶ 1. The NDA excluded information that "was or becomes generally available to the public other than as a result of a disclosure by Receiving Party" from the definition of "Confidential Information." [364] ¶ 22. Neither Sundyne nor Accudyne could produce copies of the PeopleFlo NDAs and there is no evidence that anyone at the companies disseminated copies of the NDAs to colleagues who were made privy to PeopleFlo's confidential disclosures. [382] ¶ 30. In December 2014, Sundyne informed PeopleFlo that they were going to pass on the opportunity. [364] ¶ 23.

PeopleFlo contacted Sundyne in early 2017, and conversations between the two companies began again about "Project Colorado"—a novel, metallic, magnetically coupled sealless pump design that could be used to retrofit the most common single-seal pump in the United States market, the Goulds 3196. [364] ¶ 24; [382] ¶ 6. Conversations between Sundyne and PeopleFlo continued from March through November 2017 via telephone and in person. [364] ¶ 28. Peter Johansson, who was the VP of strategy, corporate development, and marketing at Accudyne, was working temporarily at Sundyne in product management and marketing; he led the conversations with PeopleFlo. *Id*; [331-6] at 6:10–14.

Throughout 2017, Blankmeier and Johansson discussed the Project Colorado technology, possible deal structures, and financial projections. [382] ¶¶ 6, 14. Johansson used information provided by PeopleFlo to estimate the value of the potential deal with PeopleFlo at $48 million. [382] ¶¶ 14–15. In late October 2017, Johansson included that valuation in a presentation to Sundyne and Accudyne's leadership about the potential deal. [382] ¶ 15. In November 2017, Sundyne told

12

PeopleFlo that it would not going to enter into an agreement for the Project Colorado technology. [364] ¶ 30; [382] ¶ 23.

### D. Disclosures from PeopleFlo to Sundyne

PeopleFlo shared information about the Project Colorado technology with Sundyne during 2014 and 2017, via conversations with Johansson and slide presentations. [382] ¶ 11.



For Blankmeier, ██████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████ [331-17] at 134:8–12; [382] ¶ 11. Blankmeier disclosed that PeopleFlo ████████████████████████████████████████████████ ████████████████████████████ [364] ¶ 68; [331-17] at 67:6–11. Blankmeier also ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████ [331-17] at 60:16–20; [382] ¶ 11. ████████████████████████████████████████████ ██████████████████████████████ [364] ¶ 68; [331-17] at 66:20–67:5. ████████████████████████████████████████████████████ ████████████████████████████████████ [331-18] at 47:8–19, 53:9– 17; [382] ¶ 11.

Johansson's notes from an August 17, 2017 phone call reflect that PeopleFlo



[362-44]; [382] ¶ 35. Johansson testified that he had verbal permission from Blankmeier to contact ▆▆▆▆▆▆▆ regarding their ability to supply containment shells for the HMD Kontro CSA, but Blankmeier denied that he gave Johansson permission to contact ▆▆▆▆▆▆▆ for Sundyne's internal initiatives and purposes. [331-6] at 46:1–47:21; [362-8] ¶ 15; [382] ¶ 36.

The parties have submitted thirteen documents and slide decks that reflect the information disclosed from PeopleFlo to Sundyne. *See* [362-10], [362-16], [362-11], [362-15], [362-9], [362-12], [362-26], [362-27], [362-17], [362-7], [362-14], [362-20], and [362-25].[5] As to PeopleFlo's containment shell, these documents reflect that PeopleFlo shared that they were making ▆▆▆▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆ *See* [362-11] at 26, [362-15] at 5, [362-9] at 20, [362-7] at 26–27, [362-17] at 49. An undated presentation discusses the process wherein ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆ although the slide does not identify that process as PeopleFlo's proprietary process. *See* [362-15] at 4.

With regard to PeopleFlo's bushing technology, the documents reflect that PeopleFlo shared ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

---

[5] The August 2017 slide deck was submitted as several exhibits. *See* [362-9], [362-13], [388-6]. The October 2017 slides were submitted twice. *See* [388-2] and [362-17]. Sundyne's slides dated October 25th were submitted twice. *See* [359-23], [362-20].



[362-16] at 51; [362-9] at 22, [362-11] at 7, [362-7] at 21.

[362-16] at 52; [362-9] at 22; [362-7] at 21, 48; [359-23] at 31. Meeting minutes from March 2017 reflect that the bushings

[362-10] at 8.

[382] ¶ 11.

On March 7, 2017, Johansson sent an email to others at Sundyne who were part of the talks with PeopleFlo; the end of the email said, "We do not have and [sic] NDA in place." [362-31] at 2; [382] ¶ 31. Johansson testified that the line was a typo and that he was aware there was an NDA in place. [331-6] at 36:10–14, 32:8–12. Johansson's email also stated, "In addition to listening to their pitch for its potential, we should be listening for technical/design features which may impact our current development plans or if they have transgressed HMD/Ansimag I.P." [362-31] at 2; [382] ¶ 31.

In April 2017, Johansson forwarded an email chain with Blankmeier to others at Sundyne who were not in the PeopleFlo discussions, saying "I think PeopleFlo can help us accelerate the execution of our Ansimag (and sealless broadly) product and technology strategy pipeline." [382] ¶ 32. The email chain included a PowerPoint presentation that Blankmeier described as "information on PeopleFlo's product development services." [362-32] at 4. Johansson testified that he forwarded the information because "this conversation was not related to Project Colorado but

15

related to the design services aspect of PeopleFlo" and he thought that PeopleFlo could help Sundyne improve its product development process. [331-6] at 83:19–24, 84:13–85:5.

In addition to the NDAs, PeopleFlo took other measures to protect the secrecy of its information, including labeling the presentations it provided to Sundyne as "Confidential." [382] ¶ 12.

### E. Sundyne Development of the Kontro CSA Pump

Sundyne had a sealless magnetically coupled metallic pump, the HMD Kontro GSA, which the company knew needed updating. [364] ¶ 16; [382] ¶ 7. The parties dispute exactly when Sundyne began the refresh of the Kontro GSA, but the project was underway by early 2017. [364] ¶ 17; [382] ¶ 25; *see also* [362-30] at 4 (slides from initial product management meeting showing a job ticket for the GSA Refresh dated February 3, 2017). In 2018, Sundyne decided to re-brand the Kontro GSA refresh as the "new" Kontro CSA line of pumps. [364] ¶ 17; [362-124] at 2.[6]

Johansson worked on the development of the Kontro CSA in his capacity as the acting leader of product management and marketing for Sundyne; he attended the project review meetings and was one of the people who had to sign off for the project to move to the next stage. [331-7] at 193:10–194:5; [364] ¶ 89. David Clark, Keith Thompson, and Tom Helmreich were all involved in the Kontro CSA in different

---

[6] I refer to the entire project as the development of the "Kontro CSA," but I recognize that the project began as a re-design of the Kontro GSA. Similarly, the pump lines have a "CSA" version and an "CSI" version depending on whether they align with ASME or ISO/ANSI standards. *See* [362-124]. I use "CSA" to refer to both versions.

16

capacities; all three had been part of the talks with PeopleFlo. [382] ¶ 26. Clark was at HMD Kontro and supervised the team working on the Kontro CSA; he testified that it would have been inappropriate to discuss the information from PeopleFlo with his team, including Martin Stuart, an engineer on the project. [382] ¶ 27.[7] Emailed meeting invitations reflect that Johansson invited Stuart to at least two meetings about PeopleFlo, but there is no indication whether Stuart attended. [382] ¶ 28.[8] The Kontro CSA is the only product that PeopleFlo claims uses its trade secrets. [364] ¶ 15.

### 1. Sundyne's Containment Shell

Sundyne had an existing "ZeroLoss" containment shell made of carbon fiber and PEEK that withstood pressure up to 40 bars, which it had developed with Greene Tweed, a material and component manufacturer. [364] ¶ 38. Sundyne has sold pumps with the ZeroLoss 40 bar containment shell since 2009. [364] ¶ 39. In 2017, Greene Tweed informed Sundyne that it intended to stop fabricating the ZeroLoss 40 bar containment shells, forcing Sundyne to look for alternate manufacturers. [364] ¶ 45.

---

[7] Clark acknowledged that he shared the name of ▮▮▮▮▮▮▮▮▮▮ with Stuart when they were looking for a new material supplier for the HMD Kontro's "Zero Loss" containment shells. [382] ¶ 27. Clark testified that he found out about ▮▮▮▮▮▮▮▮▮▮ from Johansson and that Johansson had told Clark that he found out about ▮▮▮▮▮▮▮▮▮▮ from PeopleFlo. [382] ¶ 28. Nothing in the cited materials supports the assertion that Clark or Stuart was seeking to "utilize the same technologies and materials that PeopleFlo had disclosed to Accudyne and Sundyne," so that portion of ¶ 28 is struck.

[8] PeopleFlo asserts that Stuart was forwarded "confidential slides" with "technical features," but the document cited to, [362-32], does not support that assertion. [382] ¶ 28. The content of the email indicates that slide deck was "information on PeopleFlo's product development services" and Johansson's testimony was that the deck was about product development, not about Project Colorado. *See* [362-32] at 3–4; [331-6] at 83:19–24. Nothing in the cited portion of the record supports the assertion that Stuart was forwarded "confidential slides of materials," so that portion of ¶ 28 is struck.

In 2018, Sundyne engineer Martin Stuart contacted several material suppliers and asked whether they could manufacture a 40-bar containment carbon fiber PEEK shell and whether they would be able to manufacture a carbon fiber PEEK containment shell with a lower pressure bar for the Kontro CSA. [382] ¶ 37; [364] ¶ 47.[9] Sundyne also contacted ███████████████████, the company that had supplied PeopleFlo with PEEK and carbon fiber materials; Sundyne did not ask ██████ ████████ about the PeopleFlo PEEK formulation and ultimately did not source its carbon fiber PEEK material from ███████████████ [364] ¶ 46.

Stuart also identified a carbon fiber/PEEK material made by Greene Tweed called Xycomp® DLF as a possible source material for the Kontro CSA containment shells. [382] ¶ 38. Xycomp® DLF was a "lightweight thermoplastic composite … produced from aerospace-grade, carbon fiber reinforced, unidirectional prepreg tape which is chopped into flakes … Flakes are matched-die compression molded in a proprietary process called ProFusion®, enabling the product of 3-D shapes with

---

[9] PeopleFlo asserts that this email shows Stuart ███████████████████████████████ ████████████████████████████████████████████████████████████████████ █████████████████████████████████ [382] ¶ 37. But the cited material is an internal email, so it does not show what Stuart communicated to the third-party supplier. *See* [362-49]. The additional cited support is ¶ 35 of Blankmeier's declaration, in which he asserts that "there were many references to Sundyne first using the same type of containment shell technologies that PeopleFlo had disclosed to Sundyne in 2017 … Based on my substantial experience in this industry, and the lack of any documents to show any independent development by Sundyne and Accudyne, to suggest that this was coincidental or that Sundyne and Accudyne would have developed this technology without PeopleFlo's disclosures is not credible." [362-8] ¶ 35. Blankmeier's assertion is an opinion of what inference could be drawn from the facts and since he has not been designated as an expert, the 56.1 statements of fact are not the proper vehicle for submitting arguments about what inferences should be drawn from the facts. I disregard such arguments and accept only the facts supported by the cited evidence.

18

variable wall thickness[.]" [362-50] at 3; [382] ¶ 38. Sundyne and Greene Tweed corresponded about making a containment shell from the Xycomp® DLF material. [382] ¶ 39. In 2021, Greene Tweed wrote a white paper extolling the virtues of its Xycomp® containment shells and introducing containment shells made from Xycomp® DLF. [382] ¶ 40; [359-66].[10]

In early 2019, Greene Tweed informed Sundyne that it would continue to manufacture the ZeroLoss 40 bar containment shell, and Sundyne returned to purchasing its ZeroLoss 40 bar containment shell from Greene Tweed. [364] ¶ 48. In 2021, Sundyne began working with Victrex PEEK 450CA30, a publicly available material consisting of 30% PEEK and carbon fiber pellets that can be used in an injection molding process for the Kontro CSA pump; those shells were being tested as of August 2022. [364] ¶¶ 50–51; [362-141] at 2–3. Sundyne's containment shell is a single piece of PEEK and carbon fiber. [364] ¶ 53.

    2.    *Kontro CSA Bushing Design*

The Kontro CSA bushing design: ██████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

---

[10] PeopleFlo asserts that it was through the "combined efforts of Sundyne and Greene Tweed" that Greene Tweed was able to develop and release the new composite containment shell made out of Xycomp® DLF. [382] ¶ 40. This assertion is not supported by the evidence. The cited white paper thanks Sundyne for the trust placed in their product and being the first to bring it to market, [359-66] at 13, but per Sundyne's lead engineer, that referred to the use of Xycomp in the GSP 40 bar containment shells. [331-4] at 243:10–20. Nothing else in the document supports the assertion that Sundyne helped Greene Tweed develop the containment shells made of Xycomp® DLF. Sundyne's lead engineer also testified that Sundyne "didn't assist Greene Tweed with creation of the DLF material, no." [331-4] at 242:22–23. The first clause of the first sentence in ¶ 40 is stricken.

███████ [382] ¶ 43. These four design features had not been part of the old Kontro GSA design, although carbon graphite bushings running on a silicon carbide sleeve had been an option before the rebranding. *Id.*; [331-17] at 62:17–64:18.[11] The use of a flat-sided bushing had been used by Sundyne in other pumps, although not on the Kontro GSA. [364] ¶ 65; [382] ¶ 47. Sundyne's predecessor, Sundstrand Pumps, promoted its canned motor pumps that were field serviceable in the 1980s and used O-rings to center and retain the bushing. [364] ¶ 61. The Frame 1 size of the Kontro CSA was released to market in June 2020 and its bearings design includes all four of the design features. [382] ¶ 44.

PeopleFlo asserts that Sundyne only began shifting to these four design features after the negotiations between PeopleFlo and Sundyne ended. [382] ¶ 45. January 2018 meeting minutes show the Kontro engineering team ████████████ ███████████████████████████████████████████████████████ *Id.*; [362-65] at 2. Internal HMD Kontro documents from September 2018 reflect that the engineering team soon realized that a ███████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████ [382] ¶ 45; [382-66] at 8. A July 2018 Accudyne presentation on the Kontro CSA touted the use of ████████ ███████████████████████████████████████████████████████████████

---

[11] The testimony is about silicon carbide on carbon. No party says whether this combination is different than silicon carbide on carbon graphite.

███████████████████████████████████

████████ [382] ¶ 45; [362-68] at 10.

As part of the development of the Kontro CSA, Sundyne initiated a carbon bearing evaluation program, which it considered one of three "enabling technologies" for the project. [382] ¶ 46. On June 7, 2018, a Sundyne employee in the research and development department contacted ████████████ and asked about the best carbon material that could be used to make a "bush thrust pad" within a magnetically driven pump; the part would be operating over a large temperature range, under load, and submerged in liquid. [362-74] at 3–4.[12] The record does not reflect whether Sundyne purchased any materials from ████████████ The combination of carbon graphite and silicon carbide is known in the industry and Sundyne had offered silicon carbide with carbon graphite as a bearing combination on its GSA pumps as early as 2014. [364] ¶¶ 66–67.

After Kontro CSA's release, Sundyne said that a key driver for the new design was "to ensure servicing could be undertaken as far as possible on site" and advertised that "HMD Kontro has tested combinations of silicon carbide with other materials including carbon resulting in options that provide a more robust solution for tricky applications." [362-75] at 5–6; [382] ¶ 48. Among the "unique selling points" the

_____

[12] PeopleFlo asserts that ████████████████████████████████████████████████████ and cites to [362-74]. [382] ¶ 46. Nothing in the document supports that assertion. Another employee contacted ████████████ and did not ask for any particular hardness, ████ See [362-74] at 3–4. Instead, he asked for a part made from carbon appropriate for a bush thrust pad in a magnetically drive pump. Id. The second sentence of ¶ 46 is struck.

marketing team identified for the Kontro CSA was the fact the O-ring retention design meant the bearings are site serviceable. [382] ¶ 48. And, in 2020, Sundyne submitted a patent application for its "Bush Retention System" as utilized in the Kontro CSA. [382] ¶ 50. In the application, Sundyne describes its system as using an O-ring (or circlip) to center and secure the bushing, a single frame bearing design, and the use of flats for anti-rotation. *Id*.

### 3. *Kontro CSA Marketing*

Notes from a May 5, 2017 meeting of the Kontro CSA team stated "if we get the price break correct, the opportunity is in two areas. These are the traditional sealless opportunity of double-sealed arrangements as well as converting the single-sealed opportunity." [362-29] at 6; [382] ¶ 33. The notes also reflected that Sundyne believed the Goulds 3196 was the biggest seller in the United States and the "benchmark" against which it would measure the Kontro CSA's success. [382] ¶ 33. Internal documents from 2018 and 2019 show that Sundyne's marketing strategy for the Kontro CSA was to convince customers to "upgrade existing sealed pumps with CSA/I sealless pumps within their existing equipment footprint." [382] ¶ 34.

Sundyne has not yet released the Frame 2 size of the Kontro CSA, but development and design documents suggest that it will incorporate the same four bearing design features and a lower cost 25 bar containment shell made from compression molded PEEK carbon fiber composite material. [382] ¶ 49.

### F.     PeopleFlo, PumpWorks, and DXP

DXP distributes and services pumps and related equipment made by original equipment manufacturers, such as Viking, Sundyne, PumpWorks, and others; David Little is the chairman and CEO of DXP. [364] ¶ 4. DXP organizes itself by regions, each of which is run by its own Vice President. [364] ¶ 5. DXP regional vice presidents are autonomous managers of their respective geographic regions, responsible for the hiring, firing, and training of the region's sales professionals who work largely on commission. [364] ¶ 6. The regional vice presidents negotiate with original equipment manufacturers to obtain authorization to represent the manufacturers within their regions; within a single region, a vice president may negotiate different product listings for different territories or industries or both. [364] ¶ 7. As a result, not all salespeople within a DXP region have access to the same product mix. *Id*. No central authority at DXP dictates product coverage in any region. [364] ¶ 8. Jim Hook was the regional vice president for the Ohio River Valley region and Mark Smith the regional vice president of "DXP-Super Region 2," which covered a large portion of the southeast. [364] ¶¶ 127, 129.

PumpWorks, LLC is a company that managed smaller pump manufacturers, whose products were branded under the "PumpWorks" name. [352] ¶ 2. It was created in 2014 when DXP purchased B27, a conglomerate of pump manufacturing and service companies. [364] ¶ 9. David Little was PumpWorks's president and sole officer until its merger into DXP in 2021. [352] ¶ 5. Trey Maxwell ran PumpWorks from 2015 through late March 2020. [352] ¶ 6. Charles Harvey was the plant manager

of PumpWorks Industrial, the manufacturing entity that made the PWA-SL pumps. [352] ¶ 8; [355-1] at 32:8–10. PumpWorks did not have its own sales organization and DXP was its primary distributor. [352] ¶ 15.[13] PumpWorks also had relationships with independent distributors who distributed their products. [364] ¶ 133.

Skip Giessing was the vice president of the rotary division at DXP; his duties were to investigate rotary products, make the information available to regional vice presidents, and where appropriate, assist them in obtaining distribution agreements. [364] ¶¶ 101, 94. Giessing never had authority to direct DXP regional vice presidents to add any product to their line. [364] ¶ 94. The parties dispute Giessing's exact role with regard to the PeopleFlo–PumpWorks pump to be distributed by DXP, but he was heavily involved in the deal with PeopleFlo and the promotion and marketing of the pump. *See* [364] ¶ 104; [352] ¶ 17; [392] ¶ 27.

PeopleFlo, through its consultant Haan, had reached out to Giessing to discuss PeopleFlo's idea of a magnetically driven pump of ANSI dimension in 2014. [364] ¶ 91. Giessing, in turn, contacted PumpWorks's Maxwell to help evaluate the PeopleFlo technology. [364] ¶ 92. Early on, Giessing told Blankmeier that some DXP

---

[13] PeopleFlo asserts that "DXP was expected to serve as the exclusive sales organization, and prior to signing the [Development and Supply Agreement], PumpWorks had not identified anybody else it wanted to use as its sales team other than DXP." [352] ¶ 15. This assertion misstates the evidence upon which it relies, an email that DXP VP Skip Giessing sent in 2020 wherein he is recounting his initial thoughts on a potential PeopleFlo deal. *See* [344-3] at 4. Nothing else supports the assertion that DXP would be the "exclusive" sales organization. Giessing, Maxwell, and Harvey all testified that DXP was to be the primary distributor. The other deposition testimony cited in the statement is not attached—Exhibit 16 does not include pages 120 or 121; Exhibit 20 does not include pages 181 or 184 of Giessing's 30(b)(6) testimony. *See* [344-8] *and* [342-20]. DXP was to be the primary distributor, but the evidence does not support the other parts of the second sentence of ¶ 15 and it is struck.

regional vice presidents would see the proposed product as a conflict with the magnetically driven sealless pumps they sold for Sundyne. [364] ¶ 93. In the fall of 2017, PeopleFlo had been speaking with Maxwell and Giessing about a possible partnership around Project Colorado. [364] ¶ 97; [392] ¶ 1. PumpWorks had an existing pump line called the PWA; PumpWorks was interested in the Project Colorado technology to create a "magnetic coupling unit" that would be used in place of the seal in the PWA pump. [352] ¶ 13.

In September 2017, Mark Smith (a regional vice president) and Little attended a meeting in Colorado with Sundyne and learned that Sundyne was also in conversation with PeopleFlo. [364] ¶ 96. Little did not want to compete with Sundyne, so he waited to hear whether Sundyne was going to move forward with a deal with PeopleFlo before moving forward with negotiations. *Id*. After Sundyne passed on the deal, PeopleFlo communicated to PumpWorks that Sundyne had "blessed" the technology. [364] ¶ 98. Little instructed PumpWorks and Giessing to wait until Mark Smith confirmed with Sundyne that it would not object to PumpWorks making a magnetic-driven pump. [364] ¶ 99. Smith reported to Little that Sundyne did not have an objection to PumpWorks or DXP pursuing an agreement with PeopleFlo. [364] ¶ 100. Maxwell then told PeopleFlo that he had authority to negotiate with PeopleFlo concerning its Project Colorado technology and that no agreement would have proceeded if Sundyne or Accudyne had expressed an objection. [382] ¶ 60.

Giessing worked to build interest in the Project Colorado technology among the DXP regional vice presidents and internally. [364] ¶ 101. Maxwell, Little, Smith, and

25

Hook discussed PeopleFlo's technology, including its potential weaknesses, markets, and strengths. [364] ¶ 101. Smith had reviewed a prototype of the Project Colorado design in 2017 and he thought that the proposed product would interfere with his Sundyne distribution agreements; in December 2017 he wrote an internal email saying, "the pump is competitive with ANSI mag and InnoMag products" and sales of the product would "come at the expense of mag drive pumps like ANSI Mag." [364] ¶ 102; [331-90] at 3. He also noted that he would like to have it in the PumpWorks line because it was different than other pumps in the market. [382] ¶ 53. Hook visited the PeopleFlo offices and evaluated the product in December 2017. [364] ¶ 103. He wrote Little and other DXP executives that he thought it could sell in "niche applications" and that the Ohio River Valley could sell 30 of them a year, at the expense of ANSIMAG. [364] ¶ 103; [331-37] at 4.

### G. The Development and Supply Agreement

On March 22, 2018, PeopleFlo and PumpWorks signed a Development and Supply Agreement (the DSA). [352] ¶ 11. The DSA gave PumpWorks the right to purchase magnetic coupling units (MCUs) from PeopleFlo and the "exclusive, world-wide right and license [ ] to use and incorporate MCUs into its PWA model pumps[.]" [382] ¶ 54; [342-1] at 3. Exclusivity was to terminate after the end of the two-year Phase I period at which point PumpWorks could purchase exclusivity in perpetuity for a lump sum payment or continue with a use license through a fee. *Id*.; [342-1] at 3–4. The exclusivity fee was optional and not a contract obligation. [392] ¶ 39.

26

Section 10 of the DSA laid out the requirement for PumpWorks during the term of the agreement. The relevant obligations were:

> a.  <u>Business Development</u>. PumpWorks will use its best efforts to develop business and, promote the sale and use of, and sell the MCUs in connection with the Pumps.
>
> c.  <u>Sales Organization</u>. PumpWorks will maintain a sales organization that actively solicits the sale of the Pumps, carry out promotional programs and fully utilize any sales assistance that may be furnished by PeopleFlo and will develop all sales and marketing materials related to the MCUs and the Pumps. PumpWorks will appoint a product line manager for the MCUs to coordinate with PeopleFlo.
>
> e.  <u>Forecasted Requirements</u>. PumpWorks will consult with PeopleFlo quarterly to project the forecasted requirements of PumpWorks for the MCUs.
>
> f.  <u>Reports</u>. PumpWorks will prepare and provide to PeopleFlo regular reports updating business or technical trends, and report promptly any test results or other information in order to assist PeopleFlo with integration and trouble-shooting regarding the MCUs.

[352] ¶ 12; [382] ¶ 54; [342-1] at 11–12. The contract was segmented into different time periods—Pre-Phase I, Phase I, and Phase II—in which the parties had different order obligations and different payment schedules. *See* [342-1] at 2–3. There was no specified date for the launch of the product that would contain the PeopleFlo MCUs (eventually called the "PWA-SL" pump). Instead, the contract provides "Phase I of this agreement shall continue for two years from and after the date that PumpWorks and PeopleFlo reasonably agree the Work has been completed and PeopleFlo is ready and able to manufacture and supply MCUs to PumpWorks pursuant to the terms of this Agreement for the purpose of product validation and rollout of the MCU to market." [364] ¶ 112. Phase I began in March 2019, so the two-year rollout to market would extend through March 2021. *Id*.

PeopleFlo was obligated to supply MCUs in fulfillment of minimum stock orders placed and paid for by PumpWorks at the times and in the amounts set out in the DSA. [392] ¶ 3; [342-1] at 2. During Pre-Phase I, PumpWorks had to order 100 MCUs upon the execution of the DSA and 100 MCUs within six months of the execution. [392] ¶ 3. PumpWorks would pay 50% of the price upon placement of the order and 50% upon completion of the order and before shipment. *Id*. PumpWorks was obligated to purchase 200 MCUS during the second year of Phase I. [392] ¶ 3. During Phase I, PumpWorks would pay 25% of the MCU's price at the time of order, 50% upon completion of order and before shipment, and 25% [net 30] after shipment. *Id*. The DSA set a price for each MCU sold to PumpWorks. [392] ¶ 39; [342-1] at 3, 17.

PeopleFlo VP Shafer understood PumpWorks's orders to be "stock orders" meaning PumpWorks purchased the MCUs "to be put into inventory and not purchased for a specific customer need." [392] ¶ 8. Haan, PeopleFlo's business consultant, agreed that the MCU orders were meant to build inventory. *Id*. There is no requirement in the DSA that PumpWorks share customer information in order to place or receive a stock order. *Id*.

The DSA did not require PumpWorks to pay for parts, components, raw materials or labor used to produce the MCUs. [392] ¶ 39. The DSA did not require PumpWorks to pay royalties unless it opted to manufacture the MCUs after the fifth year of Phase II (which would have been year 7 of the DSA at the earliest). *Id*.

The DSA provides that, except for PeopleFlo's obligation to indemnify PumpWorks for any IP infringement liability, "under no circumstances ... shall either party be liable to the other or any other person or entity, for any consequential, incidental, special, indirect, punitive or exemplary damages, including without limitation damages for lost production, lost revenue, lost product, lost profit, lost business or lost business opportunities, all such damages being hereby specifically disclaimed." [392] ¶ 37; [342-1] at 15.

### H. PumpWorks's obligations under the DSA

The DSA is the "final, complete, and exclusive agreement between the parties with respect to the subject matter hereof and supersedes any prior or contemporaneous written or oral agreement." [392] ¶ 26. The following terms are not included in the DSA: sales lead, product champion, sales territory, United States, Canada, or DXP. *Id.*

#### 1. Sales Organization

Section 10(c) of the DSA required PumpWorks to maintain a sales organization that actively solicited the sale of the PWA-SL, carried out promotional programs, and develop sales and marketing materials. [392] ¶ 27. Giessing was the product line manager for the PWA-SL and could present the PWA-SL to all of the DXP Regional Vice Presidents; Giessing had filled a similar role in the development of PumpWorks' earlier product, the PWA sealed pump. *Id.* PumpWorks also developed a network of independent distributors who could sell in direct competition to DXP, and additional distributors could be added as needed. *Id.* PumpWorks assisted the salespeople with

29

quote information about products, maintenance of internal records, and other ad hoc assistance. *Id.*

Shortly after signing the DSA, DXP's Giessing and PeopleFlo's Blankmeier met in person. [382] ¶ 62. In an email summarizing the meeting, Giessing wrote that he and Blankmeier discussed "how DXP and PumpWorks has a fair amount of experience successfully designing, manufacturing, supporting and selling new PumpWorks products" and "PumpWorks history and DXP organization, especially sales organization." [352] ¶ 16; [342-15] at 2. Giessing testified that he understood that DXP was to be the primary distributor of the PWA-SL product line. [382] ¶ 62. Giessing also testified that he did not remember any communications from PumpWorks to PeopleFlo relating to regions in which it would not sell the PWA-SL. [352] ¶ 29.

Giessing promoted the PWA-SL to DXP regional vice presidents and sent informational emails to independent distributors around the time of the PWA-SL's launch. [364] ¶ 104. PumpWorks Industrial phone conferences presented the PWA-SL to DXP salespeople to update them on new offerings. [392] ¶ 28. Giessing invited PumpWorks's network of independent distributors to sell the PWA-SL and testified that several of them quoted the PWA-SL to customers. [364] ¶ 134.[14]

---

[14] PeopleFlo's objection to Exhibit 20-O is discussed below. Giessing testified that "some of our independent distributors were also generating quotations" without relying on the exhibit, so that assertion is supported by competent evidence no matter the admissibility of Exhibit 20-O. [331-2] at 368:17–19.

DXP was not a party to the DSA and the DSA does not specify any territory in which the PWA-SL must be distributed. [364] ¶ 105. PumpWorks had no authority to force DXP generally or any DXP sales regions to offer any pump it manufactured, including the PWA-SL. [364] ¶ 117. Giessing, a DXP employee, was involved in the negotiations with PeopleFlo and copied on emails discussing the contract. [382] ¶ 55.[15]

### 2. *Forecasting Requirements*

PumpWorks was also required to "consult with PeopleFlo quarterly to project the forecasted requirements of PumpWorks for the MCUs." [342-1] at 12. Maxwell identified one forecast of future sales but did not recall the date he provided that information. [352] ¶ 44. After the PWA-SL's launch in August 2019, PumpWorks and PeopleFlo met on a regular basis; during those meetings, the parties discussed quotes for the PWA-SL, sales, and marketing strategy; raw quote data was provided to PeopleFlo in January 2020. [392] ¶ 34. There were times that Maxwell did not have the actual number of sales and the meeting notes indicated that Maxwell needed to follow up; Maxwell stated in his declaration that he provided information regarding the actual number pumps sold to PeopleFlo. *Id.*

---

[15] Defendants' objection to PeopleFlo's assertion that PumpWorks confirmed DXP's marketing and sales role prior to signing the agreement and citing to a 2017 proposed outline of the deal is sustained. [382] ¶ 55; [362-82] at 3–4. PeopleFlo has not given any reason to consider parol evidence about the terms of the contract and I decline to do so.

### 3. Reports

The DSA required PumpWorks to provide regular reports to PeopleFlo of updated business or technical trends and reporting test results or other information that would help PeopleFlo with integration and trouble-shooting the MCUs. [392] ¶ 33; [342-1] at 12. Between April 2018 and September 2019, PeopleFlo and PumpWorks had weekly meetings; between September 2019 and March 2020, PeopleFlo and PumpWorks had monthly meetings. [392] ¶ 33. The parties discussed the development of the MCU, Computational Fluid Dynamics analyses, structural deficiencies and proposed resolutions, beta test sites, MCU shipment schedules, and test results. *Id*. After August 2019, the meetings were about marketing and promotional material and efforts, as well as PWA-SL customer quotes and sales. *Id*. As mentioned above, Maxwell did not always have the sale numbers ready at the meetings. [392] ¶¶ 33–34. Actual test results and data sheets were shared through a file share program. [392] ¶ 33. With respect to business trends, PumpWorks informed PeopleFlo that Sundyne was going to introduce a new light duty mag drive pump in 2020. *Id*.

### 4. Best Efforts to Develop Business and Promote Sales

Starting in 2018, Giessing prompted DXP salespeople to submit possible beta sites for the PWA-SL; ultimately PeopleFlo and Pump Works settled on two beta sites, PPG and Momentive, both of which were from the Ohio River Valley region. [392] ¶ 28.

32

PumpWorks featured the PWA-SL on its website, and created and issued a press release for the PWA-SL. [392] ¶ 28. Giessing accompanied DXP sales professionals to customer presentations and presented the PWA-SL to customers; Giessing and PumpWorks also provided support for DXP salespeople and salespeople from independent distributors regarding sales leads and quotes to customers. *Id.* PumpWorks' ePOD system was an internal system that allowed distributors to obtain information on each PWA-SL model and provide quotes; in early 2020, PumpWorks made it so that ePOD generated a quote for the PWA-SL anytime a customer requested a quote for a PWA sealed pump. *Id.* PumpWorks was working with an outside vendor for a product demonstration video. *Id.*

In September 2019, PumpWorks promoted and displayed the PWA-SL at the Annual Pump Symposium, an international pump convention; it held a launch party at its booth during the convention. [392] ¶ 28. Maxwell presented the PWA-SL to two of PumpWorks's largest customers—Plains American Pipeline and Lubrizol. *Id.*[16] PumpWorks displayed the cross-sectional demonstration model of the PWA-SL at DXP's customer appreciation event in February 2020; the event was attended by several hundred DXP customers. *Id.* The PWA-SL was featured at the Fuel and Ethanol Exposition in March 2020. *Id.* PumpWorks's efforts on behalf of the PWA-SL were comparable to its promotion of the PWA sealed pump, including the creation of a brochure, display at trade shows, work on a video, a cross-sectional model for

---

[16] Plains served as a beta site for the PWA-SL, but it used a specially-commissioned, differently-sized pump that was not part of the DSA. [392] ¶ 28. The pump was installed in December 2019 and failed two months later. *Id.*

demonstration, entry on the EPOD system, and internal presentation to DXP salespeople. [392] ¶ 29.

Hook encouraged his salespeople to sell PWA-SLs, where permitted, by offering extra credits toward compensation of PWA-SL models. [392] ¶ 28. Hook also budgeted $15,000 to purchase a cross-sectional model of the pump to show customers. [364] ¶ 131. PeopleFlo's outside business consultant, Tom Haan, wrote emails to PumpWorks expressing concern about the lack of marketing and sales efforts and suggesting particular strategies. [352] ¶ 41.[17]

Both before and after executing the DSA, both of the parties agreed that training was important for the PWA-SL. [382] ¶ 71. PumpWorks provided little training on the PWA-SL, although Giessing would train on the product during his visits to DXP regional offices. [352] ¶ 38. In October 2019, PumpWorks committed that it would prepare a marketing video and training presentation for the PWA-SL, but neither was completed as of January 2020. [352] ¶ 42. In March 2020, Giessing went to two DXP sales locations and found that the salespeople hadn't been trained to effectively to represent the PWA-SL. [352] ¶ 39.

---

[17] PeopleFlo submits that a timeline of marketing activities represents the "accurate and complete PWA-SL Timeline of marketing activities to date." [352] ¶ 43; [344-32]. This assertion is unsupported by the evidence—Harvey testified that the document did not reflect the complete list of activities that PumpWorks engaged in to market the PWA-SL. [354-9] at 136:18–137:4. Giessing's declaration also controverts the assertion that [344-32] represents the complete list of what PumpWorks did to market the PWA-SL. [356] ¶ 75. Finally, the document itself suggests it is not a complete list because PumpWorks's Murphy (who sent the original email) suggests that Harvey (the recipient) contact others at PumpWorks to ask what they had done for the PWA-SL. [344-22] at 2. The characterization of [344-32] is not supported by the evidence in the record and struck.

Many DXP sales professionals are degreed engineers who understand the workings of the pump products that they sell, including mag-drive pumps made by Sundyne, Flowserve, and Goulds. [392] ¶ 30. Regional vice presidents arrange for training as necessary and specific training on PWA-SL was made available through PumpWorks conference calls, the PWA-SL brochure, and on an ad-hoc basis from Giessing and Maxwell. [392] ¶ 30.

Maxwell testified that Giessing was responsible for the sales side of the PWA-SL, but Giessing denied that he was responsible for sales and said that would have been Maxwell's responsibility. [352] ¶ 17. Giessing also testified that he took on some of "those responsibilities" himself. *Id*. Giessing had been described as "DXP product champion" and "PWA-SL product line manager"; in February 2020, Giessing formally took on the rule of PWA-SL Champion. [352] ¶ 19; [392] ¶ 27; [355-9] at 3. PumpWorks continued its efforts to promote and sell the PWA-SL through November 2020. [392] ¶ 18.

### I.    PumpWorks, DXP, and the PWA-SL

In early 2019, DXP's Jim Hook had the opportunity to add Sundyne's HMD Kontro line to his distribution agreements; before a contract was signed, Hook took Ohio River Valley salespeople to visit the HMD Kontro plant in the UK. [364] ¶ 138.[18] At the plant, Hook and his party were shown the Kontro CSA, which was a modular

---

[18] Sundyne already had distribution agreements with other DXP sales regions including, DXP Oklahoma, Cortech Engineering (a/k/a DXP West), Delta Processing (a/k/a DXP Southeast), M.W. Smith Equipment Company, and DXP Quadna (a/k/a DXP Colorado). [364] ¶ 106. Sundyne had a distribution agreement with DXP West Texas, but the record doesn't reflect when that agreement began. *Id*.

designed pump sized for the ANSI pump market and scheduled to be released in 2020. [364] ¶ 139.

On June 13, 2019, PeopleFlo's Blankmeier emailed PumpWorks's Maxwell and reported that he had a conversation with DXP's Giessing about the PWA-SL launch and that "[w]ithout prompting him, [Giessing] said he thought Sundyne took our product/market concept and designed their own version. From what he said – lightweight, ANSI MD, modular with PEEK shell – sounds eerily familiar." [359-190] at 2; [382] ¶ 52.[19] Maxwell responded to Blankmeier's email by writing, "Don't sweat it. I will find a path through this." [352] ¶ 21; [342-28].[20] PeopleFlo's Haan and Maxwell had a phone conversation in July 2019; Haan's notes from that conversation state that Maxwell thought Sundyne copied PeopleFlo, but Haan did not have an independent recollection of what Maxwell told him. [382] ¶ 52; [330-5] at 202:13–203:2.

Hook testified that he never told Trey Maxwell or anyone within DXP or PumpWorks that he believed the CSA pump line infringed upon any trade secrets or confidential information that PeopleFlo had been supplying to DXP or PumpWorks.

---

[19] Defendants' hearsay objection to PeopleFlo's assertion that Giessing or Maxwell actually said that Sundyne stole PeopleFlo's designs is sustained. [382] ¶ 52. Blankmeier's email is hearsay as to the truth of what it contains; it is competent evidence only of the fact that on June 13, 2019, Blankmeier sent an email that contained Blankmeier's concerns. *See* Fed. R. Evid. 801(a), (c). Blankmeier's notes, [362-70], are also inadmissible hearsay. Haan's notes from his phone call with Maxwell, [359-93], are also inadmissible hearsay. PeopleFlo likewise cannot rely on these statements to show that Giessing or Maxwell thought that Sundyne's design imitated or "stole from" PeopleFlo or that Sundyne actually stole from PeopleFlo.

[20] This cannot be an admission because (a) Maxwell was not an employee or agent of Sundyne and (b) Maxwell did not have the foundational knowledge of the Kontro CSA's design in order to know whether it was derived from PeopleFlo's design.

[364] ¶ 140. Giessing testified that he never told Blankmeier that Sundyne misappropriated PeopleFlo's trade secrets and that he could not have made such an assertion because he had not seen the Sundyne CSA product and had no way of knowing what it featured. [364] ¶ 142. At most, Giessing thinks he told Blankmeier that Sundyne was introducing a new mag drive pump that is a mag drive light. *Id*. Maxwell testified that he did not tell Haan that Sundyne misappropriated PeopleFlo's proprietary information because he had not seen the CSA product. [364] ¶ 143.[21] After the CSA was launched, he saw nothing in it "that could be seen as a duplication of PeopleFlo technology." *Id*. Maxwell testified that he wrote "Don't sweat it. I will find a path through this" because he wanted to calm Blankmeier down and get him to focus on the PWA-SL product and its development. [392] ¶ 23.

### 1. Delay of the PWA-SL

In the spring of 2019, Hook had reached an agreement with Sundyne to distribute Kontro products in certain territories within the Ohio River valley. [364] ¶ 118. Before the contract was signed, Hook learned that PumpWorks was planning to launch the PWA-SL; Hook was concerned that the announcement of a new magnetic-drive pump might disrupt his pending deal. *Id*. Hook asked Maxwell to delay the launch of the PWA-SL until after the Sundyne deal was finalized. [364] ¶ 119.

---

[21] Defendants assert that Maxwell did not tell *Blankmeier* that Sundyne misappropriated PeopleFlo's proprietary information, but the deposition testimony is that Maxwell denied telling *Haan* that Sundyne copied PeopleFlo. *See* [364] ¶ 143; [331-3] at 216:11–19, 217:8–218:21.

Although Maxwell wanted the PWA-SL to launch, Giessing felt that the product was not ready for the market because testing was not complete and test results were not consistently within expected parameters. [364] ¶ 120. Furthermore, PeopleFlo had delivered fewer than 25 of the 100 low torque Group 2 MCUs, none of the 100 high torque Group 2 MCUs, and none of the 200 Group 1 MCUs. [392] ¶ 24.

Maxwell's theory was that if the PWA-SL could be shown to handle solids well, then it could be used in the oil and gas markets. [392] ¶ 23. These applications did not require the PWA-SL to meet the hydraulics results required by application in the chemical and industrial markets. [392] ¶ 23. Maxwell had ordered that all of the PWA-SL pumps be tested, but he considered a pump to "pass" even if it did not meet the performance requirements for comparability with a Goulds 3196. [392] ¶ 23. Because of his focus on the oil and gas markets, Maxwell did not perceive Hook's ORV region as central to the success of the PWA-SL. [392] ¶ 23. Ultimately, Maxwell delayed the launch until August 2019, including the release of the PWA-SL marketing brochures. [364] ¶ 121; [352] ¶ 22.[22]

### 2. Sundyne's Letter & Competition with the PWA-SL

By May or June 2019, Accudyne's Johansson knew that DXP was working with PeopleFlo on a sealless pump project. [382] ¶ 57. After PWA-SL's launch, on September 5, 2019, Sundyne wrote to DXP regional vice presidents, "Through some

---

[22] After the PWA-SL's launch, Hook's competitor for the Kontro contract forwarded Sundyne the PWA-SL brochure and implied that Hook had violated the non-compete clause with Sundyne. [364] ¶ 122. Hook forwarded that email to Maxwell and texted Maxwell, "Thanks for waiting to launch PWA-SL until after my Kontro deal. Really appreciate you working with me on this." [364] ¶ 123. Maxwell replied, "Not a problem. Probably helped us be more prepared." *Id.*

verbal communications between DXP and Sundyne personnel it is our understanding that this mag drive pump [PWA-SL] will not be offered or sold in any areas where DXP is a distributor for Sundyne mag drive pumps. Can we ask for something in writing stating that this is your intention both now and in the foreseeable future?" [352] ¶ 23; [364] ¶ 127; [344-24] at 2.[23] The 2019 Sundyne Distribution Agreement for one of the DXP regions contained a "Right to Sell Competitive Products" clause, which read: "Without prior approval, Distributor [DXP] shall not either directly or indirectly engage in the sale of or represent any organization, company or business selling products that that are directly or indirectly competitive with the Products covered by this Agreement." [364] ¶ 108.[24] The Sundyne products that some DXP regions represented included the Kontro line of pumps and the Ansimag pumps, both of which are sealless ANSI-sized pumps. [364] ¶¶ 93, 14.

DXP employees forwarded the Sundyne email to PumpWorks leadership, including David Little and Trey Maxwell. [352] ¶ 24. Little responded via email:

> Their request is reasonable. Putting something in writing will be difficult because of all the exceptions. I think we should be positive and offer something in writing. The exceptions on my list include 1) OEM's 2) other distributors PW might set up 3) national accounts 4) SCS

---

[23] Many DXP regions had represented Goulds Pumps, a large pump manufacturer that made the ANSI-dimensioned, sealed pump Goulds 3196. [364] ¶ 90. When DXP acquired B27 (now PumpWorks), Goulds asked that DXP be prohibited from selling PumpWorks's competitive products in all DXP regions, regardless of whether the region had a Goulds distribution contract. *Id.* The companies went to arbitration and DXP lost the right to continue its Goulds's contracts in all territories. *Id.*

[24] The Sundyne Agreement language changed in or around 2020 to read: "Without prior approval, Distributor shall not either directly or indirectly engage in the sale of or represent any organization, company or business selling products that are competitive with the Products covered by this Agreement. [364] ¶ 109.

Accounts 5) CTO Equipment 6) etc. It might be easier to just say Sundyne distributor salesman will not sell PWA-SL product?"

[344-25] at 2; [352] ¶ 24. DXP Regional Vice Presidents Jim Hook, wrote to Sundyne:

> Regardless of its dissimilarity to Kontro, DXP-ORV has no intent to market the PWA-SL product where we are authorized to market and sell Kontro products. In the interest of full disclosure, DXP-ORV will provide service and support to one beta site test site that was established by PumpWorks for this product prior to being authorized by Kontro to sell Kontro products. In the highly unlikely case that we wanted to make any other exception we would discuss it first with our Sundyne regional manager for his/her buy-in and approval.
>
> All DXP-ORV employees have been instructed not to propose the PWA-SL products within our Kontro assigned accounts, and that any such activity will be subject to 'out-of-territory-sales' discipline. Additionally, DXP-ORV has implemented proper safeguards to reasonably prevent such an occurrence.

[352] ¶ 25; [364] ¶ 128; [331-31] at 4. Another regional vice president sent a substantially similar letter to Sundyne stating that salespeople in his region would not sell the PWA-SL in regions in which DXP was authorized to market and sell Kontro products. [352] ¶ 25; [364] ¶ 129.

Giessing and Maxwell did not think that the PWA-SL was in direct competition with Sundyne's Kontro and Ansimag product lines. [352] ¶ 25. David Little testified that he did not think the Kontro product was competitive with the PWA-SL product. [382] ¶ 65. Giessing testified as PumpWorks's Rule 30(b)(6) witness that PumpWorks treated the PWA-SL as competitive with Sundyne's products because Sundyne believed it to be. [382] ¶ 65. DXP's Hook and Smith thought that the PWA-SL was in competition with Sundyne's Kontro line of magnetic-driven pumps and with its Ansimag line of pumps. [364] ¶ 110. PeopleFlo witnesses have admitted that there is

some overlap in the technical applications for which one or more of the Sundyne pumps and the PWA-SL could be suitable. [364] ¶ 111.

Certain DXP regional vice presidents ultimately decided not to sell the PWA-SL in territories where they had a contract with Sundyne. [352] ¶ 27. The parties dispute when those DXP regional vice presidents made the decision. On June 18, 2019, before the Sundyne email, Hook sent a text message to one of his salespeople saying he "cannot sell PWA-MD [PWA-SL] where an Ansimag or Kontro will fit UNLESS we are not authorized [to sell Sundyne] … Where we are not authorized, we can sell Chempump or PWA-MD [PWA-SL] or Magnatex." [364] ¶ 124. Right after the PWA-SL launch in late August, Hook and Smith exchanged text messages where Hook said that he would not allow his salespeople to quote the PWA-SL in Sundyne territory but he would outside of that territory; another of Hook's employees indicated that they needed to "get ahead of our guys that have Kontro" that the PWA-SL was not on the table. [364] ¶¶ 125–26. A September 2019 email from a salesperson in Smith's region states that "last week" he was told not to promote PWA-SL over ANSI-MAG. [382] ¶ 66; [362-108] at 3.

In August 2019, the salesperson who was in charge of the beta site asked Hook if he should "push forward with PWA-SL at [the beta site] or slickly convert to HMD?" [331-32] at 2. Hook responded, "You are cleared to do whatever you choose. I covered you in the letter. But you can ONLY sell PWA-SL at [the beta site]." [364] ¶ 130. Another salesperson in a Sundyne region asked that he be able to sell the PWA-SL's "back pull outs since they are not complete pumps (which Sundyne and Goulds can

offer) and also these pumps are 2X3-13 which is not a size that AnsiMag offers." [344-5] at 2; [352] ¶ 26. His regional vice president denied his request. *Id.*

The importance of the territories in which DXP salespeople could not sell the PWA-SL is disputed. The majority of the chemical plants in the United States are outside those territories. [392] ¶ 32. In the Ohio River Valley territory, Hook identified target rich locations for the PWA-SL such as Pennsylvania, Delaware, West Virginia, and parts of Ohio and Tennessee which were outside of the Sundyne territory; between 50% and 70% of the ORV sales professionals were available to sell the PWA-SL. [364] ¶ 136. DXP had many sales and service offices in the United States that were not limited by the Sundyne contracts to sell the PWA-SL. [392] ¶ 32. Maxwell believed that if the PWA-SL was successful it would be a good fit for certain oil and gas markets in Houston, the Texas Gulf Coast and North Dakota. [392] ¶ 32.[25] Those territories were not affected by the Sundyne contacts. *Id.* Hook testified that the territories covered by agreements with Sundyne were a "small slice" of the overall DXP territory; the territorial and market scope could and did change over time. [364] ¶ 107.

The chemical, oil & gas, and general industrial markets were key targets for the PWA-SL. [382] ¶ 68. The dominant regions for the oil and gas markets were West Texas and Colorado and the dominant markets for the chemical market were the

---

[25] Although a DXP region called "DXP Houston" was included on the list provided by Sundyne, DXP's 30(b)(6) witness testified that the region was actually DXP Odessa, [354-14] at 91:8–93:17, and further the named counties do not include Harris County, the county in which Houston is located. *See* [344-16] at 5–6.

southern portion of Ohio and the Gulf Coast from Corpus Christi, Texas to Pensacola, Florida. *Id.*; [330-5] at 300:21–301:19; 318:24–319:11. DXP regions that had a Sundyne distribution agreement covered West Texas, Colorado, Louisiana and Mississippi, and Southern Ohio. [382] ¶ 68. In early November 2019, Maxwell wrote Little that his target market for the PWA-SL was "WTX and we effectively killed it." [382] ¶ 69. Giessing assessed that the "Sundyne effect" resulted in the loss of two important technical sales teams. [352] ¶ 33.

Neither Hook nor Giessing was aware of any communication with Sundyne in which either party indicated that they wanted to keep PumpWorks's PWA-SL or PeopleFlo's technology out of the market. [364] ¶ 141. No one at DXP ever suggested to PumpWorks that it should not make or sell the PWA-SL in any territory. [364] ¶ 135.

Giessing testified that PumpWorks did not do anything to maintain a sales organization in the ORV regions affected by the Sundyne contract and that he did not know of specific efforts made to sell the PWA-SL in the South Atlantic region. [352] ¶ 30. Giessing had emailed independent distributors in PumpWorks's network about the PWA-SL, including at least one distributor located in the affected portion of the ORV region that generated quotes for the PWA-SL. *Id.*; [364] ¶ 134.[26]

---

[26] PeopleFlo submits affidavits from employees at six of the independent distributors that state the company has "never been asked to add the PWA-SL to its equipment, products or inventory" and that the company "has never sold or distributed the PWA-SL." *See* [352] ¶ 36; [344-28]. PumpWorks objects to the affidavits because they do not establish the affiant's source of knowledge, but each affidavit states the affiant's position with the company. *See for example*, [344-28] at 4, ¶ 1 ("I am Vice President for Carotek, Inc."), which is enough to infer competence to offer the testimony. But while admissible, the fact is disputed to the extent it

### J.    PWA-SL's Performance Post-Launch

PeopleFlo had consistently told PumpWorks that the Project Colorado technology would produce a pump that: (a) prevented loss of efficiency and matched sealed pump performance; (b) could be configured to popular impeller configurations including open impellers; (c) had enhanced solids handling; (d) provided for "easy aftermarket retrofit," including of the Goulds 3196 pump; (e) had an affordable upfront cost; (f) could use the existing power end and casing if used to replace a pump; and (g) used a bushing design and materials that enabled superior "run dry" capability. [392] ¶ 19.

Little, Giessing, Hook, and Maxwell believed that at the time of launch and thereafter, the PWA-SL never reliably achieved the target performance that would allow DXP or PumpWorks to promise customers that the PWA-SL would mimic the hydraulics the customer had with their Goulds 3196 pumps. [364] ¶ 144. PeopleFlo disputes that characterization. *Id*. There was also a design issue with the clearance between the impeller and the outer casing that resulted in PumpWorks taking over the machining and installation of impellers. [364] ¶ 144; [392] ¶ 20.

At the time of launch, Maxwell, Giessing, and others agreed that the PWA-SL could be marketed for applications for which a mag drive pump would be traditionally suitable, including some applications that could compete with sealed pumps; Giessing

---

suggests that there was no effort to promote PWA-SL to distributors. Giessing's declaration introduces emails he sent in August 2019 introducing the PWA-SL to independent distributors (the six companies who sent affidavits and six other companies). *See* [356-16] *and* [356-18]. Furthermore, PumpWorks submitted a list of PWA-SL quotes through April 2023, which indicates that three of the companies had submitted quotes for the PWA-SL— Electric Pump, Salentine, and JKA Pump. [356-20] at 2–5, 7–8.

expected that after the launch, the PWA-SL would be further developed to improve its performance. [364] ¶ 145. The PPG beta site had two pumps fail; the first likely due to a pinched O-ring during assembly by PumpWorks, the second likely due to extended dry run. [364] ¶ 130.[27]

In early November 2019, David Little asked Trey Maxwell how the PWA-SL was doing, and Maxwell replied, "The Sundyne effect is real. My target market was WTX and we effectively killed it." [352] ¶ 32. In a December 2019 meeting between the parties, Giessing expressed confusion because he had not heard negative feedback about the PWA-SL, so he was not sure why quotes for the product were not converting to orders. [352] ¶ 47. PumpWorks's efforts to market and sell the PWA-SL resulted in about 400 quotes from August 27, 2019, to January 10, 2020; Maxwell was comfortable with the pace of quoting activity. [392] ¶ 35.

In September 2020, Giessing sought to find out why the PWA-SL was getting quotes but no orders and conducted a survey of salespeople who had quoted the PWA-SL. [392] ¶ 36.[28] Giessing received an email from the regional vice president in South

---

[27] There was a second beta site in the Ohio River Valley region; the customer apparently did not immediately place the unit into service; in 2022, the customer indicated an interest in buying more of the units, but by that time this litigation was ongoing and PumpWorks considered the DSA terminated. [364] ¶ 132.

[28] PeopleFlo objects to the spreadsheet of survey responses, attached as Exhibit AE to Giessing's declaration, on the basis that because it was created for this litigation it is not a business record. [392] ¶ 36; [356-31]; *see also* [331-35]. In their response to PeopleFlo's Statement of Additional Facts, defendants make arguments about why the spreadsheet is admissible, including that it is a summary of business records. *See* [382] ¶ 65. Giessing's declaration states that the spreadsheet is a compilation of responses he received, and his testimony also provides a foundation for the spreadsheet. *See* [356] ¶ 89; [331-2] at 366:20–368:13. The spreadsheet may be an admissible summary, but why the quotes didn't translate into orders is ultimately not material here.

45

Texas stating that there had been a poor rollout of the PWA-SL. [352] ¶ 40. Giessing also testified that he didn't think that "we had a robust rollout plan." *Id*.

From 2021 to 2023, a chemical plant in California submitted nine orders for the PWA-SL. [382] ¶ 73. In 2022, another customer had a PWA-SL installed and Hook heard reports that the customer liked the product and would purchase more. *Id*.

A member of PeopleFlo's board of directors with significant experience in the pump manufacturing industry testified that two years is a reasonable lead time for a brand-new pump in the ANSI market to gain traction or momentum. [364] ¶ 146.

### K.     Disintegration of PumpWorks–PeopleFlo Relationship

The DSA required PumpWorks to order 200 MCUs in the "Pre-Phase I" portion of the contract—one order upon execution of the contract and one order within six months. [364] ¶ 113. On April 4, 2018, PumpWorks submitted a purchase order for 100 MCUs and paid $165,000, which represented 50% of the purchase price. [392] ¶ 5. On July 6, 2018, PumpWorks submitted a purchase order for 100 MCUs and paid $198,000, which represented 50% of the purchase price; these deals were in accordance with the Pre-Phase I requirements in the DSA. *Id*.[29]

In February 2019, Blankmeier texted Maxwell to ask if DXP could help PeopleFlo with a cash flow problem. [392] ¶ 4. Blankmeier and Maxwell discussed whether DXP was interested in making an equity investment in PeopleFlo, but that did not move forward. *Id*. On February 11, 2019, PumpWorks paid PeopleFlo

---

[29] The discrepancy in purchase price between the two orders is because the first was for "Group 2 low torque" MCUs and the second was for "Group 2 high torque" MCUs, which have different prices. *See* [392] ¶ 5; [342-1] at 17.

46

$260,040 as an additional 40% prepayment for the two orders it had placed in 2018; this raised the prepayments to 90% of the purchase price. [392] ¶ 5.

Three months later in May 2019, Blankmeier asked Maxwell to help PeopleFlo "get some additional cash out of Project Colorado" by accelerating the Phase I order of MCUs and increasing the prepayment of the order from 25% to 50%. [392] ¶ 4. PumpWorks submitted a purchase order in late May 2019 for 200 MCUs and paid PeopleFlo $283,800, which represented a 50% prepayment. [392] ¶ 5. On August 20, 2019, PumpWorks paid PeopleFlo $227,040, increasing the pre-payment for the third order of MCUs by an additional 40% so that PumpWorks had paid 90% of the purchase price for the third order. *Id*. The DSA states that the purchase price for Phase I and Phase II would be paid in milestone payments: "twenty-five percent at the time of order; fifty percent upon completion of order and before shipment; and twenty-five percent net 30 after shipment." [342-1] at 3.

In January 2020, Maxwell told Shafer, "We are already pretty far over our skis on payments and I'd like to see more product delivered, I think the original terms were 50/50 and we are more like 95/5 at this point." [392] ¶ 9. On Mach 24, 2020, PeopleFlo and PumpWorks had a zoom call that David Little attended. [392] ¶ 10. Little was concerned after the call because People Flo had "a lot of our money" and he wanted to determine if the deal was salvageable so he spoke with Hook about the potential market and with Harvey about the ability to fix the PWA-SL's flaws. *Id*. Maxwell's impression was that Blankmeier was no longer going to support the PWA-SL. *Id*. The DSA was only in the Validation and Rollout phase (Phase I) and there

47

was a backlog of about 264 MCUs. *Id*. Little testified, "I had had enough. That's not a partner acting like a partner." [392] ¶ 10. Little sent an email to Hook, Little, and Smith with the subject line, "PWA-SL" stating, "If there is no market then we will kill this. A lot of people disagree with you guys so I am sure someone will pick it up. Sorry the call did not work but I got enough." [331-26] at 2; [382] ¶ 63.

On April 2, 2020, PumpWorks sent a letter to PeopleFlo stating that PeopleFlo was behind in its delivery of MCUs as to the amount of PumpWorks had paid and laying out two possible resolutions—PeopleFlo delivers the paid-for MCUs and the DSA continues or PeopleFlo grants a manufacturing license to PumpWorks, keeps the pre-paid balance and allows PumpWorks to manufacture the MCUs. [392] ¶ 11; [355-26] at 2–3. The letter ended with, "Either way, PumpWorks requests that PeopleFlo provide reasonably demonstrated assurances that PeopleFlo is willing and able to manufacture the backlogged MCUs within ninety (90) days of the date of this letter." [392] ¶ 11; [355-26] at 3. This letter was written on PumpWorks stationary and signed David Little who, at the time, was President of PumpWorks. [392] ¶ 11; [352] ¶ 5.

Section 3 of the DSA states: "If at any time during any phase of this Agreement, PeopleFlo is unwilling or unable to manufacture MCUs in sufficient quantities to meet PumpWorks' reasonable orders, PumpWorks, after ninety (90) days written notice and provided PeopleFlo has failed to reasonably demonstrate that [it] is willing and able to manufacture such MCUs within such ninety (90) day period, can, as its

sole remedy, immediately purchase the Manufacturing License for $1.00 and this Agreement shall terminate." [392] ¶ 11; [342-1] at 5.

PeopleFlo shipped its last group of MCUs on April 17, 2020; around the same time, the two PeopleFlo employees who had been primarily responsible for producing the MCUs left the company and were not replaced. [392] ¶ 7. PumpWorks never told PeopleFlo to stop shipping the MCUs. [392] ¶ 9. On April 28, 2020, PeopleFlo, through counsel, sent a letter to PumpWorks warning of pending litigation, asking for document preservation, and stating that PeopleFlo continues to perform its obligations under the DSA, "including manufacturing and supplying MCU's to PumpWorks." [392] ¶ 13; [391]-55] at 3–4.

PumpWorks asserts that PeopleFlo only shipped 136 MCUs; PeopleFlo says that it shipped 148. [392] ¶ 6. PeopleFlo admits that it has retained about $700,000 in prepayments. *Id.* PumpWorks contends that PeopleFlo owes it $690,203.90, but PeopleFlo disputes that number based on its damages offsetting any balance due. [392] ¶ 6. PumpWorks had at least 115 MCUs in inventory. [382] ¶ 72. There are no delivery dates specified in the DSA for the MCUs. *Id.* The original purchase orders used place holder delivery dates; no delivery schedule was ever agreed to between PumpWorks and PeopleFlo, although PumpWorks initially accepted PeopleFlo's performance of producing five to six MCUs per week. [392] ¶ 9. Before the April 2020 letter, PumpWorks had not sent notice that PeopleFlo was in breach of its DSA obligations. [352] ¶ 48.

PumpWorks continued to solicit sales of the PWA-SL through the end of November 2020. [392] ¶ 18. In November 2020, Giessing had been appointed Manager of PumpWorks; he contacted PeopleFlo because a customer had expressed interest in ordering PWA-SLs of different sizes and Giessing inquired whether PeopleFlo would ship the MCUs for the potential order. [392] ¶ 13. PeopleFlo stated its understanding that PumpWorks had over 130 MCUS in inventory, which should have been capable of filling purchase orders and referred PumpWorks to its counsel. [392] ¶ 13.

On November 25, 2020, Giessing sent a letter to PeopleFlo invoking Section 3's remedy of the right to purchase a perpetual Manufacturing License because PeopleFlo had not responded to the April 2020 letter with reasonable assurances that it was willing and able to manufacture MCUs. [392] ¶ 14; [356-32]. In response PeopleFlo sent a letter through its attorney stating that it believed PumpWorks had sufficient inventory to supply customer orders and to "please 1) provide proof of a legitimate end user customer purchase order; and 2) allow PeopleFlo reasonable time to reasonably review the applications … Just to be clear this means that if you do receive an order for the 9 MCUs referenced in your 11/18/20 email, we will continue to work without waiver of PeopleFlo's claims." [359-141] at 3; [382] ¶ 74. Blankmeier testified that there was not a time when he determined that the DSA was terminated. [392] ¶ 41.

50

PeopleFlo had not previously made or sold a pump incorporating the MCU it sold to PumpWorks and has not identified a previous product on which it would base a lost-profits analysis. [392] ¶ 38.

## III.  Motion for Sanctions

PeopleFlo moves for sanctions against Sundyne, LLC for its "failure to preserve Martin Stuart's electronic information and work computer" and asks that I make an inference that the information on Stuart's computer, emails, and OneDrive would have been favorable to PeopleFlo and unfavorable to Sundyne. [379] at 28, 27.

Fed. R. Civ. P. 37(e) governs sanctions when electronically stored information is lost. There rule requires (a) electronically stored information that (b) should have been preserved in the anticipation or conduct of litigation, (c) which is lost because a party failed to take reasonable steps to preserve it, and (d) it cannot be restored or replaced through additional discovery. *See* Fed. R. Civ. P. 37(e); *see also DR Distribs. v. 21 Century Smoking, Inc.*, 513 F.Supp.3d 839, 958 (N.D. Ill. 2021) (identifying five pre-requisites because there must be anticipated or actual litigation that triggers the duty to preserve *and* the relevant ESI should have been preserved at the time the litigation was anticipated or ongoing). Once the moving party has met these factors by a preponderance of the evidence, then a court must decide whether the movant was prejudiced by the lost ESI, and further, whether the other party acted "with intent to deprive another party of the information's use in the litigation." Fed. R. Civ. P. 37(e)(1), (2). Findings on those questions determine whether the other party should be sanctioned and how. *Id.*

In January 2020, counsel for PeopleFlo sent a litigation hold letter to Sundyne requesting that Sundyne preserve all information regarding the potential deal with PeopleFlo for their Project Colorado technology, general information about PeopleFlo or the PWA-SL line, and Sundyne's relationship with DXP. [378-4] at 3. In April 2020, a second letter was sent asking for, among other categories, preservation of information "related to (1) PeopleFlo, PeopleFlo's intellectual property, trade secrets, or confidential information, including but not limited to (a) the Information Shared Pursuant to NDAS; (b) Sundyne's dealings with PeopleFlo … Project Colorado, and all related discussions … (5) ANSI sealless pump technology, including but not limited to Sundyne's efforts to purchase, design, research, develop, and market the same or similar technology." [378-5] at 4. The letter requested that "at a minimum" Sundyne preserve electronic devices and accounts for listed employees; that list did not include Martin Stuart. *Id*. at 5. Sundyne's general counsel issued a notice of litigation hold to some employees, interviewed employees about the matter, and gave the IT department instructions to put a hold on certain employees' files. [401-8] ¶¶ 5–7; [401-9]. PeopleFlo filed its complaint against Sundyne in May 2020. [1].

Martin Stuart was an engineer at HMD Kontro, one of Sundyne's subsidiaries, who worked on the HMD Kontro CSA line of pumps. *See* [401-10], [401-11], [401-12]. PeopleFlo asserts that Sundyne should have preserved Stuart's files because he worked on sealless pump technology, which fell under the category 5 of the litigation notice: information related to "ANSI sealless pump technology." [379] at 18. Sundyne responds that it has designed, manufactured, and sold magnetic-drive sealless pumps

since the mid-1990s so PeopleFlo's request as to all ANSI sealless pump technology was overbroad. [401] at 14. I agree that PeopleFlo's terminology was too broad to provide meaningful notice to Sundyne about what information, exactly, it should preserve regarding its development of sealless pumps.

PeopleFlo also argues that Sundyne knew or could have reasonably foreseen that information about the HMD Kontro CSA would be relevant to the litigation. *See LKQ Corp. v. General Motors Co.*, No. 20 CV 2753, 2022 WL 14634800, at *7 (N.D. Ill. Oct. 25, 2022); *see also Trask-Morton v. Motel 6 Operating L.P.*, 534 F.3d 672, 681 (7th Cir. 2008) (duty to preserve arises when a party "knew or should have known" that litigation was imminent). The first litigation hold letter said, "We also have reason to believe that Sundyne has improperly used PeopleFlo's confidential and proprietary information in order to obtain a competitive advantage of PeopleFlo," a sentiment echoed in the second letter. [378-4] at 2; [378-5] at 3.[30] Combined with the request to preserve information on all sealless pump technology, it was reasonable for Sundyne to know that the HMD Kontro CSA, its most recent sealless pump, might be relevant to the litigation. Therefore, it was reasonable that an engineer working on the HMD Kontro CSA would have relevant ESI. It is undisputed that Stuart's files were not added to Sundyne's litigation hold. There is, however, no evidence that

---

[30] PeopleFlo also argues that its first complaint alleged that "Sundyne had taken PeopleFlo's product design and target market concept for [PeopleFlo's] Sealless Pump Technology to design and engineer its own competing product." [379] at 8. But the complaint did not formally accuse Sundyne of theft and only referenced what DXP's Giessing thought about Sundyne's product.

53

PeopleFlo has been prejudiced by the failure to preserve Stuart's files or that Sundyne acted with the intent to deprive PeopleFlo of Stuart's files.

PeopleFlo argues that it is prejudiced by the lack of access to Stuart's files because Stuart received PeopleFlo's confidential information. There is no evidence in the record that Stuart received confidential information from PeopleFlo other than the name of PeopleFlo's suppliers. The facts PeopleFlo relies on to assert that Stuart received confidential information and attended Sundyne meetings are discussed above, and the record does not support the assertions. Furthermore, PeopleFlo has had access to many internal documents about the development of the HMD Kontro CSA, including emails to and from Stuart. Aside from its unsupported allegations that Stuart was forwarded confidential information, PeopleFlo provides no other reason that the lack of Stuart's files prejudices them when they have had access to so many documents about the development of the HMD Kontro CSA.

More importantly, there is no evidence that Sundyne acted in bad faith or with the intention to deprive PeopleFlo of Stuart's files. Stuart left HMD Kontro effective June 11, 2020. [378-8] at 3. His email and OneDrive accounts were disabled on the same day and deleted on July 11, 2020. *Id*. Sundyne's document retention policy is that all employee accounts will be disabled upon the end of work and the mailbox will be deleted 30 days later. [401-7] at 4. The "home drive" of a terminated user will be deleted no later than 90 days after the last workday. [401-7] at 4. Stuart's email and OneDrive account were deleted pursuant to these policies. [401-5] at 46:16–47:22. The changing explanation for what happened to Stuart's laptop after he left work

(and his files were deleted) does not impeach Sundyne's Director of IT's testimony that Stuart's files were automatically deleted. PeopleFlo also points to the five-month gap between June 2021 when PeopleFlo asked that Stuart be added as a search custodian and November 2021 when Sundyne told them that Stuart's files were not retained. *See* [378-24] at 2 and [378-28] at 2. Stuart's files were deleted in June 2020, so the delay in 2021 does not suggest that Sundyne intended to conceal Stuart's files a year earlier.

PeopleFlo cannot show that it was prejudiced by the lack of access to Stuart's files and there is no evidence that Sundyne destroyed the information with the intent to deprive PeopleFlo of its use. Sanctions are not warranted and PeopleFlo's motion is denied.

## IV. Analysis

Accudyne and Sundyne move for summary judgment on PeopleFlo's claims for trade secrets misappropriation under state law (count V), breach of contract (count IV), and against Sundyne alone, tortious interference with prospective business advantage and contract (counts II and III). DXP Enterprises moves for summary judgment on PeopleFlo's claim for tortious interference with prospective business advantage and contract (counts VI and VII). PumpWorks, Sundyne, and DXP seek summary judgment on the civil conspiracy claim (count VIII) and PumpWorks seeks judgment as a matter of law on its breach of contract counterclaim against PeopleFlo

and summary judgment on PeopleFlo's claims against it. PeopleFlo moves for partial summary judgment on the breach of contract claim against PumpWorks (count I).[31]

## A. Count V: Trade Secrets Misappropriation – Accudyne and Sundyne

In order to establish a trade-secrets claim, a plaintiff must show: "(1) a trade secret existed; (2) the secret was misappropriated through improper acquisition, disclosure, or use; and (3) the owner of the trade secret was damaged by the misappropriation." *Destiny Health, Inc. v. Conn. Gen. Life Ins. Co.*, 2015 IL App (1st) 142530, ¶ 26. Sundyne and Accudyne argue that PeopleFlo cannot prove the first two elements, that a trade secret existed or that Sundyne misappropriated any alleged trade secret.

The Illinois Trade Secrets Act defines a trade secret as "information …. that: (1) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality." 765 ILCS § 1065/2(d). To claim protection under the ITSA, a plaintiff must be able to describe its trade secret with a "high level of specificity" so that a reviewing court can determine what information he actually seeks to protect. *See REXA, Inc. v. Chester*, 42 F.4th 652, 663 (7th Cir. 2022).

---

[31] There is diversity jurisdiction over this matter because plaintiff is an Illinois citizen. [1] ¶ 7. Defendants are citizens of Delaware, England, and Texas. [1] ¶¶ 8–10. The amount in controversy is more than $75,000. [1] ¶¶ 15, 19. All parties use Illinois law and both the DSA and the NDAs indicate they should be analyzed under Illinois law. *See* [342-1] at 1, [330-22] at 4, 8. As no party has argued that another state's substantive laws apply, I apply Illinois law. *See ECHO, Inc. v. Whitson Co., Inc.*, 52 F.3d 702, 707 (7th Cir. 1995).

Information "within the realm of general skills and knowledge in the relevant industry" is not a trade secret. *Id.* at 664 (quoting *Comp. Care v. Serv. Sys. Enters., Inc.*, 982 F.2d 1063, 1072 (7th Cir. 1992)). Finally, information disclosed through publication or in a patent or which can be readily ascertained through examination of a product cannot be protected as a trade secret. *See Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 540 (7th Cir. 2021). "In determining whether information is a trade secret, the focus of both the common law and the ITSA is on the secrecy of the information sought to be protected." *Stampede Tool Warehouse, Inc. v. May*, 272 Ill.App.3d 580, 588 (1st Dist. 1995) (citing *Hamer Holding Group, Inc.*, 202 Ill.App.3d 994, 1011 (1st Dist. 1990)).

### 1. Containment Shell

PeopleFlo asserts a trade secret in



[382] ¶ 19. There is no assertion or evidence that PeopleFlo disclosed its in-house molding process or that Sundyne has stolen PeopleFlo's in-house molding process; the question is whether PeopleFlo has a trade secret in the process of

PeopleFlo's containment shell production, as articulated in its brief, cannot be a trade secret because Xycomp DLF, a material created by third-party Greene Tweed,

exists in the marketplace. "Xycomp DLF is produced from aerospace-grade carbon fiber reinforced, unidirectional prepreg tape which is chopped into flakes … Flakes are matched-die compression molded in a proprietary process called Profusion®." [362-50] at 3; [382] ¶¶ 38–39. ████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████ A process that is known in the relevant market cannot be protected as a trade secret. *REXA, Inc.*, 42 F.4th at 664.

PeopleFlo characterizes Green Tweed's development of Xycomp DLF as the product of a "multi-year effort between Sundyne and its vendor to recreate PeopleFlo's trade secret disclosures, which led to the 2021 release of ████████████

████████████████████████████████████████████████████

████████████████████████████████ [368] at 20–21; *see* [382] ¶ 40. But PeopleFlo can point to no facts that actually support this assertion. Instead, the facts reflect that Stuart shared information about Xycomp DLF, which already existed in the market, with the Kontro CSA team. [362-50]; [382] ¶ 38. The HMD Kontro team investigated whether Xycomp DLF could be used to make the containment shells for the Kontro CSA, but there is no indication that they were telling Greene Tweed how to produce or manipulate the material; instead, the emails reflect that Stuart was sharing information about the specifications needed to ensure that the pumps functioned. *See* [362-51], [359-58], [362-52], [362-54], [362-55], 362-56], [362-57], [362-58], [362-59]; [382] ¶ 39. Clark, the head of engineering at HMD Kontro, testified that they did not help Greene Tweed with the creation of the DLF

58

material, and there is no evidence in the record that controverts his assertion. [331-4] at 242:9–23.[32]



it cannot be protected as a trade secret. Summary judgment for defendants on PeopleFlo's trade secret claim as it relates to the containment shell is granted.

    *2.*    *Bushings Design*

PeopleFlo designed a bushing system that combined

[382] ¶ 21. All four pieces of the design have been used previously in the pump industry—

[364] ¶¶ 65, 61, 66–67. No other pump has used the four features together in one pump. [382] ¶ 22.

---

[32] PeopleFlo's reliance on the Greene Tweed white paper announcing the new containment shell and thanking Sundyne for "its trust ... and to bring it first to market" is misplaced because Clark testified that HMD Kontro used Xycomp (not Xycomp DLF) for its GSP 40 bar containment shells. [331-4] at 243:10–20; [364] ¶ 38. Furthermore, the white paper refers to the fact that as of 2021, Xycomp shells had been sold for "ten years." [359-66] at 12.

PeopleFlo claims that the four design features used together creates a combination trade secret. "A trade secret can exist in a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process, design and operation of which, in unique combination, affords a competitive advantage and is a protectable secret." *3M v. Pribyl*, 259 F.3d 587, 595–96 (7th Cir. 2001).[33] The combination of generally known elements must "transform [the individual features] into something that is itself secret—that is, not generally known or easily duplicated by the industry." *Comput. Care*, 982 F.2d at 1075. "[B]eing the first or only one to use certain information does not in and of itself transform otherwise general knowledge into a trade secret." *Id.* at 1073 (internal quotation omitted).

No pump manufacturer had used this combination of the four design features in a pump before 2017. [382] ¶ 22. PeopleFlo argues that each element had a purpose— ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ [368] at 11. Sundyne argues that PeopleFlo has failed to show that the four distinct elements "combine to form a unified feature that affords a competitive advantage." [384] at 15. The fact that each of the elements was already known in the industry means that it

---

[33] *3M v. Pribyl* applies Wisconsin law, but the similarities between Wisconsin and Illinois trade secret law make the court's interpretation binding here. *See REXA, Inc. v. Chester*, 42 F.4th 652, 663 n. 2 (7th Cir. 2022).

is possible that the design elements could have been "easily duplicated" and thus not sufficiently secretive, but I cannot resolve that question of fact at summary judgment.

On the disclosure element, there is sufficient evidence in the record for a jury to find that PeopleFlo disclosed all four design elements to Sundyne.



[382] ¶ 11; [331-17] at 60:16–20. That fact is disputed, *see* [362-44], but at summary judgment I do not make credibility determinations.

Sundyne argues that PeopleFlo disclosed three of the four bushing features in its '764 patent—the use of an O-ring to center and secure the bearing and using a single bushing with one end flat to prevent radial motion. The patent does disclose all three of these features, *see* [330-20] at 25–26 (col. 8, ln. 40 through col. 9, ln. 5), which destroys the trade secret in those features. *Life Spine, Inc.*, 8 F.4th at 540. But the patent does not disclose ███████████████████████████████████ ███████████████████████████████ Furthermore, the sale of the PWA-SL does not destroy a potential trade secret in the bushings design. "A company does not forfeit trade secret protection by publicly displaying or selling a product unless the trade secret is 'readily ascertainable' upon examination of the

product." *Life Spine, Inc.*, 8 F.4th at 540 (citing Restatement (Third) of Unfair Competition § 39 cmt. f (1995)). While ████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████

Finally, it is undisputed that the Kontro CSA uses all four of the bushing design elements. [382] ¶ 43. When there is evidence that a trade secret has been disclosed to defendant and defendant manufactures a similar device, then the burden shifts to the defendant to show that it did not use the trade secret. *See Sokol Crystal Prods., Inc. v. DSC Commc'ns Corp.*, 15 F.3d 1427, 1432 (7th Cir. 1994); *REXA, Inc.*, 42 F.4th at 662 ("A misappropriation may also occur when a person produces 'modified or even new products that are substantially derived from the trade secret of another.'") (quoting *Mangren Rsch. & Dev. Corp. v. Nat'l Chem. Co.*, 87 F.3d 937, 944 (7th Cir. 1996)). While defendants argue that all four elements of the bushing design were known in the market, they have not put into evidence how the HMD Kontro team decided to use those elements together. If PeopleFlo establishes that the four elements qualify as a combination trade secret, then the burden would shift to Sundyne to show how it arrived at using all four elements in the HMD Kontro CSA. Sundyne is not entitled to judgment as a matter of law on this record.

Defendants focus on the fact that Blankmeier did not know the exact grade of carbon graphite used in his design or that used in the Kontro CSA. [336] at 17. But Blankmeier's knowledge of whether Kontro CSA used PeopleFlo's trade secret is not

a necessary element of PeopleFlo's claim. Instead, the plaintiff must make a showing that "the secret was misappropriated through improper acquisition, disclosure, or use." *Destiny Health, Inc.*, 2015 Il App (1st) 142530, ¶ 26. The objective truth of whether the product uses the trade secret or was substantially derived from the trade secret is the necessary element. In this case, PeopleFlo meets its burden at summary judgment by showing a dispute of material fact as to whether the bushings design is a combination trade secret and whether Sundyne used the knowledge of PeopleFlo's design to create its Kontro CSA bushing system.

Accudyne argues that it is not liable for any wrong committed by Sundyne because the two are distinct corporate entities. [327] at 15. PeopleFlo responds that Johansson was an Accudyne employee and a corporation can be liable for the actions of its employees. The record reflects that Johansson was an Accudyne employee who was temporarily working at Sundyne in product management and marketing. *See* [364] ¶ 28. Accudyne simply states that Johansson was "on loan to Sundyne" without providing evidence or argument about the legal effect of being "on loan." Accudyne has not demonstrated that it is entitled to judgment as a matter of law, so I decline to enter summary judgment for Accudyne on the misappropriation of trade secrets claim as it relates to PeopleFlo's bushings design.

### 3. Go-to-Market Strategy

Finally, PeopleFlo claims a trade secret in its "go-to-market" strategy, ███

████████████████████████████████████████████████████████

████████████████████████████████████████ [364] ¶¶ 69, 76.

63

To qualify as a trade secret the unknown elements of the design or strategy must be the aspect that gives the design or strategy its value. *See* 765 ILCS 1065/2(d)(1). The parts of PeopleFlo's marketing strategy that are valuable, and secret, are the physical design features and manufacturing process that allows it to produce a pump (or MCU) at a reduced cost. The record reflects that aiming to replace sealed pumps with sealless pumps has long been a goal for sealless pump manufacturers. *See* [364] ¶¶ 74–75. What differentiated PeopleFlo's strategy was the proposition that it could build an effective sealless pump for less money, and that proposition rested on its design and manufacturing process. *See* [364] ¶¶ 84, 78. The design and manufacturing process are what give PeopleFlo's "go-to-market" strategy its value, and those are the elements that PeopleFlo can protect.

A marketing strategy can be a trade secret. *See* 765 ILCS 1065/2(d) ("trade secret" can be "information … technical or non-technical data … technique, financial data, or list of actual or potential customers."); *Lucini Italia Co. v. Grappolini*, No. 01 CV 6405, 2003 WL 1989605 (N.D. Ill. Apr. 24, 2003). But in order to garner trade secret protection, there must be something unique and unknown about the marketing plan. For example, the plaintiff in *Lucini Italia Co.* had completed market research by holding focus groups and used that information to create labels for its products, brand design, and pricing strategies. *Id.*, at **10–11. PeopleFlo has not submitted any evidence that it had engaged in similar market investigation to create its plan to target the sealed pump market. PeopleFlo recognized an opportunity, but the

evidence shows that other companies had similarly recognized and sought to capitalize on that opportunity.

While a marketing strategy can be a trade secret, there must be information that is particular, unknown, and valuable within that strategy to qualify. ▅▅▅ ▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅ ▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅ it was PeopleFlo's design and manufacturing process that would have differentiated PeopleFlo's strategy and those elements are analyzed above—only the bushings design arguably qualifies as a trade secret. Summary judgment is appropriate for defendants on PeopleFlo's trade secret claim as it relates to its go-to-market strategy.

## B. Count IV: Breach of Contract – Accudyne and Sundyne

Sundyne makes no argument in its opening brief about why it is entitled to summary judgment on PeopleFlo's breach of contract claim, so it has forfeited that argument. *See Narducci v. Moore*, 572 F.3d 313, 323–24 (7th Cir. 2009) (argument made for the first time in a reply brief is forfeited).

Accudyne argues that PeopleFlo's breach of contract claim based on the NDA must fail because it relies on the same facts as PeopleFlo's trade secret misappropriation claim. Because I find that there is an issue of material fact as to whether PeopleFlo's bearings design was a trade secret and whether Sundyne relied on that trade secret when developing the HMD Kontro CSA, I deny Accudyne's motion for summary judgment on the breach of contract claim.

65

### C.     Count I: Breach of Contract – PumpWorks

A breach of contract claim requires a plaintiff to show (1) the existence of a valid and enforceable contract, (2) substantial performance by the plaintiff, (3) a breach by defendant, and (4) damages. *Hernandez v. Illinois Inst. of Tech.*, 63 F.4th 661, 667 (7th Cir. 2023). When interpreting a contract, a court should "ascertain and give effect to the intention of the parties at the time the contract was formed. Where no ambiguity exists, the intent of the parties at the time the contract was entered into must be ascertained from the language of the contract itself." *Matthews v. Chicago Transit Auth.*, 2016 IL 117638, ¶ 77 (cleaned up). PeopleFlo claims that PumpWorks breached four of its obligations under the DSA.

#### 1.     *Best Efforts*

The DSA requires PumpWorks to "use its best efforts to develop business and, promote the sale and use of, and sell the MCUs in connection with the Pumps." [352] ¶ 12; [382] ¶ 54; [342-1] at 11–12. In Illinois the term "best efforts" is rarely enforced without there being some external criteria by which to measure the efforts. *See Beraha v. Baxter Health Care Corp.*, 956 F.2d 1436, 1440–41 (7th Cir. 1992) (citing in part *Kraftco Corp. v. Kolbus*, 1 Ill.App.3d 635, 639–640 (4th Dist. 1971) ("best efforts to sell" is too vague to be intelligible without obligation to sell specific quantity or meet quotas)); *Clever Ideas, Inc. v. Citicorp Diners Club, Inc.*, No. 02 CV 5096, 2003 WL 21982141, at **15–17 (N.D. Ill. Aug. 20, 2003). The relevant clause of the DSA does not provide criteria to measure PumpWorks's efforts and PeopleFlo is bringing breach of contract claims based on the other, more definite terms of the DSA—i.e.,

66

failure to provide a sales organization, failure to provide reports or forecasts. Standing alone then, it is difficult to see how "best efforts" is enforceable.

PeopleFlo points out that Illinois courts enforce (or insert) "best efforts" clauses when the contract is between a supplier and an exclusive distributor. *See W.P. Iverson & Co v. Dunham Mfg. Co.*, 18 Ill.App.2d 404, 413–15 (1st Dist. 1958); *Gentieu v. Tony Stone Images/Chicago, Inc.*, 255 F.Supp.2d 838, 867–68 (N.D. Ill. 2003). This practice traces back to *Wood v. Lucy, Lady Duff-Gordon*, in which the court inserted a "best efforts" clause into an exclusive contract between a clothes designer and a distributor; otherwise, the contract would fail for a lack of mutuality because Lady Duff-Gordon was only compensated if Wood sold her product. *See TMG Kreations, LLC v. Seltzer*, 771 F.3d 1006, 1012 (7th Cir. 2014) (discussing *Wood v. Lucy, Lady Duff-Gordon*, 222 N.Y. 88 (1917)). Here, however, there is no concern about lack of mutuality because PumpWorks pays PeopleFlo for each MCU it orders and there were minimum order requirements in the contract. [392] ¶ 3; [342-1] at 2–3; *Beraha*, 956 F.2d at 1442 (declining to enforce a "best efforts" clause where plaintiff received advance royalties).[34] PeopleFlo is protected by the definite terms of the DSA; the "best efforts" clause does not include criteria by which to measure the efforts, nor is it necessary to save the contract from a lack of mutuality. It is not independently enforceable.

---

[34] People Flo's argument that PumpWorks provided "no efforts" to promote the sale and use of the PWA-SL, [343] at 11, is belied by the evidence in the record. *See* [392] ¶¶ 27–28, 30, 33–34. The argument that the delay of the PWA-SL's launch violates the DSA is unsupported because there was no requirement in the DSA for the PWA-SL to launch on a particular day or even within a particular timeframe. The DSA only defines the phases of the project and Phase I was defined to start when "Pump Works and PeopleFlo reasonably agree" that PeopleFlo could manufacture MCUS and supply to PeopleFlo for "product validation and rollout." [364] ¶ 112.

### 2. Lack of Sales Organization

The next obligation at issue is the requirement that "PumpWorks will maintain a sales organization that actively solicits the sale of the Pumps, carry out promotional programs … and will develop all sales and marketing materials related to the MCU and the Pumps. PumpWorks will appoint a product line manager for the MCUs to coordinate with PeopleFlo." [342-1] at 12. PumpWorks worked with DXP and independent distributors to sell the PWA-SL. [392] ¶¶ 27–28; [364] ¶ 134. PumpWorks promoted the pump at DXP gatherings and pump industry conferences. [392] ¶ 28. It also created sales and marketing materials for the PWA-SL including a brochure, the press release announcing the launch of the product, display of the product on PumpWorks's website, and a demonstrative model of the pump. [392] ¶ 28. Giessing was the product line manager for the MCUs. [392] ¶ 27.

Most of PeopleFlo's argument is that PumpWorks's sales organization and marketing were inept or substandard, but a dispute over the effectiveness of PumpWorks's sales team is distinct from a claim that PumpWorks breached its contractual obligation to provide a sales organization and marketing. The one area where PeopleFlo claims that PumpWorks had no sales organization at all was in the areas affected by the DXP regional vice presidents' contracts with Sundyne. Because the DSA gives PumpWorks exclusivity worldwide in return for PumpWorks's supplying a sales organization for the PWA-SL, PeopleFlo argues that PumpWorks was required to provide a sales organization in all territories. [394] at 10 ("There was no reason to list each geographic territory in the DSA based on those express terms.").

But PeopleFlo cites no legal authority for this proposition and taking the argument one step further, it suggests that PumpWorks could be liable for not providing a sales organization in any location in the world because PumpWorks had been granted worldwide exclusivity.

PumpWorks could have done a better job of rolling out the PWA-SL and training the salespeople who would be offering the product. But that does not amount to a breach of the DSA. The undisputed evidence demonstrates that PumpWorks provided a sales organization through DXP and independent distributors and created marketing and promotional materials for the PWA-SL; it did not breach its contractual obligations under the DSA.

### 3. Forecasting and Reporting Obligations

The DSA states: "PumpWorks will consult with PeopleFlo quarterly to project the forecasted requirements of PumpWorks for the MCUs" and "PumpWorks will prepare and provide to PeopleFlo regular reports updating business or technical trends, and report promptly any test results in order to assist PeolpeFlo [sic] with integration and trouble-shooting regarding the MCUs." [342-1] at 12.

It is undisputed that PumpWorks only provided one formal forecast of sales and Maxwell did not know when he provided the forecast. [352] ¶ 44. On the other hand, the parties met monthly from September 2019 to March 2020, meetings during which PumpWorks shared information on quotes and sales, including raw quote data in January 2020. [392] ¶ 34. There were approximately seven meetings after the PWA-SL's launch wherein PumpWorks provided information about the demand in

the market for the PWA-SL so that PeopleFlo could be prepared to manufacture the requisite MCUs. *Id*. The DSA does not require a written forecast, instead it requires a quarterly meeting "to project the forecasted requirements," and the uncontroverted evidence in the record is that PumpWorks met monthly to share information about activity in the market with PeopleFlo. There was no breach of PumpWorks's requirement to consult regularly with PeopleFlo to project the forecasted requirements for the MCUs.

The regular meetings between PeopleFlo and PumpWorks also suffice to meet PumpWorks's requirement to provide "regular reports updating business or technical trends, and report promptly any test results in order to assist PeopleFlo with integration and trouble-shooting regarding the MCUs." [342-1] at 12. PeopleFlo and PumpWorks met weekly for nearly eighteen months and monthly for the six months thereafter until their relationship fell apart. [392] ¶ 33. It is undisputed that test results were a topic of conversation and that PumpWorks shared test results and data sheets with PeopleFlo. [392] ¶ 33. The parties had extensive discussions about the technical features of the MCUs. *Id*. PumpWorks cites only one update on business trends, that Sundyne would be introducing a new light duty mag drive pump. *Id*. But the language of the contract is disjunctive—business *or* technical trends and there is evidence in the record that the parties discussed the technical aspects of the pump, including how it could be improved. Finally, by sharing test results and field experience, the meetings provided information to PeopleFlo that helped it improve

70

the design of the MCUs. PeopleFlo asserts no argument about why these oral reports do not meet the requirements of the DSA. There was no breach.

### 4. Damages

Even if PeopleFlo could show that PumpWorks breached the terms of the DSA, its breach of contract claim fails because PeopleFlo did not suffer any damages as a result of the alleged breach. *Ivey v. Transunion Rental Screening Sols., Inc.*, 2021 IL App (1st) 200894, ¶ 38 ("In a breach of contract case, a plaintiff must establish an actual loss or measurable damages resulting from the breach in order to recover … failure to prove damages entitles the defendant to judgment as a matter of law.") (cleaned up). PeopleFlo claims that if not for PumpWorks's breach it would have recouped its labor, material, and operating costs and that it lost profits from the future success of the business. [394] at 14. Neither argument is persuasive.

"The general rule is that damages for breach of contract should place the injured in the same position it would have been in had the contract been fully performed." *Delatorre v. Safeway Ins. Co.*, 2013 IL App (1st) 120852, ¶ 36. Nothing in the terms of the DSA required PeopleFlo to be compensated for its out-of-pocket costs; PeopleFlo was paid for each MCU sold. PeopleFlo makes no cogent argument otherwise. It is true that a plaintiff may recover for out-of-pocket costs but the facts of the cases that PeopleFlo cites are quite different—the sale of a damaged house where the cost of repairs put the plaintiff in the position he would have been in had defendant not breached, and the delivery of defective steel that meant plaintiff general contractor lost its bonus for timely completion. *See LeFevour v. Howorka*, 224

Ill.App.3d 428, 431 (1st Dist. 1991) *and Ill. Structural Steel Corp. v. Pathman Const. Co.*, 23 Ill.App.3d 1, 6–7 (1st Dist. 1974). Nothing in those cases stands for the proposition that when a manufacturer has been paid for its product and a purchaser stops buying the product, the manufacturer is entitled to the cost of making the products for which he has already been paid.

PeopleFlo argues that PumpWorks's breaches caused fewer sales of the PWA-SL, but it does not provide factual support for that argument.[35] Furthermore, "[i]n Illinois, a plaintiff pursuing damages for future lost profits must establish those damages with reasonable certainty … Generally, such evidence involves past profits in an established business." *Chicago Joe's Tea Room, LLC v. Village of Broadview*, No. 22-3194, 2024 WL 771527, at *7 (7th Cir. Feb. 26, 2024) (cleaned up). There is no inviolate rule against awarding lost profits to a new business, but "[t]he nature of the business or venture upon which the anticipated profits are claimed must be such as to support an inference of definite profits grounded upon a reasonably sure basis of facts." *Ivey v. Transunion Rental Screening Sols., Inc.*, 2022 IL 127903, ¶ 31 (internal quotation omitted). PeopleFlo argues that it was a not a new business in 2019, but that is not the relevant inquiry. PeopleFlo does not point to a "similar product or a similar business in a similar market" on which to base its claim that the PWA-SL would have been successful. *Ivey*, 2022 IL 127903, ¶ 37.

---

[35] PeopleFlo cites *Hutchcraft v. Indep. Mech. Indus., Inc.* for the proposition that PumpWorks must affirmatively disprove damages. *See* [394] at 14–15 (citing *Hutchcraft v. Indep. Mech. Indus., Inc.*, 312 Ill.App.3d 351, 355 (4th Dist. 2000). But, as that opinion discusses, this is a "Celotex-type" motion for summary judgment where the plaintiff must show that there is a question of fact or some evidence upon which a reasonable jury could find for the plaintiff on the elements of its claim. *Id.*

PeopleFlo seeks to differentiate *Ivey v. Transunion Rental Screening*, the recent Illinois Supreme Court case on lost profits, but the facts there are remarkably similar. *Id.*, 2022 IL 127903. Ivey was an executive at a real estate company who had extensive experience in creating leases. *Id.* at ¶ 3. He left his company to start a new company that would provide customizable lease forms and entered into an agreement with Transunion to provide those forms on its tenant screening products. *Id.* at ¶¶ 4–5. Transunion never built the platform to include the leases on its products and Ivey sued for breach of contract. *Id.* at ¶¶ 6–9. The court found that Ivey could not establish lost profits, even with expert testimony, because he had created a new product that did not have an established market. *Id.* at ¶¶ 34–36. While PeopleFlo was an existing company that had considerable experience in designing and building pumps, it has not provided any evidence that it previously created and sold a sealless pump based on the Project Colorado technology. *See TAS Distrib. Co., Inc. v. Cummins Engine Co., Inc.*, 491 F.3d 625, 634–35 (7th Cir. 2007) ("Illinois courts likewise have held that the new business rule applies with equal force to new products which create potential new business for the entity.").

PeopleFlo has not provided evidence upon which a reasonable jury could find that but-for PumpWorks's breaches, it would have made profits from the PWA-SL. *See Ivey*, 2022 IL 127903, ¶ 38 (affirming trial court's grant of summary judgment to defendant because plaintiff could not show damages from breach). For that reason, summary judgment is appropriate for PumpWorks on PeopleFlo's breach of contract claim.

### D. Counterclaim: Breach of Contract – PeopleFlo

PumpWorks seeks summary judgment on its claim of breach of contract against PeopleFlo for its failure to deliver the MCUs that PumpWorks ordered and paid for. Section One of the DSA states, "PeopleFlo agrees to manufacture and supply to PumpWorks, based upon purchase orders submitted by PumpWorks, and PumpWorks agrees to purchase from PeopleFlo and stock MCUs at a minimum volume of MCUs [as determined by the subsequent schedule]." [342-1] at 2. There is no requirement in this portion of the DSA that PumpWorks's orders be "reasonable."

PumpWorks submitted purchase orders for 400 MCUs and paid 90% of the purchase price. [392] ¶ 5. It is undisputed that PeopleFlo has not delivered all of the MCUs (or even 90% of them). [392] ¶ 6. The DSA does not set out a delivery schedule for the MCUs, but PumpWorks points to the UCC provision that when a contract does not provide a timeline for shipment or delivery, then it shall be "a reasonable time." 810 ILCS 5/2-309(1). PeopleFlo argues that section 309 requires that there was no previously agreed upon delivery schedule and the parties had agreed to PeopleFlo's delivery of five to six MCUs per week. *See* [392] ¶ 9. But PeopleFlo is no longer, and has not been for some time, sending five to six MCUs per week to PumpWorks. *See* [392] ¶ 7 (last shipment of MCUs was April 17, 2020). PeopleFlo has breached the terms of the DSA with the implied provision of a reasonable timeline for delivery.

Because PumpWorks did not breached its obligations under the DSA (discussed above), there was substantial performance of the contract on PumpWorks's part. Furthermore, even if I had found that PumpWorks breached the DSA, the fact

74

that PeopleFlo continued working under the DSA means that PumpWorks's breach does not bar its recovery for PeopleFlo's later breach. *See PML Development, LLC v. Village of Hawthorn Woods*, 2023 IL 128770, ¶¶ 51–52. Finally, PumpWorks was injured by the breach because it does not have the MCUs that it ordered and paid for and PeopleFlo admits that it has retained the pre-payments. [392] ¶ 6.

PumpWorks also argues that it has satisfied the requirements of Section 3 of the DSA which give it the right to purchase the Manufacturing License for the MCUS for one dollar and terminate the Agreement. Section 3 states that if "PeopleFlo is unwilling or unable to manufacture MCUs in sufficient quantities to meet PumpWorks' reasonable orders" then PumpWorks should send written notice and demand that PeopleFlo demonstrate that it is willing and able to manufacture such MCUs. [342-1] at 5. If PeopleFlo fails to reasonably demonstrate that it is willing and able to manufacture the MCUs within 90 days of the date of the letter, then PumpWorks can, "as its sole remedy" purchase the Manufacturing License for one dollar and terminate the agreement. [342-1] at 5. PumpWorks relies on the letters sent by Little and Giessing in April and November 2020. [392] ¶¶ 11, 13.

PeopleFlo argues that David Little's April letter does not meet the requirements of notice under the DSA because it was sent from Little's executive assistant at DXP, cc'ed to Little's DXP email, and sent in an DXP envelope. [394] at 23. But PeopleFlo does not dispute that Little was the CEO of PumpWorks at the time, *see* [364] ¶ 4, or make a legal argument that Little did not have the authority to send notice under the DSA. Furthermore, the notice requirements of the DSA are

75

about *to whom* the notice is sent, not the envelope or email address from which the notice was sent. *See* [342-1] at 13. PeopleFlo raises a question of fact about its April 28, 2020 response to Little's letter, and whether the letter provides "reasonably demonstrated assurances" that PeopleFlo was willing to make MCUs. [392] ¶ 12. PumpWorks has not established as a matter of law that it's entitled to the Section 3 remedy.

Regardless, the terms of the DSA state that purchase of the Manufacturing License for one dollar would be PumpWorks's "sole remedy" for PeopleFlo's failure to show that it was manufacturing MCUs. [342-1] at 5. Invoking Section 3 would be PumpWorks's sole remedy to the exclusion of damages if PumpWorks so chose. PumpWorks must decide whether it wants to pursue its claim for money damages or its claim that it is entitled to injunctive relief under the DSA. There are disputed issues of fact about the amount of money damages and PeopleFlo's response to the April 2020 letter. Summary judgment on liability for breach of contract is appropriate, but not on the remedy.

### E.    Counts III and VII: Tortious Interference with Contract – Sundyne and DXP

A claim for tortious interference with contract requires (1) the existence of a valid enforceable contract between the plaintiff and another; (2) the defendant's awareness of the contract; (3) the defendant's intentional and unjustified inducement of a breach of the contract; (4) a subsequent breach caused by the defendant's conduct; and (5) damages. *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 131 Ill.2d 145, 154–55 (1989). Because I have found that there was no breach of the DSA,

PeopleFlo's claims for tortious interference with contract fail. *See Bank Financial, FSB v. Brandwein*, 2015 IL App (1st) 143956, ¶ 46 (no evidence to support breach of contract resulted in judgment as a matter of law on claim for tortious interference with contract).

### F. Counts II and VI: Tortious Interference with Prospective Business Advantage – Sundyne and DXP

To succeed on a claim of tortious interference with prospective business advantage, "(1) a plaintiff must have a reasonable expectancy of a valid business relationship, (2) defendant must know about it, (3) defendant must intentionally interfere with the expectancy, and so prevent it from ripening into a valid business relationship, and (4) intentional interference must injure the plaintiff." *Schuler v. Abbott Lab'ys*, 265 Ill.App.3d 991, 994 (1st Dist. 1993). Defendants argue that PeopleFlo has failed to show evidence that it had a reasonable expectancy of a valid business relationship with specific customers as required to meet the first element. *See DuPage Aviation Corp. v. DuPage Airport Auth.*, 229 Ill.App.3d 793, 803–04 (1st Dist. 1992).[36]

PeopleFlo identifies two lost sales—a possible sale to the beta site at PPG and a denied request from a DXP salesperson to present the PWA-SL to a chemical manufacturer. *See* [364] ¶ 130; [352] ¶ 26. DXP's rejoinder is that the two potential

---

[36] PeopleFlo's reliance on *Labor Ready, Inc. v. Williams Staffing, LLC*, 149 F.Supp.2d 398, 410 (N.D. Ill. 2001), is misplaced because in Illinois a plaintiff must allege a relationship with a specific third party. *See BCS Servs., Inc. v. Heartwood 88, LLC*, 637 F.3d 750, 761 (7th Cir. 2011) (citing cases).

deals were with two DXP's customers, not PeopleFlo's. Tortious interference is about the disruption of a potential business relationship between *the plaintiff* and a third party. *See Schuler*, 265 Ill.App.3d at 994–95 (plaintiff's prospective employers); *BCS Services, Inc. v. Heartwood 88, LLC*, 637 F.3d 750, 761 (7th Cir. 2011) (plaintiffs were bidders at a tax lien auction and third party was the County as owner of the tax lien); *Adams v. Catrambone*, 359 F.3d 858, 860–61, 865 (7th Cir. 2004) (plaintiff's future employer, even where defendant was president of the corporation); *Associated Underwriters of America Agency, Inc. v. McCarthy*, 356 Ill.App.3d 1010, 1012–13, 1020 (1st Dist. 2005) (plaintiff was insurance wholesaler who had reasonable expectancy of business relation with subproducer). PeopleFlo can't base its claim for tortious interference with business expectancy on its expectancy of purchases by downstream customers. Summary judgment is appropriate for defendants DXP and Sundyne on PeopleFlo's claims for tortious interference with prospective business advantage.

### G. Count VIII: Civil Conspiracy – PumpWorks, Sundyne and DXP

A claim for civil conspiracy requires "(1) a combination of two or more persons, (2) for the purpose of accomplishing some concerted action either an unlawful purpose or a lawful purpose by unlawful means, (3) in the furtherance of which one of the conspirators committed an overt tortious or unlawful act." *Fritz v. Johnston*, 209 Ill.2d 302, 317 (2004). PeopleFlo contends that DXP, Sundyne, and PumpWorks worked together to "prevent PeopleFlo's sealless pump technology, and the PWA-SL

Product line from reaching a majority of significant sales markets in the United States" and to cover up Sundyne's alleged theft of trade secrets.

PeopleFlo's cannot advance its claim of civil conspiracy based on DXP and Sundyne's alleged tortious interference with contract or business advantage because the underlying tort claims fail as a matter of law. *See Law Offices of David Freydin, P.C. v. Chamara*, 24 F.4th 1122, 1133 (7th Cir. 2022). The only evidence that DXP or PumpWorks knew about Sundyne's Kontro CSA is that Hook (a DXP employee) traveled to the HMD Kontro plant in the spring of 2019. [363] ¶ 138. There is no evidence in the record that Hook knew or believed that the HMD Kontro CSA incorporated PeopleFlo's trade secrets; Hook's uncontroverted testimony is that he never told Giessing or Maxwell that he thought the Kontro CSA incorporated PeopleFlo's designs or trade secrets. *See* [364] ¶ 140.

Accepting as true the assertions that Maxwell and Giessing told Blankmeier that the HMD Kontro CSA incorporated PeopleFlo's ideas, that is solely evidence that Maxwell and Giessing reported the alleged theft; it is not evidence that Maxwell or Giessing hid the alleged theft, or somehow acted to help Sundyne achieve its goal of incorporating PeopleFlo's trade secrets into the HMD Kontro CSA. Evidence that one party knew about another's bad behavior is not evidence that the parties were working together. *See Fritz*, 209 Ill.2d at 318 (allegations in complaint indicating that Governor's office knew about issue between plaintiff and co-defendant is not evidence that Governor's office and co-defendant conspired together).

PeopleFlo asserts no other factual basis for its argument that Sundyne, PumpWorks, and DXP acted in concert to hide Sundyne's misappropriation of PeopleFlo's trade secrets. Because there is no basis for a reasonable jury to conclude that PumpWorks, Sundyne, and DXP were working together, summary judgment for defendants is appropriate on the civil conspiracy claim.

## V.     Conclusion

Accudyne's motion for summary judgment, [325], is granted in part, denied in part. Sundyne's motion for summary judgment, [334], is granted in part, denied in part. Summary judgment is granted for Accudyne and Sundyne on PeopleFlo's trade secrets misappropriation claim to the extent it relies on PeopleFlo's containment shell and go-to-market strategy and for Sundyne on PeopleFlo's tortious interference with contract and business expectancy and conspiracy claims. Summary judgment is denied for Accudyne and Sundyne on PeopleFlo's trade secret misappropriation claim to the extent it relies on PeopleFlo's bearings design and on PeopleFlo's breach of contract claim.

DXP's motion for summary judgment, [337], is granted. PeopleFlo's motion for partial summary judgment, [340], is denied. PumpWorks's motion for summary judgment, [347], is granted as to liability, but denied as to damages.

PeopleFlo's motion for sanctions, [377], is denied. PumpWorks's motions for oral argument, [397], and leave to file three new exhibits and a reply brief, [398], are denied.

ENTER:

_____
Manish S. Shah
United States District Judge

Date:  March 22, 2024