# EXHIBIT 1

Case: 1:20-cv-03642 Document #: 472-1 Filed: 08/15/25 Page 2 of 17 PageID #:37397

Case: 1:20-cv-03642 Document #: 342-1 Filed: 04/18/23 Page 2 of 17 PageID #:20659
Case: 1:20-cv-03642 Document #: 77-1 Filed: 03/08/21 Page 2 of 17 PageID #:1667

## DEVELOPMENT AND SUPPLY AGREEMENT

THIS DEVELOPMENT AND SUPPLY AGREEMENT (this "Agreement") is entered into as of this 22nd day of March, 2018 (the "Effective Date"), by and between **PEOPLEFLO MANUFACTURING, INC.**, an Illinois corporation ("PeopleFlo"), and **PUMPWORKS, LLC**, a Delaware limited liability company ("PumpWorks"). The parties agree as follows:

1. Development of Magnetic Coupling Unit. PeopleFlo agrees to engineer and design a magnetic coupling unit (each, a "MCU") for ASME B73.3 single stage ANSI centrifugal pumps based upon the technology described in Pump Devices US Patent No 9,920,764 issued March 2018 (collectively, including the referenced patent and intellectual property contained therein, any patents that issue from such referenced application in the United States or any foreign country, region, or territory; any later filed continuation or divisional application that claim the benefit of priority of the applications described above (whether designated as a "continuation" application, a "continued prosecution" application, a "request for continued examination" application, or any other term assigned by the patent offices of this or a foreign country) and any patent that issues therefrom (in the United States or any foreign country, region, or territory); any later filed continuation-in-part application that claim the benefit of priority of the application described above and any patents that issue therefrom (in the United States or any foreign country, region, or territory); and any application that is the subject of a reissue procedure (whether for purposes of broadening the claims or not) or a reexamination procedure and that claims the benefit of priority of one or more of the application referenced above, the "Technology") by reference, to meet, in all material respects, the specifications and requirements of PumpWorks, as described on **Exhibits A** attached hereto and incorporated herein by reference (collectively, the "Work").

2. Purchase and Supply of MCUs. PeopleFlo agrees to manufacture and supply to PumpWorks, based upon purchase orders submitted by PumpWorks, and PumpWorks agrees to purchase from PeopleFlo and stock MCUs at a minimum volume of MCUs as follows:

Pre-Phase I: Performance of the Work ("Pre-Phase I").

During Pre-Phase I PumpWorks agrees to order MCUs as selected by PumpWorks as follows:

   a. 100 MCUs upon full execution of this Agreement; and

   b. 100 MCUs within six (6) months after execution of this Agreement (provided the Work has progressed to PumpWorks' and PeopleFlo's reasonable satisfaction).

PumpWorks agrees to pay for such MCUs fifty (50%) percent upon placement of order and fifty (50%) percent upon completion of order and before shipment.


EXHIBIT: 6
NAME: PeopleFlo
DATE: 12-14-21
Pat E. Arredondo, CRR, RMR

Phase I: Validation and Rollout ("Phase I").

Phase I of this Agreement shall continue for two (2) years from and after the date that PumpWorks and PeopleFlo reasonably agree the Work has been completed and PeopleFlo is ready and able to manufacture and supply MCUs to PumpWorks pursuant to the terms of this Agreement for the purpose of product validation and rollout of the MCU product to market. During the second year of Phase I, PumpWorks shall order a minimum of 200 MCUs.

Phase II: Success Phase ("Phase II").

Phase II of this Agreement shall begin upon the end of Phase I and shall continue until termination of this Agreement or the payment of the Manufacturing License Fee pursuant to Section 3 below. During Phase II, PumpWorks shall order the minimum volume of MCUs selected by PumpWorks as follows:

 a. Year three (3) – 250 MCUs;

 b. Year four (4) – 300 MCUs.; and

 c. After year four (4) – 350 MCUs per year.

During all phases of this Agreement, so long as PeopleFlo is manufacturing the MCUs, PumpWorks shall provide PeopleFlo with the impeller raw casting for the manufacture of the MCUs. The purchase price to be paid by PumpWorks for each MCU is as set forth on **Exhibit A** attached hereto, subject to mutually agreed upon price increases supported by relevant price change indexes. Except for purchases during Pre-Phase I, the purchase price (hereinafter referred to as the "Purchase Price") for each order shall be paid in milestone payments as set forth below:

 a. Twenty-five (25%) percent at time of order;

 b. Fifty (50%) percent upon completion of order and before shipment; and

 c. Twenty-five (25%) net 30 after shipment.

PeopleFlo will ship the ordered MCUs at PumpWorks' expense to PumpWorks at the location designated by PumpWorks in its purchase order in accordance with the delivery schedule required by PumpWorks for such order PeopleFlo agrees that all MCUs will be packaged and prepared suitably for transportation and handling. All MCUs will be shipped Ex Works PeopleFlo's manufacturing facility.

3. Exclusive Agreement. Subject to the terms and conditions set forth herein PeopleFlo grants (subject to PumpWorks ordering the minimum volume of MCUs set forth in Section 2 above) to PumpWorks during Pre-Phase I and Phase I the exclusive, world-wide right and license (the "Use License") to use and incorporate MCUs into the its PWA model pumps for resale to its end-users ("Customers"). The license granted hereinabove shall be

assignable to any subsidiary or affiliated entity of PumpWorks and shall terminate if PumpWorks fails to order the minimum volume of MCUs set forth in Section 2 above. PeopleFlo specifically acknowledges and agrees that the development, use, license, sale, or any other disposition of the Technology (and Know-How and R&D (hereinafter defined)) in the ASME B73.3 single stage ANSI centrifugal pumps (the "Field") is exclusive to PumpWorks during Pre-Phase I and Phase I. PeopleFlo agrees that it will not, directly or indirectly, whether by operation of law or otherwise, sell, market, use, license, assign, or otherwise transfer any right or interest in and to the Technology Know-How and R&D, or any derivative thereof in the Field, and/or to any competitor of PumpWorks, during the term of this Agreement so long as PumpWorks' rights are exclusive under any of the licenses granted hereunder, including the Use License and the Manufacturing License (hereinafter defined). PeopleFlo acknowledges that a breach or threatened breach of the provisions of this paragraph relating to exclusivity of PumpWorks will cause irreparable harm to PumpWorks that cannot be adequately remedied by an award of monetary damages. PeopleFlo accordingly agrees that in the event of a breach, or a threatened breach, of such provisions, PumpWorks will be entitled to, without having to post a bond or other similar undertaking, injunctive relief, specific performance or other appropriate equitable remedies against such breach or threatened breach, without showing or proving any actual damage sustained by PumpWorks, this being in addition to and without prejudice to any other remedy to which PumpWorks is entitled at law or in equity. PeopleFlo further agrees that, in the event of any action for an injunction or specific performance in respect of any such threatened or actual breach or violation, it shall not assert that a remedy at law would be adequate. PeopleFlo further agrees that it will be responsible for any actual, direct damages, claims, liabilities, losses, costs or expenses resulting from, or arising out of PeopleFlo's breach or threatened breach of this paragraph including, without limitation, attorneys' fees and litigation costs incurred by PumpWorks.

At the end of Phase I, by notice to PeopleFlo, PumpWorks shall have the option to purchase from PeopleFlo the production know-how and all related plans, drawings, MCU designs, cell designs, and specifications for the MCUs ("Know-How and R&D") and to extend the term of exclusivity to the Use License for perpetuity (subject to PumpWorks continuing to order the minimum volumes set forth in Section 2 hereinabove) for a one-time payment of an exclusivity extension fee in the amount of $1,300,000.00. At any time after the fifth (5th) year of Phase II, PumpWorks shall have a right to expand the Use License to grant PumpWorks the right to use the Technology, Know-How and R&D to manufacture, have manufactured by third parties, market, use and incorporate into its own products, sell, and offer to sell, MCUs, including but not limited to by incorporation of the MCUs into the Pumps, in the Field (the "Manufacturing License") in exchange for the payment of a one-time license expansion fee in the amount of $700,000.00 (the "Manufacturing License Fee") plus payment of a royalty in the amount of $500 per MCU sold thereafter (the "Manufacturing Royalty"), such Manufacturing Royalty to paid on a quarterly basis for MCUs sold during the previous calendar quarterly (for clarity, the sale of a Pump incorporating a MCU shall be a sale of a MCU); further provided the Manufacturing Royalty shall reduce to $0.00 six (6) years after payment of the Manufacturing License Fee. PumpWorks shall also have the right under the Manufacturing License to engineer, design, and manufacture improvements and derivatives of the

Technology Know-How and R&D, which improvements and derivatives shall be exclusively owned by PumpWorks.

If at any time during any phase of this Agreement, PeopleFlo is unwilling or unable to manufacture MCUs in sufficient quantities to meet PumpWorks' reasonable orders, PumpWorks, after ninety (90) days written notice and provided PeopleFlo has failed to reasonably demonstrate that is willing and able to manufacture such MCUs within such ninety (90) day period, can, as its sole remedy, immediately purchase the Manufacturing License for $1.00 and this Agreement shall terminate.

4. Royalty Payments.

    a. On or before the date which is thirty (30) days after the last day of each calendar quarter PumpWorks shall prepare and deliver to PeopleFlo a written statement setting forth in reasonable detail the basis of its determination of the number of MCUs sold during the prior calendar quarter, a copy of PumpWorks' basic business records supporting that determination, and its calculation of the resulting aggregate Manufacturing Royalty owed for such quarter ("Royalty Calculation Documentation"). For each calendar month from and after the first sale, within fifteen (15) days of the end of the calendar month, PumpWorks shall deliver to PeopleFlo monthly reports of sales of MCUs.
    b. PeopleFlo shall have a forty-five (45) day review period (each a "Review Period") after receipt of the Royalty Calculation Documentation for each quarter to review the Manufacturing Royalty owed for such quarter. During the Review Period, PeopleFlo shall have the right to inspect PumpWorks' books and records during normal business hours at PumpWorks' offices, upon reasonable prior notice and solely for purposes reasonably related to the determinations of the number of MCUs sold and the resulting aggregate Manufacturing Royalty owed for such quarter. Prior to the expiration of the Review Period, PeopleFlo may object to the calculation of the aggregate Manufacturing Royalty owed by delivering a written notice of objection to PumpWorks. Any such objection document shall specify the items disputed by PeopleFlo and shall describe in reasonable detail the basis for such objection, as well as the amount in dispute. If PeopleFlo fails to deliver an objection for a quarter to PumpWorks prior to the expiration of the applicable Review Period, then the calculation of the aggregate Manufacturing Royalty set forth in the Royalty Calculation Documentation shall be final and binding on the parties hereto. If PeopleFlo timely delivers an objection, PumpWorks and PeopleFlo shall negotiate in good faith to resolve the disputed items and agree upon the resulting amount of the aggregate Manufacturing Royalty for such period. If PumpWorks and PeopleFlo are unable to reach agreement within thirty (30) days after such an objection has been given, all unresolved disputed items shall be promptly referred to the Independent Accountant. The Independent Accountant shall be directed to render a written report on the unresolved disputed items with respect to the applicable calculation of aggregate Manufacturing Royalty owed as promptly as practicable, but in no event greater than thirty (30) days after such submission to the Independent Accountant. If unresolved disputed items are submitted to the Independent Accountant, PumpWorks (and PeopleFlo, if

{00113206 7}                **DEVELOPMENT AND SUPPLY AGREEMENT – Page 4**

    applicable) shall promptly furnish to the Independent Accountant such work papers, schedules and other documents and information relating to the unresolved disputed items as the Independent Accountant may reasonably request. The Independent Accountant shall resolve the disputed items based solely on the applicable definitions and other terms in this Agreement and the presentations by PumpWorks and PeopleFlo, and not by independent review. The resolution of the dispute and the calculation of the aggregate Manufacturing Royalty owed that is the subject of the applicable objection by the Independent Accountant shall be final and binding on the parties hereto. The fees and expenses of the Independent Accountant shall be borne by PumpWorks and PeopleFlo in proportion to the amounts by which their respective calculations of aggregate Manufacturing Royalty owed differ from the aggregate Manufacturing Royalty owed as finally determined by the Independent Accountants. For the purposes hereof, "Independent Accountant" means an impartial firm of certified public accountants other than PeopleFlo's accountants or PumpWorks' accountants, which shall be appointed by mutual agreement of PumpWorks and PeopleFlo.

  c. PumpWorks shall pay to PeopleFlo within 30 days following each calendar quarter the aggregate Manufacturing Royalty for such quarter. If any amount due under this Agreement remains unpaid for 30 days after its due date, PumpWorks shall pay PeopleFlo a finance charge of the lesser of one and one half percent per month or the maximum amount allowed by law on amounts from the date that such amount became due and payable until paid.

5. Term and Termination. This Agreement shall continue from and after execution until terminated as provided herein. This Agreement may be terminated by either party in the event of a material breach hereof, by the non-breaching party upon thirty (30) days prior written notice if such material breach is not cured by the breaching party prior to the expiration of such notice period. Either party may immediately terminate this Agreement by providing written notice of termination to the other party if: the other party has filed or becomes subject to bankruptcy, reorganization or insolvency proceedings, has executed an assignment for the benefit of its creditors or has appointed a trustee or receiver over any part of its business or assets and such proceeding or assignment is not dismissed or withdrawn within ninety days; or such party becomes prohibited by any law, statute, regulation, judgment, order or decree of any court, agency or other governmental or regulatory authority from performing any of its obligations or receiving any of the benefits to which it is entitled under this Agreement.

6. Effect of Termination. Notwithstanding the termination of this Agreement, each party shall remain bound by the provisions of this Agreement which by their terms impose obligations upon that party that expressly survive termination of this Agreement or if necessary or desirable to accomplish the purposes of other surviving provisions, including, without limitation, the following: Section 5 (Ownership of Intellectual Property); Section 8 (Confidentiality); Section 9 (Covenants and Warranties of PeopleFlo); and Section 12 (Miscellaneous).

7. Ownership of Intellectual Property. All right, title and interest in and to Intellectual Property (hereinafter defined) (and any depictions or analyses thereof) shall at all times

Case: 1:20-cv-03642 Document #: 472-1 Filed: 08/15/25 Page 7 of 17 PageID #:37402

Case: 1:20-cv-03642 Document #: 342-1 Filed: 04/18/23 Page 7 of 17 PageID #:20664
Case: 1:20-cv-03642 Document #: 77-1 Filed: 03/08/21 Page 7 of 17 PageID #:1672

remain the sole and exclusive property of PeopleFlo and no rights therein are granted to PumpWorks under this Agreement or otherwise except as are expressly set forth herein and which terminate upon the termination of this Agreement, unless prior to the expiration or earlier termination of this Agreement PumpWorks has exercised its rights under Section 3 hereinabove to purchase the License in which case PumpWorks shall have the perpetual license rights described in Section 3 hereinabove; provided that such termination shall not affect the rights of Customers to continue to use Pumps purchased from PumpWorks for which PeopleFlo has been paid the Purchase Price and the Royalty pursuant to this Agreement. "Intellectual Property" means all rights, title and interests arising from or in respect of any of the following related to the Technology Know-How and R&D in any jurisdiction throughout the world: (i) patents, patent applications, patent disclosures and inventions (whether patentable or unpatentable and whether or not reduced to practice), including any continuations, divisionals, continuations-in-part, renewals and reissues for any of the foregoing, (ii) internet domain names, URLs, trademarks, service marks, service names, trade dress rights, trade names, brand names, slogans, logos or symbols, identifying symbols, emblems, signs or insignia, and corporate names and registrations and applications for registration thereof together with all of the goodwill associated therewith, (iii) copyrights (registered or unregistered) and copyrightable works and registrations and applications for registration thereof, and mask works and registrations and applications for registration thereof, (iv) computer software, data, data bases and documentation thereof, (v) trade secrets and other confidential and proprietary information (including ideas, formulas, compositions, inventions (whether patentable or unpatentable and whether or not reduced to practice), know-how, manufacturing and production processes and techniques, research and development information, drawings, specifications, designs, plans, proposals, technical data, copyrightable works, financial and marketing plans and PumpWorks and supplier lists and information), and (vi) copies and tangible embodiments thereof (in whatever form or medium); provided that Intellectual Property shall not include any improvements or derivatives developed by PumpWorks after expansion of the Use License to the Manufacturing License pursuant to Section 3 hereinabove.

8. Confidentiality. PumpWorks shall treat and hold as confidential any information concerning PeopleFlo and the Intellectual Property that is not already generally available to the public (the "Confidential Information"), refrain from using any of the Confidential Information except in connection with this Agreement and the License, and at any time upon the request of PeopleFlo after termination of this Agreement or the License (whichever is later) deliver promptly to PeopleFlo or destroy, at the request and option of PeopleFlo, all tangible embodiments (and all copies) of the Confidential Information which are in its possession or under its control. "Confidential Information" does not include information that (i) is or becomes generally available to the public other than as a result of an unauthorized disclosure by PumpWorks; (ii) becomes available to PumpWorks on a non-confidential basis from a source other than PeopleFlo, provided that such source is not bound by a confidentiality agreement with, or other contractual, legal, or fiduciary obligation of confidentiality to, PeopleFlo with respect to such information; (iii) is independently developed by PumpWorks without violating any of the PumpWorks' obligations under this Agreement.

If PumpWorks is requested or required (by oral question or request for information or documents in any legal proceeding, interrogatory, subpoena, civil investigative demand, or similar process) to disclose any Confidential Information, it shall notify PeopleFlo promptly of the request or requirement so that PeopleFlo may seek an appropriate protective order or waive compliance with the provisions of this Section 8. If, in the absence of a protective order or the receipt of a waiver, PumpWorks is, on the advice of counsel, compelled to disclose any Confidential Information to any tribunal or else stand liable for contempt, it may disclose the Confidential Information to the tribunal; provided that it shall use its best efforts, at PeopleFlo's sole cost and expense, to obtain, at the request of PeopleFlo, an order from the tribunal or other assurance that confidential treatment shall be accorded to such portion of the Confidential Information required to be disclosed as PeopleFlo shall designate.

PumpWorks acknowledges that a breach or threatened breach of the provisions of this Agreement relating to the Intellectual Property or Confidential Information will cause irreparable harm to PeopleFlo that cannot be adequately remedied by an award of monetary damages. PumpWorks accordingly agrees that in the event of a breach, or a threatened breach, of such provisions of this Agreement, PeopleFlo will be entitled to, without having to post a bond or other similar undertaking, injunctive relief, specific performance or other appropriate equitable remedies against such breach or threatened breach, without showing or proving any actual damage sustained by PeopleFlo, this being in addition to and without prejudice to any other remedy to which PeopleFlo is entitled at law or in equity. PumpWorks further agrees that, in the event of any action for an injunction or specific performance in respect of any such threatened or actual breach or violation, it shall not assert that a remedy at law would be adequate. PumpWorks further agrees that it will be responsible for any actual, direct damages, claims, liabilities, losses, costs or expenses resulting from, or arising out of PumpWorks' breach or threatened breach of such provisions of this Agreement including, without limitation, attorneys' fees and litigation costs incurred by PeopleFlo. Additionally, PumpWorks agrees to notify PeopleFlo immediately upon discovery of any unauthorized use or disclosure of the Intellectual Property or Confidential Information of PeopleFlo and agrees to cooperate with PeopleFlo to regain possession thereof and to prevent further unauthorized use or disclosure.

9. **Covenants and Warranties of PeopleFlo.** PeopleFlo hereby provides the following covenants and warranties:

    a. <u>Quality.</u> PeopleFlo hereby warrants that the MCUs delivered pursuant to this Agreement are of the quality specified, meet the specifications, and are merchantable. PeopleFlo warrants MCUs sold pursuant hereto to be free of defects in material and workmanship for a period of twelve (12) months after first use of a Pump by a Customer, or eighteen (18) months after delivery of a Pump to a Customer by PumpWorks, whichever occurs first. In addition to its other rights and remedies, PumpWorks reserves the right to cancel this Agreement in its entirety or in part if the MCU's are defective or not in conformity with the specifications. The MCUs are subject to PumpWorks' inspection and approval at the delivery destination. Payment of the Purchase Price and/or the Manufacturing Royalty (if applicable) shall not constitute an acceptance thereof, but such MCUs shall be received subject to

Case: 1:20-cv-03642 Document #: 472-1 Filed: 08/15/25 Page 9 of 17 PageID #:37404

Case: 1:20-cv-03642 Document #: 342-1 Filed: 04/18/23 Page 9 of 17 PageID #:20666
Case: 1:20-cv-03642 Document #: 77-1 Filed: 03/08/21 Page 9 of 17 PageID #:1674

PumpWorks' acceptance or rejection. PumpWorks and PeopleFlo shall develop a mutually beneficial suspect material / return process. All warranties survive delivery and acceptance by PumpWorks. PeopleFlo will replace or correct defective or recalled MCU's that are in PumpWorks' inventory, for up to 10 years of original MCU purchase date, at their sole cost including freight.

b. Title. PeopleFlo hereby represents and warrants that PeopleFlo is the sole owner of the Technology, free and clear of all liens, claims, and encumbrances, and has the right, power, and authority to enter into this Agreement, and to grant the rights granted to PumpWorks pursuant to Section 3 hereof, including but not limited to the right to grant the License, if PumpWorks exercises its rights under Section 3 related thereto. PeopleFlo, during the term of this Agreement, shall cause the Technology to remain free and clear of all liens, claims, and encumbrances.

c. Infringement. PeopleFlo warrants that the Technology will not infringe any patent, trademark, copyright or other intellectual property of any other person or entity.

  i. If a third party claims the Technology infringes, in breach of the above warranty, PeopleFlo shall promptly notify PumpWorks thereof in writing. PeopleFlo shall have the sole right to defend, at its own expense, all suits or proceedings relating to such claim of infringement (the "Defense"). PumpWorks shall have the right to participate in the Defense at its sole cost and expense. If PeopleFlo assumes the Defense, PeopleFlo shall provide written notice to PumpWorks. PumpWorks shall provide assistance and cooperation as reasonably requested by PeopleFlo in connection with the Defense at PeopleFlo's expense. If PeopleFlo elects not to take up, or at any time to discontinue, the Defense, PumpWorks shall have the option to pursue the Defense. If PeopleFlo elects not to take up, or at any time discontinues, the Defense, and PumpWorks elects to assume the Defense, (A) PeopleFlo shall reimburse PumpWorks for reasonable costs and attorney's fees PumpWorks incurs in connection with the Defense ("Defense Costs") up to the Reimbursement Amount (defined below); (B) all Defense Costs in excess of the Reimbursement Amount actually paid by PumpWorks shall be applied towards any future royalty amounts owed by PumpWorks pursuant to the terms of this Agreement. "Reimbursement Amount" means (A)(1) $100,000 until the commencement of Phase I, (2) $200,000 upon the commencement of Phase I until the commencement of Phase II, (3) $300,000 upon the commencement of Phase II until the fifth anniversary of the commencement of Phase II, and (4) $500,000 after the fifth anniversary of the commencement of Phase II; LESS (B) all reasonable expenses actually incurred by PeopleFlo in connection with the Defense, if PeopleFlo initially elects to assume the Defense. In the event any damages are awarded against PumpWorks as a result of any such claim, PumpWorks shall be entitled to be reimbursed all such damages by way of set off against any future royalty amounts owed by PumpWorks to PeopleFlo pursuant to this Agreement.

{00113206 7} **DEVELOPMENT AND SUPPLY AGREEMENT – Page 8**

ii. If PeopleFlo learns of any claim or act which constitutes or might constitute or result in an infringement of any of the Technology, solely with respect to the Field, PeopleFlo shall promptly notify PumpWorks thereof in writing. PumpWorks shall have the sole right to institute and prosecute, at its own expense, all suits or proceedings against infringers of the Technology. PeopleFlo shall have the right to participate in any such suit or proceedings at its sole cost and expense. If PumpWorks commences an action against an infringing party, PumpWorks shall provide written notice to PeopleFlo. PeopleFlo shall have the right but not the obligation, to join any such suit. PeopleFlo shall provide assistance and cooperation as reasonably requested by PumpWorks, at PumpWorks' expense, by (A) providing all information and documents in its possession and any witnesses as are or may be reasonably required in the conduct of any proceedings taken or brought by PumpWorks and (B) joining PumpWorks as a party plaintiff, if so required by applicable law or necessary to allow PumpWorks to institute such action against the infringing party.

iii. If PumpWorks learns of any claim or act of any other Person, which constitutes or might constitute or result in an infringement of the Technology outside of the Field, PumpWorks shall promptly notify PeopleFlo thereof in writing. PeopleFlo shall have the sole right to institute and prosecute, at its own expense, all suits or proceedings against infringers of the Technology. PumpWorks shall have the right to participate in any such suit or proceedings at its sole cost and expense. If PeopleFlo commences an action against an infringing party, PeopleFlo shall provide written notice to PumpWorks. PumpWorks shall have the right but not the obligation, to join any such suit. PumpWorks shall provide assistance and cooperation as reasonably requested by PeopleFlo, at PeopleFlo's expense, by (A) providing all information and documents in its possession and any witnesses as are or may be reasonably required in the conduct of any proceedings taken or brought by PeopleFlo and (B) joining PeopleFlo as a party plaintiff, if so required by applicable law or necessary to allow PeopleFlo to institute such action against the infringing party.

iv. If PeopleFlo or PumpWorks (the "Non Pursuing Party") (A) decides not to commence an action or fails to institute a court proceeding or comparable formal enforcement proceeding against the infringing party in accordance with the Non Pursuing Party's rights pursuant to Sections 9(c)(i) or 8(c)(ii) above, as applicable, within sixty (60) days after discovering such infringement or being informed of such infringement, (B) has been unsuccessful in persuading the alleged infringer for which the Non Pursuing Party has the right to pursue pursuant to Sections 9(c)(i) or 8(c)(ii) above, as applicable, to cease and desist within six (6) months of having received information regarding the alleged infringement, or (C) does not diligently enforce an infringement action for which the Non Pursuing Party has the right to pursue pursuant to Sections 9(c)(i) or 8(c)(ii) above, as applicable, the other party (the "Pursuing Party") shall have the right, but not the obligation, to take at its sole discretion, any necessary action to end such infringement at its own cost and for its own account, including, if necessary,

  instituting legal action against the infringing party. In such event, the Pursuing Party shall have the right, if Non Pursuing Party is a legally indispensable party, to bring such suit in the name of Non Pursuing Party. In this case, the Non Pursuing Party shall grant to the Pursuing Party any necessary power in the required form to conduct such proceedings and assign to the Pursuing Party all claims, demands and rights of action, both statutory and based upon common law that the Non Pursuing Party has or might have as a reason of such infringement. The Non Pursuing Party shall cooperate with the Pursuing Party, as the Pursuing Party may reasonably request, in connection with any such action, including by (A) providing all information and documents in its possession and any witnesses as are or may be required in the conduct of any proceedings taken or brought by the Pursuing Party and (B) joining the Pursuing Party as a party plaintiff, if so required by court to applicable law or necessary to allow the Pursuing Party to institute such action against the infringing party. The Pursuing Party shall keep the Non Pursuing Party informed of the development and the outcome of the proceedings. The Pursuing Party shall be entitled to keep any proceeds and monies recovered from these actions or proceedings. The Non Pursuing Party shall not be entitled to any fees or royalty payments on any monies recovered by the Pursuing Party from such infringement action.

  v. Neither PumpWorks or PeopleFlo shall settle any action without the prior written consent of the other Party if such settlement: (A) diminishes or extinguishes the other Party's rights under this Agreement or seeks to impose additional obligations on the other Party; or (B) arises out of or is a part of any criminal action, suit or proceeding or contains a stipulation or admission or acknowledgement of any liability or wrongdoing.

 d. Labor. PeopleFlo represents and warrants that the MCUs to be furnished hereunder were or will be produced in compliance with the requirements of the Fair Labor Standards Act of 1938, as amended.

 e. Equal Opportunity. MCUs to be furnished hereunder shall be produced in compliance w/ Executive Order 11246, Section 402 of the Vietnam Era Veterans Readjustment Assistance Act of 1974, and Section 503 of the Rehabilitation Act of 1973, and upon request from PumpWorks, PeopleFlo will furnish evidence of compliance and permit access to its books, records and accounts for purposes of investigation to ascertain compliance with such rules, regulations and orders. PeopleFlo represents and warrants to PumpWorks that, as of the date of this Agreement, PeopleFlo is in full compliance with all Equal Employment Opportunity laws, regulations and orders, including, those set forth above. The provisions of Executive Order 11246, as amended, and the rules and regulations issued pursuant thereto are hereby incorporated into this Agreement by reference, and PeopleFlo shall comply therewith unless exempted.

10. Obligations of PumpWorks. During the Term of this Agreement, PumpWorks agrees and covenants as follows:

    a. Business Development. PumpWorks will use its best efforts to develop business and, promote the sale and use of, and sell the MCUs in connection with the Pumps.

    b. Testing. PumpWorks will supply PeopleFlo with CAD models of components for design and testing and will provide testing of the MCUs at no cost to PeopleFlo.

    c. Sales Organization. PumpWorks will maintain a sales organization that actively solicits the sale of the Pumps, carry out promotional programs and fully utilize any sales assistance that may be furnished by PeopleFlo and will develop all sales and marketing materials related to the MCUs and the Pumps. PumpWorks will appoint a product line manager for the MCUs to coordinate with PeopleFlo.

    d. Premises. PumpWorks will provide suitable premises to store the MCUs and maintain the MCUs in factory condition until sold, and provide suitable premises with capacity to provide complete sales and service requirements.

    e. Forecasted Requirements. PumpWorks will consult with PeopleFlo quarterly to project the forecasted requirements of PumpWorks for the MCUs.

    f. Reports. PumpWorks will prepare and provide to PeopleFlo regular reports updating business or technical trends, and report promptly any test results or other information in order to assist PeolpeFlo with integration and trouble-shooting regarding the MCUs.

11. Limitation of Liability. EXCEPT FOR LIABILITY ARISING FROM (A) THIRD PARTY INJURIES OR PHYSICAL DAMAGE, (B) BREACH OF ITS CONFIDENTIALITY OBLIGATIONS, OR (C) ITS GROSS NEGLIGENCE OR WILLFUL MISCONDUCT (ALL OF WHICH SHALL BE UNCAPPED), OR (D) A BREACH OF SECTION 9(c) (WHICH SHALL BE ADRESSED IN THE MANNER DESCRIBED IN SECTION 9(c)(i)), PUMPWORKS AGREES THAT THE AGGREGATE LIABILITY OF PEOPLEFLO FOR DAMAGES FROM ANY CAUSE OF ACTION WHATSOEVER, REGARDLESS OF THE FORM OF ACTION, WHETHER BASED IN CONTRACT, TORT (INCLUDING NEGLIGENCE), MISREPRESENTATION, WARRANTY OR ANY OTHER LEGAL OR EQUITABLE GROUNDS, AND WHETHER BASED UPON THE ACTIONS OF PEOPLEFLO SHALL NOT EXCEED $1,000,000 PER OCCURRENCE AND $2,000,000 IN THE AGGREGATE IN ANY 12 MONTH PERIOD. EXCEPT FOR LIABILITY ARISING FROM (Y) BREACH OF ITS CONFIDENTIALITY OBLIGATIONS, OR (Z) ITS GROSS NEGLIGENCE OR WILLFUL MISCONDUCT, IN NO EVENT SHALL EITHER PARTY BE LIABLE FOR LOST PROFITS OR INDIRECT, INCIDENTAL, CONSEQUENTIAL, SPECIAL OR PUNITIVE DAMAGES OF ANY NATURE WHATSOEVER, INCLUDING DAMAGES ARISING FROM LOSS OF USE OF ANY DELIVERABLE, LOSS OF BUSINESS, DATA OR GOODWILL, OR DAMAGES RELATING TO THE FAILURE TO MEET ANY DUTY OR TO EXERCISE COMMERCIALLY REASONABLE CARE OR FOR NEGLIGENCE, ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE PERFORMANCE OR BREACH

Case: 1:20-cv-03642 Document #: 472-1 Filed: 08/15/25 Page 13 of 17 PageID #:37408

Case: 1:20-cv-03642 Document #: 342-1 Filed: 04/18/23 Page 13 of 17 PageID #:20670
Case: 1:20-cv-03642 Document #: 77-1 Filed: 03/08/21 Page 13 of 17 PageID #:1678

HEREOF OR WITH RESPECT TO THE USE OR PERFORMANCE OF THE DELIVERABLES, EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY.

12. Miscellaneous.

    a. Choice of Law and Venue; Wavier of Jury Trial. This Agreement shall be construed under the laws of the State of Illinois, without regard to principles of conflicts of laws. Any dispute or action arising hereunder or related hereto shall be brought in the state or federal courts sited in Cook County, Illinois, to the exclusion of all other venues and the parties submit to personal jurisdiction in Texas in connection with any such dispute. The parties hereby waive any right to a trial by jury in connection with any such action or dispute.

    b. Notice. Any notice, request, demand, waiver, consent, approval or other communication which is required or permitted hereunder shall be in writing and shall be deemed given (a) on the date established by the sender as having been delivered personally, (b) on the date delivered by a nationally recognized overnight delivery service with signature required, (c) on the date that that receipt of an electronic mail (e-mail) is requested and received, or (d) on the fifth (5th)day after the date mailed, by certified mail, return receipt requested, postage prepaid. Such communications, to be valid, must be addressed as follows:

    | | |
    |---|---|
    | If to PeopleFlo: | PeopleFlo Manufacturing, Inc.<br>Attn: William Blankemeier<br>10045 Pacific Ave<br>Franklin Park, IL 60131<br><br>Telephone: 630-862-1602<br>Email: wblankemeier@peopleflo.com |
    | With copy to: | David Fletcher, Esq.<br>Roberts McGivney Zagotta, LLC<br>55 West Monroe St., Suite 1700<br>Chicago, IL 60603<br>Telephone: 312-251-2264<br>Email: dfletcher@rmczlaw.com |
    | If to PumpWorks: | PumpWorks, LLC<br>Attention: Trey Maxwell, Manager<br>7272 Pinemont Drive<br>Houston, TX 77040<br>Telephone: (281) 788-4491<br>Email: trey.maxwell@dxpe.com |

{00113206 7}    DEVELOPMENT AND SUPPLY AGREEMENT – Page 12

>
> with a copy to: Paul C. Sewell, Esq.
> Krage & Janvey, LLP
> 2100 Ross Avenue, Suite 2600
> Dallas, Texas 75201
> Telephone: (214) 397-1909
> Email: psewell@kjllp.com

or to such other address or to the attention of such person or persons as the recipient party has specified by prior written notice to the sending party (or in the case of counsel, to such other readily ascertainable business address as such counsel may hereafter maintain). If more than one method for sending notice as set forth above is used, the earliest notice date established as set forth above shall control.

c. Assignment. This Agreement shall inure to the benefit of and shall be binding upon the successors and assigns of the parties.

d. Independent Contractors. The parties hereto are independent contractors. Neither party shall be deemed an employee, agent, partner, or legal representative of the other for any purpose, and neither party shall have the right, power, or authority to create any obligation or responsibility on behalf of the other.

e. Severability. If any provision of this Agreement is held by a court of competent jurisdiction to be contrary to law, such provision shall be changed and interpreted to best accomplish the objectives of the original provision to the fullest extent allowed by law, and the remaining provisions of this Agreement shall remain in full force and effect.

f. Headings. The headings in this Agreement are for reference only and shall not be construed to limit or otherwise affect the meaning of any of the provisions of this Agreement.

g. Multiple Counterparts. This Agreement may be executed in counterparts that together shall constitute one and the same instrument, and each party agrees that a copy of a counterpart executed by it and sent to the other by any method shall constitute acceptance of this Agreement.

h. Court Costs; Attorneys' Fees. If any action at law or in equity, including any action for declaratory relief, is brought to enforce or interpret the provisions of this Agreement, the prevailing party shall be entitled to recover court costs and attorneys' fees from the losing party suing to enforce or interpret the provisions of this Agreement in addition to any other relief that may be awarded.

i. Waiver and Amendment. No modification, amendment, or waiver of any provision of this Agreement shall be effective unless in writing and signed by all parties hereto. No failure or delay by either party in exercising any right, power, or remedy under this Agreement, except as specifically provided herein, shall operate as a waiver of any such right, power, or remedy.

Case: 1:20-cv-03642 Document #: 472-1 Filed: 08/15/25 Page 15 of 17 PageID #:37410
Case: 1:20-cv-03642 Document #: 342-1 Filed: 04/18/23 Page 15 of 17 PageID #:20672
Case: 1:20-cv-03642 Document #: 77-1 Filed: 03/08/21 Page 15 of 17 PageID #:1680

j.  Integration. Except as otherwise expressed herein, this Agreement constitutes the final, complete, and exclusive agreement between the parties with respect to the subject matter hereof, and supersedes any prior or contemporaneous written or oral agreement.

k.  Representations and Warranties. Each party hereto represents and warrants to the other party hereto (a) that the appropriate person, persons, or entity has authorized and/or approved on such party's behalf such party's execution and delivery of this Agreement and the consummation of the transactions contemplated hereby; (b) that no further act on the part of any person or entity is necessary to fully approve and authorize such party's execution and delivery of this Agreement and the consummation of the transactions contemplated hereby; (c) that this Agreement evidences the valid and binding obligation of such party, enforceable in accordance with its terms except as limited by applicable bankruptcy, insolvency, reorganization, moratorium, and similar laws affecting the enforcement of creditors' rights generally and the application of general principles of equity and judicial discretion; (d) that such party has had full opportunity to review this Agreement with an attorney of its own choosing; and (e) that such party has relied upon its own judgment in entering into this Agreement and the obligations contemplated hereby.

l.  Rules of Interpretation. Licensor and Licensee participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by Licensor and Licensee, and no presumption or burden of proof shall arise favoring or disfavoring any party hereto by virtue of the authorship of any provision of this Agreement. Without limitation as to the foregoing, no rule of strict construction construing ambiguities against the draftsperson shall be applied against any person with respect to this Agreement.

m.  Notwithstanding any other term, condition or provision of this Agreement to the contrary, under no circumstances, except for PeopleFlo's obligations to indemnify PumpWorks and Customers for intellectual property infringement claims, including any indemnity obligations, shall either party be liable to the other or any other person or entity, for any consequential, incidental, special, indirect, punitive or exemplary damages, including without limitation damages for lost production, lost revenue, lost product, lost profit, lost business or lost business opportunities, all such damages being hereby specifically disclaimed.

*[Signatures on separate page]*

| "PEOPLEFLO" | "PUMPWORKS" |
|---|---|
| **PEOPLEFLO MANUFACTURING, INC.,** an Illinois corporation | **PUMPWORKS, INC.,** a Delaware corporation |
| By: _William Blankemeier_ <br> Its: ___President___ | By: _James B. Maxwell III "Trey"_ <br> Its: _Manager_ |

H:\DXP\Peopleflo\Peopleflo - DXP agreement (n).docx

Case: 1:20-cv-03642 Document #: 472-1 Filed: 08/15/25 Page 17 of 17 PageID #:37412
Case: 1:20-cv-03642 Document #: 342-1 Filed: 04/18/23 Page 17 of 17 PageID #:20674
Case: 1:20-cv-03642 Document #: 77-1 Filed: 03/08/21 Page 17 of 17 PageID #:1682

Exhibit A

## Magnetic Seal Group 1 Pricing
### Stainless steel

| | Model | Group | Speed | Magnetic Seal Price | | Model | Group | Speed | Magnetic Seal Price |
|---|---|---|---|---|---|---|---|---|---|
| Group 1 Low Torque | 1.5x1-6 | 1 | 1750 | $2,706 | Group 1 High Torque | 1.5x1-6 | 1 | 3550 | $2,970 |
| | 3x1.5-6 | 1 | 1750 | $2,706 | | 3x1.5-6 | 1 | 3550 | $2,970 |
| | 3x2-6 | 1 | 1750 | $2,706 | | 3x2-6 | 1 | 3550 | $2,970 |
| | 1.5x1-8 | 1 | 1750 | $2,706 | | 1.5x1-8 | 1 | 3550 | $2,970 |
| | 3x1.5-8 | 1 | 1750 | $2,706 | | 3x1.5-8 | 1 | 3550 | $2,970 |

## Magnetic Seal Group 2 Pricing
### Stainless steel

| | Model | Group | Speed | Magnetic Seal Price | | Model | Group | Speed | Magnetic Seal Price |
|---|---|---|---|---|---|---|---|---|---|
| Group 2 Low Torque | 4x3-7 | 2 | 1750 | $3,300 | Group 2 High Torque | 4x3-7 | 2 | 3550 | $3,960 |
| | 3x2-8 | 2 | 1750 | $3,300 | | 3x2-8 | 2 | 3550 | $3,960 |
| | 4x3-8G | 2 | 1750 | $3,300 | | 4x3-8G | 2 | 3550 | $3,960 |
| | 4x3-8 | 2 | 1750 | $3,300 | | 4x3-8 | 2 | 3550 | $3,960 |
| | 2x1-10 | 2 | 1750 | $3,300 | | 2x1-10 | 2 | 3550 | $3,960 |
| | 3x1.5-10 | 2 | 1750 | $3,300 | | 3x1.5-10 | 2 | 3550 | $3,960 |
| | 3x2-10 | 2 | 1750 | $3,300 | | 3x2-10 | 2 | 3550 | $3,960 |
| | 4x3-10 | 2 | 1750 | $3,300 | | 4x3-10 | 2 | 3550 | $3,960 |

*[signature]*
wb