## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| **PEOPLEFLO MANUFACTURING, INC.,** | |
| **Plaintiff,** | |
| **v.** | **Case No. 1:20-cv-03642** |
| **SUNDYNE, LLC; DXP ENTERPRISES, INC.; and PUMPWORKS, LLC,** | **Honorable Manish S. Shah** |
| **Defendants,** | **Magistrate Judge Young B. Kim** |
| **PUMPWORKS, LLC,** | |
| **Counter-Plaintiff,** | |
| **v.** | |
| **PEOPLEFLO MANUFACTURING, INC.,** | |
| **Counter-Defendant.** | |

### REPLY IN SUPPORT OF PUMPWORKS LLC'S PROVE UP OF DAMAGES

PumpWorks, LLC ("PumpWorks") brings this prove up motion to support its judgement against PeopleFlo Manufacturing, Inc. ("PeopleFlo") after this Court found that "Summary judgement on liability for breach of contract is appropriate, but not on the remedy." The contract at issue is the Development and Supply Agreement of March 22, 2018. (the "DSA"). Specifically, the Court found that PeopleFlo raised a question of fact as to whether it provided the adequate assurance demanded by PumpWorks, sufficient to prevent PumpWorks from taking a perpetual royalty free license to practice the PeopleFlo know-how and patents and PeopleFlo raised a questions as to the amount of money damages which PumpWorks sought for PeopleFlo's breach of contract. ECF 405 at 76. In either case, this Court held that "PumpWorks must decide whether it wants to pursue its claim for money damages or its claim that it is entitled to

1

injunctive relief under the DSA.  Id.  PumpWorks has elected to receive money damages, and in this motion presents its, and PeopleFlo's, own business records which irrefutably establish the amount as $690,203.90.

## ARGUMENT

### I.    PumpWorks Has Elected to Receive Money Damages from PeopleFlo

The DSA implicitly provides the aggrieved licensee with a choice of remedies.  It assumes that normal contract remedies are available and therefore includes provisions to allow for injunctive relief along with contract damages in some cases and to prevent recovery of lost profits and other consequential damages in other actions for breach.   See, e.g., DSA, ECF No. 472-1 at §3, ¶1 & §11.  Further the language of section 3 indicates that it is the licensees' choice to make:  not that PumpWorks must or will take a license, but that it "can" take a license. Neither remedy is self-actuating as this Court has already noted.  If PumpWorks were to choose the license, it would have to pursue injunctive relief, as it does not possess or have access to the Know-How and R &D required to manufacture the MCUs. Similarly, without a money judgement, PumpWorks cannot commence collection of the amounts it paid for MCUs that were never delivered.

In arguing that the manufacturing license (and associated know-how) is PumpWorks's sole remedy PeopleFlo is attempting to make the election for PumpWorks.  Until its response to the present motion, PeopleFlo has consistently denied that PumpWorks validly terminated the DSA under section 3 and refused to provide access to the Know-How and R & D.  See, e.g., PeopleFlo's Responses to PumpWorks' Statement of Additional Facts, ECF 391 at 39.  PeopleFlo did not argue that the license was the only remedy under the DSA in answers to the counterclaim

(ECF 27), in response to summary judgement (ECF 394), or in its motion for reconsideration (ECF 418).

Nor had PumpWorks made an irrevocable election until after the entry of summary judgment. PumpWorks has consistently sought money damages and a license recognizing that before judgment it would have to make an election. In its letter of November 25, 2020 where PumpWorks demands a license, it also demands a final accounting and return of pre-paid funds for which product was not delivered. ECF 356-32 at 3. PeopleFlo cannot claim that it was misled as to an election of remedies when both remedies were consistently pursued by PumpWorks. Starting in its counterclaim against PeopleFlo for breach of the DSA, PumpWorks alleged:

> As a result of PeopleFlo's continuing breaches of its obligations under the Agreement, PumpWorks is entitled, at its election: 1) to immediate delivery of the balance of the MCUs it has ordered, 2) to declare the Agreement terminated for anticipatory breach and have PeopleFlo return all impellers in its possession along with the $770,000.00 prepayment for which it has not provided product, or 3) to exercise the rights under paragraph 3 of the Agreement to have the Agreement declared terminated and for PumpWorks to purchase the Manufacturing License for $1. (emphasis added)

PumpWorks' Answer and Counterclaim, ECF 23 at 43, ¶48. PumpWorks' Answer to PeopleFlo's First Amended Complaint and Counterclaim contained similar language. ECF 115, at 59, ¶ 59. PeopleFlo has known throughout this case that PumpWorks consistently preserved its right to either recoup its damages arising from PeopleFlo's breach of the DSA **or** obtain the Manufacturing License, including access to all the materials required under the DSA to support the Manufacturing License. Although PeopleFlo repeatedly admitted that it owed PumpWorks about $700,000 in prepayments for MCUs that PeopleFlo never manufactured or delivered (see Ex.13, ECF 472-14, Blankemeier Dep. at 21 and Ex. 14, ECF 472-15 at 19), it steadfastly

3

denied, and still denies, that PumpWorks properly terminated the DSA under section 3 or that it is entitled to the Manufacturing license and associated know-how. In fact, PeopleFlo denies that PumpWorks ever invoked the last paragraph of Section 3 of the DSA providing for termination and a Manufacturing License in the event that PeopleFlo was unwilling or unable to give assurances that it would comply with its MCU manufacturing obligations.

> For the factual statement asserted in Paragraph 11 subpart (a) PeopleFlo admits that the quoted language is contained in Paragraph 3 of the DSA, but disputes that it was ever invoked by PumpWorks, who had already contemporaneously acknowledged, contractually, that PeopleFlo was willing and able to manufacture MCUs and decided that the quantities that had been provided by PeopleFlo were sufficient and were being shipped in greater quantities than PumpWorks wanted.

PeopleFlo's Responses to PumpWorks' Statement of Additional Facts, ECF 391 at 39.

While PumpWorks argued in its motion for summary judgment that PeopleFlo owed damages for breach of the DSA in the amount of about $700,000 (ECF No. 348 at 7-8), PeopleFlo's response never raised or hinted at its *post facto* argument that PumpWorks' sole remedy is the manufacturing license. It merely argued that the question of PumpWorks' damages "is for the jury and premature." ECF No. 393 at 19. Nor did PeopleFlo's motion for clarification or for reconsideration (ECF No. 418) address the issue at all. "A party seeking to defeat a motion for summary judgment is required to 'wheel out all its artillery to defeat it' " *Caisse Nationale de Credit Agricole v. CBI Indus., Inc*., 90 F.3d 1264, 1270 (7th Cir. 1996) (citations omitted). It is Peopleflo who has waived the argument it now attempts to make that PumpWorks is foreclosed from an award of its damages.

As previously noted, in its summary judgment decision, the Court recognized PumpWorks had to make an election of remedies, opting for either damages or the manufacturing license and associated know-how:

> Regardless, the terms of the DSA state that purchase of the Manufacturing License for one dollar would be PumpWorks's "sole remedy" for PeopleFlo's failure to show that it was manufacturing MCUs. [342-1] at 5. Invoking Section 3 would be PumpWorks's sole remedy to the exclusion of damages if PumpWorks so chose. PumpWorks must decide whether it wants to pursue its claim for money damages or its claim that it is entitled to injunctive relief under the DSA.

Memorandum Opinion and Order, ECF 405 at p. 76. Thus, the Court has already decided the issue and the Court's election of remedies decision is now law of the case. *Ienco v. Angarone*, 429 F.3d 680, 684 (7th Cir.2005) ("once an issue is litigated and decided that should be the end of the matter"). PeopleFlo did not ask the Court to reconsider its election of remedies decision when PeopleFlo had the opportunity to do so under the Rules. Nor has PeopleFlo provided any good reason for the Court to change its decision now. *Blue Cross & Blue Shield United of Wisconsin v. Marshfield Clinic*, 152 F.3d 588, 591 (7th Cir.1998) (under law of the case doctrine, district courts should not change their prior decisions without a good reason); *Carr v. O'Leary*, 167 F.3d 1124, 1126 (7th Cir. 1999) (explaining that a ruling granting partial summary judgment in favor of a party was the law of the case and "the district judge therefore could not change it without a good reason.").

The cases on which PeopleFlo relies are inapposite in the present context. In *Matter of Witte*, 841 F.2d 804 (7th Cir. 1988), the Seventh Circuit determined that by repossessing the property at issue and, at the same time, seeking continued installment payments for the property, the claimant was seeking double compensation which would result in an unfair windfall. *Id*. at 807-08. Indeed, the claimant in *Witte* had already retaken possession of the property, so he had already obtained his remedy and was not entitled to future installment payments on a sale that had been terminated. Here, there is no possibility of such "double compensation." Only one remedy will be awarded.

In *Essington v. Parish*, 164 F.2d 725 (7th Cir. 1947), the court explained the unremarkable notion that under the doctrine of remedies, once a party has chosen among two or more potential remedies for the same harm and has obtained that remedy, he cannot later seek a second remedy. Here, PumpWorks has not obtained any remedy for PeopleFlo's breach, but seeks only to enforce the remedy it has selected. In PeopleFlo's other cases, *O'Shield v. Lakeside Bank*, 335 Ill.App.3d 834 (2002), *Cala v. Gerami,* 484 N.E.2d 1199, 1202 (Ill. App. 1985), the contracts at issue provided for an exclusive remedy for any and all breaches, and the parties were limited to that exclusive remedy. The DSA does not mandate only one remedy, but makes a license available if the licensee foregoes other remedies. In fact, certain sections of the DSA contemplate monetary damages, *inter alia*, as a potential remedy for PeopleFlo's breaches. See, e.g., DSA, ECF No. 472-1 at §3, ¶1 & §11.

## II. PeopleFlo's Barrage of Flimsy Objections

PeopleFlo throws up a myriad of issues, the sole purpose of which is to burden the court and prolong the litigation. These will be dispensed with as efficiently as possible.

### 1. PumpWorks' Declarants Are Qualified to Introduce Business Records

As PeopleFlo well knows, during the pendency of this case, the employees of PumpWorks changed and indeed, the structure of PumpWorks was altered when in December 31, 2021, it merged with a wholly owned subsidiary of DXP Industries, Inc. and later formally merged into DXP itself in March 2022. ECF 330-36, Giessing Decl. ¶ 40. PeopleFlo well knows this change in structure and personnel and has no grounds either factually or under the law to contest the adequacy of the declarants based on business records that they collected and reviewed. First, George "Skip" Giessing who was the Vice President of the Rotating Equipment

Division of DXP (see Exhibit 15, ECF No. 472-16 at ¶ 2)[1] was assigned the role of Manager of PumpWorks between March 2020 and December 31, 2021. ECF 356 at 6, fn. 2. His tenure in this position, lasting until PumpWorks was merged into DXP, as well as his general familiarity with the PumpWorks' operations, qualifies him to gather and review the business records of the company so as to create the Giessing Accounting. PeopleFlo even took his deposition as the Rule 30(b)(6) deponent designated on behalf of PumpWorks. ECF 330-17.

Mr. Giessing's declaration more than adequately describes the practices and procedures of PumpWorks with respect to the ordering of MCUs from PeopleFlo, the prepayments and other payments made by PumpWorks to PeopleFlo, the receipt of invoices from PeopleFlo, the packing slips accompanying shipments of MCUs from PeopleFlo to PumpWorks. Giessing Decl., ECF 356 at ¶¶ 27-37. Mr. Giessing further prepared the chart attached as Exhibit C to his declaration (and reproduced as Exhibit 15 and 15A to the present motion) from the company's records. ECF 356-3. Mr. Giessing identified the routine business records on which he relied by Bates Number in Exhibit C to his summary judgement Declaration (ECF 356-3), including purchase orders, invoices, payment records and packing slips.[2] ECF 356-3, 356-4, 356-5 & 356-6. Copies of all of

---

[1] George Giessing submitted a declaration in support of PumpWorks' cross-motion for summary judgment which was filed on June 8, 2023. See ECF 356. In a well-meaning effort to minimize the materials the Court had to review in connection with PumpWorks' damages prove-up, only those portions of Mr. Giessing's declaration relating to his damage chart were re-submitted as Exhibit 15. ECF No. 472-16. That was made clear in the Index to the Exhibits. ECF No. 472 at 2. Because PeopleFlo has raised inconsequential objections to the incomplete version of Mr. Giessing's declaration (ECF No. 472-16), in this reply, references to Mr. Giessing's declaration herein will be made to the full version at ECF No. 356 as well as to its or its exhibits' reproduction submitted with the prove-up of damages. For example, PeopleFlo's objections that Mr. Giessing's declaration was unsigned and not signed under penalty of perjury is, as PeopleFlo fully knows, belied by Mr. Giessing's signature on page 35 of his Declaration which was made under perjury. ECF No. 356 at 36 which is part of the record in this case.
[2] Why PeopleFlo would ever object to the use of its invoices and packing slips as proof of what it sent to PumpWorks, other than to annoy the Court, is a mystery. PumpWorks' admission against interest by accepting these documents as proof of shipments benefits PeopleFlo who, given the work of Mr. Shafer, (see Exhibit 6) relied on these same types of documents to prove shipments to PumpWorks.

these referenced documents have been included in the present motion not only showing the Bates

Numbers from the PumpWorks production, but also those from the PeopleFlo production for the

identical documents.  See Exhibits 2, 3, 4, 5, ECF 472-2, 472-3, 472-4, 472-5.  A copy of

PumpWorks' ERP accounts payable printout prepared by Mr. Wick from PumpWorks' electronic

accounting files, was produced in discovery under Bates Numbers DXP-PW 022375-400 and

was used by Mr. Giessing in creating his Accounting and is included here as Exhibit 16A & 16Ai

to this motion.  ECF 472-23 & 24. These are quintessential business records.

PumpWorks' other declarant, Stephen Wick, is DXP's Controller.  He, or people working

under his direction, now oversee DXP's/PumpWorks' accounting operations, including ensuring

accuracy in the company's financial reporting, budgeting and other financial services things.

ECF-472-16 at ¶ 2.  When preparing his declaration, Mr. Giessing asked Mr. Wick to provide

information from Pump Works' business accounting system showing all payments that had been

made by PumpWorks to PeopleFlo since March 22, 2018.  ECF-472-16 at ¶ 3. Mr. Wick had this

report created from the ERP system report which recorded payments by either check or wire

transfer and associated vouchers loosely corresponding to one or a group of invoices against

which the payments were made.[3] *Id.* Mr. Wick  reviewed the report (attached as Exhibit A to

Wick's Declaration, ECF 472-23) and then transmitted it to Mr. Giessing.

PeopleFlo claims that PumpWorks never disclosed Mr. Wick as a person with knowledge.

Response, p. 5. That claim is false—PumpWorks timely disclosed Mr. Wick as a witness who

could speak to PumpWorks damages in April 2024 (ECF 410 at 2-3), and repeated this disclosure

a year later as "a witness who can speak to the payments PumpWorks made to PeopleFlo" in its

---

[3] The ERP could record prepayment amounts, but was very cumbersome in the way it allocated these
payments to shipment invoices as they arrived.

Status Report filed on April 29, 2025. See ECF 450 at 4.[4]  And that is precisely the subject matter of Mr. Wick's declaration.  See generally Exhibit 16, ECF 472-22.  Despite being aware of Mr. Wick as a potential witness concerning PumpWorks' payments to PeopleFlo, PeopleFlo never requested to depose him, presumably because his testimony was to be so limited and is only a reiteration of information in the ERP and presumably matches PeopleFlo's own records.  Again, these bank records on the accounts administered by Mr. Wick or his department are quintessential business records.

Finally,  the Seventh Circuit has rejected the notion that only an employee can lay a proper foundation for a company's records. *United States v. Franco*, 874 F.2d 1136, 1139-40 (7th Cir.1989) (finding that a federal agent could properly testify regarding the reliability of records of a third-party money exchange because he understood the system used to prepare those records, even though he could not identify the actual preparer of the records); See also U.S. Bank Nat. Ass'n v. American Screw & Rivet Corp., No. 09 C 7312, 2010 WL 3172772, * 2 (N.D. Ill. Aug. 10, 220 (Kennelley, D.J) (citing cases).

## 2. The Bank Records, Which PeopleFlo Never Requested in Discovery, Merely Duplicate Previously Furnished Information

PeopleFlo never requested any documents or information regarding PumpWork's damages or damages calculation during discovery.  Nonetheless, all of the information on which PumpWorks' damage analysis is based was produced to PeopleFlo as evidenced by the Giessing

---

[4] Based on in-court representations by PeopleFlo's counsel, PumpWorks understood that the parties would be working on a stipulation as to the amount of prepayments retained by PeopleFlo with PeopleFlo consulting its own records in a manner similar to the work done by Mr. Shafer, making any further testimony on this point unnecessary. When PeopleFlo repeatedly ignored attempts to engage on this issue, PumpWorks determined it would need to bring this present motion.   In fact, the ERP has all of the same information, but Mr. Wick's presentation of the bank records are simpler for a reader not familiar with the ERP layout to process.

Accounting which reaches exactly the same numbers as those shown in the Wick Verification. The bank statements do not add information, but merely confirm (as a secondary check) the payments PumpWorks made that are reflected in other documents that were produced, including the ERP spreadsheet (Exhibit 16A and 16 Ai, ECF 472-23 & 24), and deposition testimony (*e.g.*, Exhibit 11, ECF 472-12, at 137:1-11.) They even match the work done by PeopleFlo in the Shafer Chart up to its last entry at the end of 2019. Exhibit 6 & 6i, ECF 472-6 & 472-7.[5] A prime example is the payment of $227,040 reflected in the bank statements (Exhibit 16B, ECF 472-25 at 47) paid on September 16, 2019.[6] The Shafer Chart acknowledges that PeopleFlo received from PumpWorks a payment in the amount of $227,040 on September 16, 2019. See Exhibit 6i, ECF 472-7, the sum of lines 40 ($108,240) and 51 ($118,800).

### 3. Simply Reading the PumpWorks' Damage Charts Demonstrates the Frivolity of PeopleFlo's Objections

The easiest way to see how all the charts, documents and testimony reconcile to each other is to refer to Exhibit 17. ECF 472-29. The underlying invoices (showing amount owed) and packing slips (showing the number and type of MCUs PeopleFlo shipped to PumpWorks) were created by PeopleFlo. Copies were sent to PumpWorks and are referenced in columns E

---

[5] While no party is required to prove the other party's case, litigants do have a responsibility not to vexatiously multiply proceedings. The Shafer chart demonstrates that PeopleFlo's own records contained all of the information needed to verify PumpWorks' damage analysis, but that PeopleFlo chose instead to unnecessarily complicate these proceedings rather than face entry of a judgement.

[6] PeopleFlo argues that this payment entry in the bank statement should be deducted from the total payments received because the entry, along with a few others, does not mention "PeopleFlo" by name. Response, at 6 & fn. 6. Each of the payment entries that PeopleFlo identifies in footnote 6 of its response however is *admitted* in the Shafer Chart. For example, the two payment entries on ECF 472-25 at 27 for $94,370 and $7,270 (totaling $101,640) are confirmed by the Shafer Chart, Exhibit 6i, ECF 472-7 at line 13. The payment entry dated November 28, 2018 for $6,600 (ECF 472-25 at 16) is confirmed in the Shafer Chart at line 10. The payment entry dated January 14, 2019 in the amount of $25,750 (ECF 472-25 at 21) is confirmed by the sum of lines 7 ($1,650), 12 ($13,200), 62 ($7,600) and 68 ($3,300) of the Shafer Chart, ECF 472-7, totaling $25,750, paid on January 14, 2019. In short, the bank records which do not contain the name "PeopleFlo" add no payments that have not already been admitted by PeopleFlo so it is disingenuous to say that $360,980 should be deducted from the total that PeopleFlo owes.

and N of Exhibit 17.  PeopleFlo does not object to the accuracy, reliability or authenticity of any of these supporting business records as almost each and every invoice or packing slip has a BATES Number that shows the document was produced by both PumpWorks and PeopleFlo. Indeed, by producing these supporting documents during discovery, PeopleFlo provided their "implicit authentication." *Article II Gun Shop, Inc. v. Gonzales*, 441 F.3d 492, 496 (7th Cir.2006). See also *Thanongsinh v. Board of Educ.*, 462 F.3d 762 (7th Cir.2006) ("Requiring authenticating affidavits ... would be an empty formality" where the defendant drafted the relevant documents and produced them during discovery).  And despite the foundation objections in its response, PeopleFlo's counsel expressly stipulated to the authenticity of PeopleFlo invoices and packing slips on August 12, 2025.  See Exhibit 18 attached hereto.

Exhibit 17 (ECF 472-29) is based on the Giessing Accounting such that the line numbers match the line numbers on the Giessing Accounting. Compare Exhibit 17 with Exhibit 15Ai, ECF 472-18.   Column L of Exhibit 17 shows where the payment information is found on the ERP with a parenthetical reference to the Wick Verification. Column M shows where the same information is found on the Shafer Chart.  Thus, Exhibit 17 contains all the information necessary to calculate PumpWorks damages and cross-references all sources of information.

Most of the MCU invoices/packing slips are grouped under their corresponding purchase orders (PO#) as shown above the grouping.  Note there are only 3 groupings, but PO# 7024 is split between high and low torque as that is how the information is reflected on the Shafer Chart.

*First objection resolved:* There are no inconsistencies as to the number of MCUs shipped or received.  All of the 148 MCUs that PeopleFlo claims it shipped are accounted for in PumpWorks' damage chart. Focusing on Column C entitled "event" and Column F entitled "qty," if one adds all amounts in the "qty" column for every "event" entry that indicates "ship," the

total contract MCUs shipped amount to 136.[7] That is the number of MCUs that PumpWorks received for orders placed in accordance with the DSA.  (See Exhibit 17i at line 90 in blue) In addition to MCUs ordered in accordance with the DSA, PumpWorks ordered and PeopleFlo delivered twelve miscellaneous MCUs, including eight MCUs sized at 2x3x13 and four MCUs used as demonstration/cutaway units.  (See Exhibit 17i at line 153 and highlighted in blue) The number of MCUs received by PumpWorks, including those ordered under the DSA and the miscellaneous orders total 148.  PeopleFlo ignores the treatment of miscellaneous orders in a very weak effort to create a dispute about the number of MCUs included in the PumpWorks' damage analysis where none exists.

*Second objection resolved:* There is no discrepancy between the amount of payments shown on the Giessing Accounting and the Wick Verification.  As Giessing explained in creating his totals, he chose to ignore those miscellaneous MCUs for which full payment was made, the logic being that the same amount would be reflected on the payment side as would be reflected on the value of goods side having a net zero effect on the amount of damages.  See Exhibit 15, Giessing Declaration, ECF 472-16 at ¶37, fn. 3.  These net zero transactions cover $28,482 of payments and goods shipped.[8]  And yes, $1,168,970.40 + $28,482 does equal $1,197,457.40— the same as the Wick Verification total of all payments.  Wick is not reporting more or different payments than Giessing. By ignoring the Giessing footnote, PeopleFlo attempts to manufacture a discrepancy that does not exist between the PumpWorks' damage charts.

---

[7] As PeopleFlo appears either unable or unwilling to perform simple mathematical calculations, PumpWorks attaches Exhibit 17i, which color codes Exhibit 17 to show the simple addition that resolves the PeopleFlo objections.

[8] These payments are highlighted in orange on Exhibit 17i in column I starting at line 95.

*Third objection resolved:* PumpWorks clearly credited PeopleFlo for the value of invoices which PumpWorks did not pay. The very invoices about which Mr. Blankemeier complains amount to $69,997.50 and are identified in Exhibit 10 to PumpWorks' motion.[9] PumpWorks included this exhibit to show the source of line items that it included in its charts. See Exhibit 17 at line numbers 17-28, 41, 52-57, 140, 146, 152. These shipments are included in the value of MCUs invoiced and shipped, and have been offset against the total payments.[10] Mr. Blankemeier's suggestion that these invoices should be double counted is wholly without merit.[11]

*Fourth objection resolved:* PeopleFlo has not attacked the reliability of the ERP accounting which was clearly a business record of PumpWorks. Further, the only argument it raises as to the bank records used by Mr. Wick is that some entries did not have the "PeopleFlo" name in them. However, as shown in fn 6 above, PeopleFlo's own chart as created by Mr. Shafer, admits receipt of these payments. Therefore, PumpWorks has undisputedly established that it paid $1,197,454 to PeopleFlo.

*The Final Accounting:* PeopleFlo never says that it did not receive $1,197,454 from PumpWorks, nor could it truthfully make such a statement. All that remains to finalize damages is to deduct the allowable set-offs. These, as shown in the charts, are derived solely from PeopleFlo's own documents. PeopleFlo not challenge the accuracy and reliability of any of the documents on which PumpWorks relies to prove the value of goods received. PeopleFlo's

---

[9] Those invoice numbers are 984, 985, 986, 988, 994, 995, 1003, 1007, 1011, 1012, 1014, 1015, 1016, 1018, 1020, 1023, 1024, 1025, 1027, 1028, 1030, 1031.

[10] These setoffs are highlighted in yellow on Exhibit 17i and included in the sum Total Value of MCUs invoiced and shipped (set-offs).

[11] Mr. Blankemeier suggests that interest should be calculated on these unpaid invoices, a fairly ridiculous suggestion as PeopleFlo was always in possession of more money than PumpWorks owed. He notably does not cite any source for permitting such interest nor does he state an amount that should be included in this set-off.

arguments that some invoices were overlooked, as shown above, is nonsense as each of these invoices is listed in the Giessing Accounting and in Exhibit 17. There is no allegation that any of those business records have been altered or modified, nor is there any argument that additional invoices or packing slips should be considered. The value of goods shipped by PeopleFlo is $507,250.50.

PeopleFlo owes PumpWorks $690,203.90. [12]

### III. PumpWorks is Entitled to Prejudgment Interest as a Matter of Law

In Illinois, an award of prejudgment interest is appropriate where it is "authorized by statute, agreement of the parties [,] or warranted by equitable considerations." *Tully v. McLean*, 948 N.E.2d 714 (1st Dist. 2011). Section 2 of the Illinois Interest Act allows for prejudgment interest at a rate of 5% per annum per year "for all moneys after they become due on any bond, bill, promissory note, or other instrument of writing." 815 ILCS 205/2.4 "An instrument of writing is one which establishes a creditor-debtor relationship, which includes contracts." *Califf & Harper, P.C. v. Energy Data Res., LLC*, No. 4:18-cv-04169-SLD-JEH, 2019 WL 13203958, at *2 (C.D. Ill. Sept. 3, 2019) (internal quotation marks and citation omitted). "Damages must also be fixed and easily ascertainable in order for prejudgment interest to be awarded pursuant to section 2." *Id.* (awarding prejudgment interest for breach of contract claim); *SolAmerica Energy Services, LLC v. J-Hulick Electric I, Inc.*, Case No. 3:22-cv-50391, 2024 WL 5681672, * 4 (N.D. Ill. Feb. 13, 2024) (awarding prejudgment interest in breach of contract claim).

---

[12] Exhibit 17i shows the math with respect to the total value of MCUs invoiced and shipped, highlighted in yellow, amounting to $507,250.50 and the total value of PumpWorks' payments highlighted in orange, amounting to $1,197,457.40. The difference, amounting to $ 690,203.90, reflects the value of overpayments PumpWorks made for MCUs ordered but never delivered—in other words the amount of PumpWork's damages.

PumpWorks notified PeopleFlo and the Court that it was seeking prejudgment interest in the amount of 5% per annum pursuant to 815 ILCS 205/2, from May 1, 2020. See PumpWorks Opposed Motion for Leave to File Evidence to Prove Up Damages, ECF 462, at 2 & 5. PeopleFlo's argument that PumpWorks failed to justify its claim for prejudgment interest starting from May 1, 2020. As PeopleFlo well knows, the Court determined that PumpWorks was in breach of the DSA after April 2020, when it intentionally chose not to deliver any further MCUs within a reasonable time.  The "last shipment of MCUs was April 17, 2020. PeopleFlo has breached the terms of the DSA with the implied provision of a reasonable timeline for delivery." Memorandum Opinion and Order, ECF 405 at 74.  Starting prejudgment interest on the overpayments retained starting in May 2020 is an obviously reasonable starting point.

Date: September 29, 2025

Respectfully submitted,

**PUMPWORKS, LLC**

By: /s/ Monica L. Thompson

Monica L. Thompson (ARDC No. 6181455)
mthompson@tottislaw.com
Keith Stolte (ARDC No. 6244848)
kstolte@tottislaw.com
**TOTTISLAW**
401 N. Michigan, Suite 530
Chicago, IL  60611
Tel: (312) 527-1400
Fax: (312) 589-7192

*Attorneys for DXP Enterprises, Inc.,
and PumpWorks, LLC*

15

## **CERTIFICATE OF SERVICE**

I certify that on September 29, 2025, I electronically filed the foregoing document with the Clerk of the Court, using the CM/ECF system, which sent notification of such filing to all counsel of record in this matter.

/s/ Monica L. Thompson